In Demand Electronic Court Reporting, Inc.        www.InDemandReporting.com        (773) 239-6008

Page 1

1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF ILLINOIS

3              SPRINGFIELD DIVISION

4    ---------------------------------------------------------

5    Julie Swanson, et al.,

6           Plaintiffs,

7       vs.                    Case Number 3:19-CV-03220

8    Murray Bros., LLC, et al.

9           Defendants.

10   and

11

12   Margarita A. Martinez

13          Plaintiff,

14      vs.                    Case Number 3:20-CV-03083

15

16   Jimmie Dale Cox, et al.,

17          Defendants.

18   ---------------------------------------------------------

19    Remote Videoconference Deposition of Lee Alan Murray

20              September 10, 2020

21

22          -Video Recorded Remotely by-

23          In Demand Video Court Reporting

24       216 South Jefferson Street, Suite 103

25              Chicago, Illinois 60661       EXHIBIT A

In Demand Electronic Court Reporting, Inc        www.InDemandReporting.com        (773) 239-6008

Page 2

1                          APPEARANCES

2

3          For Plaintiff Margarita Martinez:

4

5                    Timothy J. Deffet

6          The Law Office of Timothy J. Deffet

7          5875 North Lincoln Avenue, Suite 231

8                  Chicago, Illinois 60659

9

10         For Plaintiffs Swanson and Elmore:

11

12                     Sean Driscoll

13               Clifford Law Offices PC

14          120 N. LaSalle Street, Suite 3100

15                 Chicago, Illinois 60602

16

17         For Defendant Piramal Glass USA, Inc:

18

19                     Tucker Blaser

20                     Brad Woodson

21              Brown & James Law Firm

22                   Richland Plaza 1

23          525 West Main Street, Suite 200

24              Belleville, Illinois 62220

25

Page 3

1                    APPEARANCES (Continued)

2

3      For Defendant Murray Bros., LLC, and Jimmie Dale Cox:

4

5                      Devin M. Taseff

6                     Nathan Henderson

7            Heyl, Royster, Voelker & Allen, PC

8            300 Hamilton Blvd., 1st Floor

9                   Peoria, Illinois 61601

10

11       For Defendant Larry Murray Trucking, Inc.:

12

13                      James Wilke

14                     Wilke & Wilke

15                   2708 Olive Street

16              Beaufort, Missouri 63013

17

18

19

20

21

22

23

24

25

Page 4

1                          EXAMINATION INDEX

2

3      DIRECT              CROSS              REDIRECT          RECROSS

4      8, 169              226                245, 272          --

5

6                            EXHIBIT INDEX

7

8      EXHIBIT NUMBER                              PAGE NUMBER

9      1   -                                       10

10     2   -                                       59

11     3   -                                       75

12     4   -                                       79

13     5   -                                       143

14     6   -                                       156

15     PX C -                                      177

16     PX D-                                       198

17

18

19

20

21

22

23

24

25

Page 5

1        THE RECORDER:  Good morning.  We are now on

2   the record, Thursday, September 10th, 2020.  The time

3   is 10:04 a.m.  By agreement of all parties, we are

4   convened via remote videoconference for the

5   video-recorded deposition in the matters of Julie

6   Swanson, et al., versus Murray Brothers, LLC, et al.,

7   and Margarita A. Martinez versus Jimmie Dale Cox, et

8   al., Case Nos. 3:19-CV-03220 and 3:20-CV-0383 [sic] in

9   the Central District of Illinois, Central [sic]

10  Division.                                      0:00:38

11        This deposition is being recorded by In

12  Demand Court Reporting, located at 216 South Jefferson

13  Street, Chicago, Illinois 60661, on behalf of the

14  plaintiff and being taken at the instance of the

15  plaintiff.  The witness today is Lee Alan Murray.  0:00:51

16        Mr. Murray, my name is Allyson Pritchard, and

17  I am a notary public and the video recording device

18  operator for this deposition.  At this time, would you

19  please raise your right hand for the oath?      0:00:59

20              (Witness sworn.)

21        THE RECORDER:  All right.  Will the attorneys

22  please state their appearances for the record?  0:01:08

23        MR. DEFFET:  Timothy Deffet for Plaintiff

24  Martinez.

25        MR. DRISCOLL:  Sean Driscoll on -- on the

Page 6

1    Swanson -- on behalf of the Swanson Plaintiffs.          0:01:19

2              MR. BLASER:  Tucker Blaser --

3              MR. HENDERSON:  Nathan --

4              MR. BLASER:  Oh, go ahead, Nate.

5              MR. HENDERSON:  All right.  Nathan Henderson

6    on behalf of Murray Brothers, LLC, and Jimmie Dale Cox.   0:01:24

7              MR. BLASER:  Tucker Blaser on behalf of

8    Piramal Glass USA, Inc., in both the Swanson and

9    Martinez matters.

10             MR. WILKE:  James Wilke for Larry Murray

11   Trucking.                                                 0:01:41

12             THE RECORDER:  Is that everyone?

13             MR. DEFFET:  I -- I believe there's other

14   people, but I'm not sure they all have to identify

15   themselves if they're not --                             0:01:54

16             THE RECORDER:  Just whoever's on the call

17   needs to be --

18             MR. DEFFET:  Yeah, yeah --

19             THE RECORDER:  -- identified.

20             MR. DEFFET:  -- Brad, can you identify

21   yourself, please?                                         0:02:00

22             MR. WOODSON:  Brad Woodson on behalf of

23   Piramal Glass USA, Inc., for both Swanson and Martinez.

24             THE RECORDER:  Okay.

25             MR. TASEFF:  Devin Taseff on behalf of Murray

Page 7

1   Brothers, LLC, Jimmie Dale Cox, Margarita Martinez.        0:02:11

2           MR. DEFFET:  I think we got an echo back.

3   Maybe you guys are too close to each other or someone's

4   too close to someone or -- Devin?

5           Am I the only one that heard that?        0:02:26

6           THE RECORDER:  I heard that too.

7           MR. HENDERSON:  I don't think Devin's going

8   to be speaking much.  Am I coming across okay?

9           THE RECORDER:  Yeah, you're coming across.  I

10  just need everyone who is here to be identified for the

11  sake of the record.        0:02:37

12          MR. BLASER:  I think you --

13          MR. DEFFET:  I think --

14          MR. BLASER:  -- got everybody.

15          THE RECORDER:  Okay.

16          MR. DEFFET:  Allyson?  Just --

17          THE RECORDER:  Yes?        0:02:42

18          MR. DEFFET:  -- for -- did she -- oh, sorry.

19  Never mind, never mind.  You're --

20          THE RECORDER:  Okay.

21          MR. DEFFET:  -- the court reporter.  I'm

22  sorry.  I --

23          THE RECORDER:  All right.

24          MR. DEFFET:  -- think that's everyone, right?        0:02:49

25          THE RECORDER:  That completes the required

In Demand Electronic Court Reporting, Inc.          www.InDemandReporting.com                    (773) 239-6008

Page 8

1    information and we can proceed.

2          MR. DEFFET:  Okay.  Let the record reflect

3    that this is the agreed deposition of Mr. Lee Murray as

4    a fact and 30(b)(6) witness for Murray Brothers, LLC,

5    pursuant to the August 6, '20 agreed notice between the

6    parties.                                                 0:03:13

7                     DIRECT EXAMINATION

8    BY MR. DEFFET:

9          Q.   Good morning, Mr. Murray.  How are you today?

10         A.   Fine, sir.  How are you?                        0:03:19

11         Q.   Good.  Okay.  My goal is not to drag this

12    out.  I'm going to try to get as much information as

13    possible, but we do have a lot of stuff to go through.    0:03:26

14         I'm anticipating with my questions and the

15    other attorneys' questions, this could last somewhere

16    between three to four hours.  Okay?

17         A.   Okay.                                           0:03:37

18         Q.   If you need a break at any time, I'm sure

19    your attorneys told me, just please wait till I finish

20    asking my questions and answer the last question.

21         All right.  You can take a break any time you

22    want.  If you need to use the bathroom, get a drink of

23    water, please ask me and I'll -- I'll grant it at any

24    time.  Okay?

25         A.   Sounds great.                                   0:03:56

In Demand Electronic Court Reporting, Inc.          www.InDemandReporting.com                    (773) 239-6008

Page 9

1      Q.    Okay.   This -- this -- this case is taken

2    pursuant to notice, agreed -- according to Federal

3    Rules of Civil Procedure and Rules of Evidence.          0:04:07

4           As your attorneys probably told you, I know

5    this is a video deposition, okay, but it's possible

6    that only a written transcript may be used of this, not

7    a video, so you have to keep your voice up so the court

8    reporter can take -- can take this down later on a

9    written transcript.                                      0:04:26

10          And even though you are on video, please try

11   to refrain from shrugging your shoulders, uh-huhs when

12   you answer a question, because again, even though this

13   is being videotaped, it may only be used as a written

14   record later.   Okay?                                    0:04:39

15     A.    Yes, sir.

16     Q.    Okay.   Okay.   Could you please state your

17   full name for the record?

18     A.    Lee Alan Murray.                                 0:04:53

19     Q.    What is your home address?

20     A.    500 Murray Place, Desloge, Missouri 63601.

21     Q.    What is your business address?

22     A.    3548 Rosener Road, Farmington, Missouri

23   63640.                                                   0:05:11

24     Q.    What was your cell phone number at the time

25   of this incident in April 2018?

In Demand Electronic Court Reporting, Inc          www.InDemandReporting.com                    (773) 239-6008

Page 10

1          A.    314-422-9644.

2          Q.    What is your date of birth?                    0:05:24

3          A.    8/14/1959.

4          Q.    Did you receive a copy of the deposition

5     notice in this case?

6          A.    Yes, I did.

7          Q.    Okay.  You've reviewed that?                    0:05:39

8          A.    No, what -- what are you talking about?

9          (Exhibit No. 1 marked for identification.)

10    BY MR. DEFFET:

11         Q.    I'm going to pull it up.  I'm going to mark

12    Exhibit 1, even though it's not marked in advance, as

13    the August 6, 2020, notice of deposition.  I'm going to

14    pull it up on the screen, okay?                           0:05:54

15         A.    Oh --

16         Q.    Bear with me.

17         A.    -- okay, yeah.  I -- I probably got that,

18    yes.  I got that.

19         Q.    Okay.  Can you see this on the screen?

20    Amended Notice --                                         0:06:01

21         A.    Yes.

22         Q.    -- of Corporate Deposition?

23         A.    Yes, sir.

24         Q.    Okay.  And you've seen this document before?

25         A.    Yes.                                           0:06:10

Page 11

1        Q.    It's three pages?

2        A.    Yes.

3        Q.    Okay.   And you see paragraph 1 here on page

4    2, under subject matters for inquiry?                          0:06:20

5        A.    Yes.

6        Q.    Okay.   And in summary, that talks about the

7    person most knowledgeable regarding safety procedures

8    and operations at the time of the collision at the

9    company?                                                        0:06:31

10       A.    Yes.

11       Q.    Okay.   The person that deals with driver

12   manuals, company rules, the logs, safety manuals,

13   safety videos, keeping all of the data from the trucks,

14   things like that?                                               0:06:46

15       A.    Yes, sir.

16       Q.    Okay.   Number 2 talks about the hiring

17   process at Murray Brothers, LLC, including Jimmie Dale

18   Cox's employment, contract, training, his logs, all

19   that kind of stuff, right?                                      0:07:00

20       A.    Yes, sir.

21       Q.    Okay.   Number 3 talks about all maintenance,

22   inspection, employment, and personnel and payroll files

23   for the defendant?   You read that?                             0:07:12

24       A.    Yes.

25       Q.    Number 4 talks about any and all written

Page 12

1   agreements, contracts, lease agreements, invoices,

2   letters of understanding, transportation agreements,

3   broker agreements between all of the parties in this

4   litigation?                                        0:07:27

5          Did -- did you review that?

6      A.   I have.

7      Q.   Okay.  So that includes Murray Brothers, LLC,

8   Larry Murray Trucking, Piramal Glass USA.  You -- you

9   have -- you noted that I'm asking for all those things

10  between any of those parties.  Correct?            0:07:44

11     A.   I do.

12     Q.   Number 5 is rules and regulations regarding

13  maintenance, inspection, policy manuals,

14  correspondence, the reporting of incidents involving

15  Jimmie Dale Cox?                                   0:07:59

16         You saw that?

17     A.   Yes.

18     Q.   And Number 6 is all phone records belonging

19  or in use by the defendant, Jimmie Dale Cox, on the

20  date of the occurrence?                            0:08:12

21     A.   Yes.

22     Q.   Okay.  Now, I don't want to -- any

23  conversations with your attorneys, so I'm only

24  interested really in documents that you've reviewed.

25  Conversations with your attorneys are privileged.

Page 13

1    Okay?

2              So we're going to go through some of the

3    things that you reviewed today, but what documents did

4    you review in preparation for this deposition?        0:08:37

5              MR. HENDERSON:  I'm going to object to

6    attorney-client privilege.  If you want to limit that

7    to specific documents, we'll let him answer, but he's

8    not just going to list off documents that -- that we

9    shared with him.                                        0:08:45

10             MR. DEFFET:  Yes, he is going to list off

11   documents, and that's not a privileged question.

12   BY MR. DEFFET:

13        Q.   So please answer the question, Mr. Murray.    0:08:51

14        A.   I looked over all the stuff in the

15   discoveries.

16        Q.   Okay.  What -- I'm not trying to trick you or

17   anything, but I need to know what you reviewed.  So can

18   we please try to remember what you reviewed in

19   preparation for this deposition?                        0:09:08

20        A.   I reviewed like the safety policy, accident

21   policy, drug policy, invoices, annual inspections,

22   Jimmie Cox's pay sheets, credit cards from Multi

23   Service, lease agreements, Piramal Glass transportation

24   service agreement, accident -- the accident scenes, the

25   accident reports, Jimmie's file.  And the -- yeah, the

Page 14

1    traffic report.   The crash report.

2         Q.   And again, I don't want any conversations

3    with your attorneys.   But you supplied answers to the

4    discovery in this case and you certified that the

5    discovery was correct.   Right?                              0:09:58

6         A.   Yes.

7         Q.   Okay.   And you're the one that gave this

8    information to your attorneys in the documents.

9    Correct?

10        A.   Yes.                                               0:10:07

11        Q.   Okay.   And again, I'm not trying to put words

12   in your mouth, but I took your brother's deposition,

13   who's part of the two-member LLC of Murray Brothers,

14   LLC.   Correct?                                              0:10:17

15        A.   I guess you did.   Yes.

16        Q.   Okay.   Sorry.   That's a bad question.

17             What I'm trying to say is Lee -- you and your

18   brother are part of the two-member LLC, Murray

19   Brothers, LLC, correct?                                      0:10:32

20        A.   We are.

21        Q.   Okay.   You are the only members, correct?

22        A.   Yes.   That's true.

23        Q.   Okay.   Are there any other officers in the

24   company?                                                     0:10:41

25        A.   No, sir.

In Demand Electronic Court Reporting, Inc.        www.InDemandReporting.com                (773) 239-6008

Page 15

1    Q.    Are there any other employees besides the

2  drivers?

3    A.    Yes.

4    Q.    Okay.  Who are the employees besides the

5  drivers and you two?

6    A.    Janice Neubrand.                                    0:10:56

7    Q.    Okay.  She is an employee of the company?

8    A.    Yes.  She works for Murray Brothers.

9    Q.    Okay, okay.  Is she paid as an employee or

10  she just does work for Murray Brothers?                     0:11:10

11    A.    She does work for Murray Brothers.

12    Q.    Is that her only job?

13    A.    No.  She has an accounting office too.

14    Q.    Okay, okay.  How many drivers did you have on

15  the roster in April 2018?                                   0:11:25

16    A.    Eight.

17    Q.    Do you -- do you know their names?

18    A.    Yes.

19    Q.    Okay.  Could you list them, please?                 0:11:33

20    A.    Jimmie Cox, Charlie Heberlie, Dennis White,

21  Gene Curtman, Terry Moore, Brian Adams.  Shit a city

22  driver.  Danny Howlett.  And Terry Moore.                   0:12:02

23    Q.    Okay.  A couple of those -- I'm sorry.  Could

24  you -- Charlie Heberlie?  Could you -- do you know how

25  to spell his last name?                                     0:12:08

In Demand Electronic Court Reporting, Inc        www.InDemandReporting.com                (773) 239-6008

Page 16

1          A.    H-E-B-E-R-L-I-E.

2          Q.    And someone named Howlett?

3          A.    Danny Howlett.

4          Q.    Could you spell that last name, please?

5          A.    H-O-W-L-E-T-T.                                       0:12:25

6          Q.    Are any of these drivers no longer working

7    for you?

8          A.    Yes.  Charlie Heberlie is not working for me

9    and Danny Howlett is no more longer working for me.

10          Q.    Okay.  What is the reason they're not working

11    for you anymore?                                                0:12:41

12          A.    Charlie Heberlie went and got him a job at

13    Walmart and Danny Howlett retired.

14          Q.    Thank you.  So those topics that I just

15    mentioned in the notice, would you agree that you're

16    the person that's most knowledgeable regarding those

17    matters listed in the notice?                                  0:13:02

18          A.    One of them.  Yes.

19          Q.    Well, who would be the other person?

20          A.    Larry Murray.

21          Q.    Okay.  So when I took your brother's

22    deposition, Larry, it seemed like most of the things he

23    was pointing to you as the person who would have the

24    most knowledge.                                                0:13:21

25                Could you tell me what division, if any, is

Page 17

1   there between the duties you have for Murray Brothers,

2   LLC, and what he has?

3          A.   Well, I -- I more run the day to day

4   operation.  He's more into the billing operations.          0:13:38

5          Q.   Could you break that down a little bit more?

6          A.   Such as what -- what are you asking?

7          Q.   Sure.  So when you say the day to day versus

8   billing, can you be a little more detailed as far as

9   what those job duties are?                                  0:13:53

10         A.   Well, I dispatch the drivers.  I get the

11  return loads.  I get the loads going out.  Take care of

12  the -- any problems they have with the trucks or

13  trailers.  Such as that.                                    0:14:05

14              And he does mostly all the paperwork.

15         Q.   Are -- are you -- when you say you do the

16  dispatch, are you the one actually physically

17  dispatching the -- the drivers?

18         A.   I do.                                           0:14:17

19         Q.   Okay.  Have you done that the whole time the

20  -- the company's been in existence?

21         A.   I have not.

22         Q.   Were you doing it in April 2018?               0:14:26

23         A.   I was.

24         Q.   Okay.  So you've been designated by Murray

25  Brothers to speak on its behalf in respect to hiring

Page 18

1   and screening of employees.  Correct?                    0:14:43

2        A.   Yes.

3        Q.   You've been designated by Murray Brothers,

4   LLC, to talk about safety and accident prevention and

5   reporting?

6        A.   Yes, sir.                                       0:14:53

7        Q.   You've been designated by Murray Brothers,

8   LLC, for this deposition for driver supervision and

9   inspection of logs?

10        A.   Yes.

11        Q.   And who designated you to speak on behalf of

12   Murray Brothers, LLC?                                    0:15:09

13        A.   Who designated me?

14        Q.   Yes.  I know it sounds like you're a

15   two-member organization, but did you have a discussion

16   where you and your brother stated you would be the

17   person to testify and you are the most knowledgeable?    0:15:24

18        A.   No, sir.  No, we did not discuss that at all.

19   They just sent me the deposition and said I had to be

20   here.

21        Q.   Okay.  But you agree you are the person most

22   knowledgeable on the topics listed in the notice, not

23   your brother?                                            0:15:37

24        A.   Probably a majority of it, yes.

25        Q.   Okay.  Is there anything in the notice that

Page 19

1    you do not think you have the personal knowledge of the

2    company?

3        A.   Well, when we first started out, he was more

4    in charge than I was of this stuff.                      0:15:52

5        Q.   When you first --

6        A.   Or during --

7        Q.   -- started the company?

8        A.   Yes, sir.

9        Q.   Okay.  Well, let's just say at the time of

10   this incident in April 2018, were you the person most

11   knowledgeable regarding the topics listed in the

12   notice?                                                  0:16:04

13       A.   I would say so, yes.

14       Q.   Okay.  Are there any areas regarding the

15   hiring and the screening of employees that you are not

16   knowledgeable about?                                     0:16:21

17       A.   No.

18       Q.   Are there any areas regarding safety and

19   accident prevention and reporting that you are not

20   knowledgeable?

21       A.   Such as what are you asking?                    0:16:35

22       Q.   Are -- are there any areas you feel you are

23   not qualified regarding safety and accident prevention

24   and reporting that you are not knowledgeable about?

25            MR. HENDERSON:  I'm just going to object as

In Demand Electronic Court Reporting, Inc.          www.InDemandReporting.com                    (773) 239-6008

Page 20

1   vague.                                                    0:16:46

2          THE WITNESS:  I mean, I'm pretty well

3   knowledgeable about it.

4   BY MR. DEFFET:

5      Q.   Are there any areas regarding driver

6   supervision and inspection of logs that you are not

7   knowledgeable?                                            0:16:59

8          MR. HENDERSON:  Objection.  Vague, calls for

9   speculation.

10         THE RECORDER:  I just -- whoever is doing

11  these objections, you're coming up as the phone number,

12  and if you could like say who you are before you do it.   0:17:11

13         MR. HENDERSON:  Any objection from the phone

14  number is going to be Nathan Henderson.

15         THE RECORDER:  Okay.  Thank you.

16         MR. DEFFET:  Can you write your name in the

17  thing if it's -- if it's not already done, please?        0:17:23

18         MR. HENDERSON:  I don't know if I can or not.

19         MR. DEFFET:  You can.  Why don't you ask

20  somebody -- you -- you can just write it if it's --

21  unless it's --

22         MR. DRISCOLL:  It's there.

23         MR. BLASER:  It's there.                            0:17:33

24         MR. DRISCOLL:  His name's on -- his name's on

25  the screen.

In Demand Electronic Court Reporting, Inc          www.InDemandReporting.com                    (773) 239-6008

In Demand Electronic Court Reporting, Inc.        www.InDemandReporting.com                    (773) 239-6008

Page 21

1         MR. DEFFET:  Oh, that's what I'm trying to

2  qualify.  I don't see it.  I see a number.  Okay.        0:17:38

3         MR. DRISCOLL:  I see it --

4         THE RECORDER:  And --

5         MR. DRISCOLL:  I see a name.

6         THE RECORDER:  And there's a name --

7         MR. DEFFET:  Okay, that's --

8         THE RECORDER:  -- and --

9         MR. DEFFET:  -- all right.                          0:17:41

10        THE RECORDER:  There's a name and the phone

11 number, and I'm -- just like when he objects, the phone

12 number is what comes up.

13        MR. HENDERSON:  So we -- we dialed in through

14 a phone number so that we wouldn't have different audio

15 feeds coming through at the same time, which is why you

16 heard the echo earlier, so we're all using --           0:17:54

17        THE RECORDER:  Okay.

18        MR. HENDERSON:  -- the same phone.

19        THE RECORDER:  All right.  Got it.

20        MR. DEFFET:  Okay.  Okay.  All right.  If --

21 if she's having a little bit of an issue -- if you

22 don't mind, maybe you can say Nathan, I'm objecting,

23 blah, blah, blah?                                        0:18:11

24        Is that okay with you guys?

25        MR. HENDERSON:  I will -- I will try to

Page 22

1    remember that in the future.

2          MR. DEFFET:  If -- if not, just don't worry

3    about it.  I'll move on.  So I think there's a pending

4    question.

5          Allyson, can we repeat that question, please?    0:18:22

6          THE RECORDER:  Yes.  Just give me one second.

7               (Recording replayed.)

8          THE RECORDER:  Not far enough.               0:18:43

9               (Recording replayed.)

10         THE RECORDER:  Was that it?

11         MR. DEFFET:  I think it was the next one

12   actually.

13         THE RECORDER:  Next one?  Sure.            0:19:03

14              (Recording replayed.)

15         THE RECORDER:  There you go.

16         THE WITNESS:  I would say --

17   BY MR. DEFFET:

18       Q.   Okay --

19       A.   -- no.

20       Q.   -- please answer the question.

21       A.   No.                                    0:19:27

22       Q.   Okay.  Is there anyone else at the company

23   that has more knowledge about hiring and screening of

24   employees?

25       A.   No.

Page  23

1      Q.    Is there anyone else at Murray Brothers, LLC,

2    that has more knowledge about safety and accident

3    prevention and reporting?                                    0:19:45

4      A.    Myself and Larry.

5      Q.    Is Larry more knowledgeable about safety and

6    accident prevention and reporting?

7      A.    I'd say about 50/50.                                 0:19:56

8      Q.    But you've been designated to answer the

9    questions today.  You believe that you have the

10   knowledge to do it, correct?

11     A.    I hope so.

12     Q.    Okay.  You said that your brother's

13   responsible for billing, so that doesn't really seem

14   like that would be his MO; it would be your MO.

15   Correct?                                                     0:20:14

16     A.    What do you mean by MO?

17     Q.    Meaning your job responsibility for Murray

18   Brothers, LLC, not your brother.

19     A.    My job responsibilities, like the day to day

20   operations and taking care of the drivers and trucks.

21   Yes.                                                         0:20:29

22     Q.    Okay.  And that includes being knowledgeable

23   -- the most knowledgeable at the company regarding

24   safety and accident prevention and reporting.  Correct?     0:20:37

25            MR. HENDERSON:  Objection --

Page 24

1          THE WITNESS:  I --

2          MR. HENDERSON:  -- asked and answered.

3   Several times --

4          THE WITNESS:  I don't know about the most,

5   but yes.

6   BY MR. DEFFET:

7      Q.   Well, if you're not, then should we be

8   deposing your brother, not you, right now?        0:20:46

9      A.   I'm --

10     Q.   You --

11     A.   No, I mean --

12     Q.   -- you've been designated -- you've been

13  designated --

14     A.   I'm -- I -- I --

15     Q.   -- to answer the questions.  So if you don't

16  know the answers to these questions, then we should be

17  deposing your brother.                            0:21:05

18          Your brother said he was not responsible for

19  this.

20          MR. HENDERSON:  If we can get on to the

21  questions, we'll find out if he knows the answers.

22          THE WITNESS:  Yes.                         0:21:13

23          MR. DEFFET:  No.  That's not how a -- a

24  30(b)(6) deposition works.  A 30(b)(6) --

25          MR. HENDERSON:  He --

Page 25

1            MR. DEFFET:  -- deposition -- let me speak.

2    You put them in the notice.  It's listed in the notice.        0:21:23

3            And you specifically stated you wanted Lee

4    Murray to answer these questions.  And that's why he's

5    in the seat right now.  So I'm not going to have him

6    answer questions where he's waffling on whether he says

7    he's the 30(b)(6).  So he needs to answer definitively

8    that he is the 30(b)(6) as noticed.

9            MR. HENDERSON:  Okay.

10   BY MR. DEFFET:

11       Q.   So once again, are you the person responsible

12   for safety and accident prevention and reporting for

13   Murray Brothers, LLC?                                          0:21:55

14       A.   Yes.

15       Q.   And you are the person most knowledgeable for

16   safety and accident prevention and reporting at Murray

17   Brothers, LLC.

18       A.   Yes.                                                  0:22:04

19       Q.   You are the most -- you are the person that

20   has the most knowledge about driver supervision and

21   inspection of logs for Murray Brothers, LLC.

22       A.   Yes.                                                  0:22:14

23       Q.   You have full authority to speak on behalf of

24   Murray Brothers, LLC, with respect to hiring and

25   screening of employees.

Page 26

1          A.    I do.

2          Q.    You have full authority to speak on behalf of

3     Murray Brothers, LLC, in regard to safety and accident

4     prevention and reporting.                                 0:22:29

5          A.    Yes.

6          Q.    You have full authority to speak on behalf of

7     Murray Brothers, LLC, with respect to driver

8     supervision and inspection of logs.

9          A.    Yes.                                           0:22:40

10         Q.    You understand that the answers you will give

11    to these questions will be on behalf of Murray

12    Brothers, LLC.

13         A.    I do.

14         Q.    Do you understand that all of the answers you

15    will give to these questions will represent all of the

16    information available to Murray Brothers, LLC?          0:22:57

17         A.    Yes.

18         Q.    You are aware that the answers you will give

19    to these questions will be binding upon Murray

20    Brothers, LLC.

21         A.    Yes.                                           0:23:09

22         Q.    Do you agree the answers you will give to

23    these questions will be binding upon Murray Brothers,

24    LLC?

25         A.    Yes.

Page 27

1     Q.   Are you fully prepared to speak with respect
2  to hiring and screening of employees?                    0:23:23
3     A.   Yes.
4     Q.   Are you fully prepared to speak regarding
5  safety and accident prevention and reporting?
6     A.   Yes.                                              0:23:33
7     Q.   Are you fully prepared to speak with respect
8  to driver supervision and inspection of logs?
9     A.   Yes.
10    Q.   Okay.  Have you testified under oath before
11 today?                                                    0:23:44
12    A.   I have not.
13    Q.   You have never given a deposition before?
14    A.   I have not.
15    Q.   Okay.  I know we've briefly touched on this,
16 but is there anything you don't understand about the
17 deposition rules that we've gone over?                    0:23:57
18    A.   Well, I mean, it's the first time I've ever
19 done anything like this.  I've never been in court for
20 nothing.
21    Q.   Okay.  That's fair.  I'll move on.                0:24:07
22         Are you a member of any professional
23 organizations?
24    A.   What do -- what do you -- well, like what are
25 you talking about?

Page  28

1      Q.    For example, are you aware of the North

2   American Transport Safety Institute?                    0:24:20

3      A.    The what now?

4      Q.    The North American Transport Safety

5   Institute?

6      A.    No, I'm not a member.

7      Q.    Okay.  Is Murray Brothers a member?          0:24:33

8      A.    No.

9      Q.    Okay.  Is Murray Brothers a member of the

10  ATA?

11     A.    No, we are not.

12     Q.    Who is the certified director of

13  safety/certified safety supervisor for Murray Brothers,

14  LLC?                                                    0:24:48

15     A.    I guess that would be me.

16     Q.    You guess or you are?

17     A.    I am.

18     Q.    What is your prior work and education before

19  getting into the trucking industry, if you can briefly

20  describe to me, please?                                0:25:03

21     A.    That's basically all I've done all my life.

22     Q.    Okay.  So have you been driving since --

23  since how long?

24     A.    Since I was 20 years old.

25     Q.    Okay.  So you obviously have experience as a

In Demand Electronic Court Reporting, Inc.          www.InDemandReporting.com                    (773) 239-6008

Page 29

1    driver before you were an owner of the -- of the

2    company, correct?                                    0:25:20

3        A.   Yes, sir.

4        Q.   Okay.  Did you have experience with this

5    route that the driver, Mr. Cox, took before this

6    incident happened?

7        A.   I have been on it before, yes.              0:25:31

8        Q.   Okay.  And are you the one that dispatched

9    him on this route?

10       A.   I am that.

11       Q.   Okay.  And what was the total mileage -- if

12   he completed his trip, what have been -- what would

13   have been the total mileage for him for that day?     0:25:43

14       A.   491 miles.

15       Q.   And how many hours do you think that would

16   take?

17       A.   That's about a 9-hour trip.

18       Q.   Okay.  Is that over the hours of service?    0:25:56

19       A.   No, sir, it is not.

20       Q.   Okay.  Do you have training on safety and

21   certification?

22       A.   Well, I have experience.  Like I said, I've

23   been driving since I was 20.                          0:26:09

24       Q.   Okay.

25       A.   Training.  I've never been through a training

Page  30

1    course, if that's what you're asking.

2         Q.   Yes.  So never been through a training or

3    certification course in safety?                    0:26:18

4         A.   I have not.

5         Q.   Do you have training in accident prevention

6    or reconstruction?

7         A.   I've never been to no training at all, sir.   0:26:28

8         Q.   So that's a no?

9         A.   That's a no.

10        Q.   Okay.  Do you have familiarity with the

11   Federal Motor Carrier Safety Administration?       0:26:36

12        A.   I do.

13        Q.   Are you familiar with safersys.org?

14        A.   With what, sir?

15        Q.   Safersys, S-A-F-E-R-S-Y-S, dot org?       0:26:49

16        A.   No.

17        Q.   Does Murray Brothers, LLC, have a safety

18   program?

19        A.   Yes.  We have a safety program.

20        Q.   What is the safety program?

21        A.   We just have a guideline that -- for policy

22   in place.                                          0:27:08

23        Q.   And what is that policy?

24        A.   It just discussed about accidents and stuff.

25   Safety.

Page 31

1      Q.   Is -- is that a printed document or an oral

2   policy?

3      A.   It's a printed document.                         0:27:24

4      Q.   Okay.  Is that something that you produced in

5   discovery with -- with your attorneys?  Again, I don't

6   want a discussion.  I just want to know if that is a

7   document you produced.                                   0:27:32

8      A.   Yes, it is.

9      Q.   Okay.  I'm going to try to see if I can pull

10  up a few documents here.  If you'll bear with me, okay?

11     A.   Fine.                                            0:27:41

12     Q.   Give me one second.  Can you see this on the

13  screen, Mr. Murray?

14     A.   Yes.  I do see that.                             0:28:30

15     Q.   Okay.  This is called Missouri Department of

16  Transportation Safety Compliance Manual?

17     A.   Yes, sir.

18     Q.   Is this one of the documents you're talking

19  about?                                                   0:28:40

20     A.   It is.

21     Q.   Okay.  And is this something that every

22  driver is given?

23     A.   It is.

24     Q.   Okay.  And do you get a new -- does the

25  Missouri Department of Transportation produce a new one

Page 32

1    every year?                                         0:28:55

2         A.   Well, we've got a new one from CDL

3    Consultants.  We've got a consulting company that helps

4    us with our safety now.

5         Q.   Okay.  That was after the collision?

6         A.   No.  We had -- we had them before that, sir.    0:29:11

7         Q.   Oh, I'm sorry.  Okay.  Okay.  So in 2018, you

8    had -- who was your safety consultant?

9         A.   CDL Consultants out of Libertyville,

10   Illinois.

11        Q.   What did they do for Murray Brothers, LLC?    0:29:27

12        A.   They keep an eye on all of our safety, all of

13   our accidents, logs, make sure the drivers are all --

14   are okay.  They're just a consulting company to help

15   us.                                                 0:29:40

16        Q.   And how long have you used that?

17        A.   I think we got them back in 2012, I believe.

18   2012, 2013.

19        Q.   Okay.  I haven't seen them mentioned in

20   discovery answers.  So are there -- are you saying

21   they're the ones that helped you distribute this --

22   this safety manual to your drivers?                 0:30:09

23        A.   Yes.  They have -- they have printed safety

24   manuals for us to give to our drivers.  Yes.  They

25   have.  In the past.

Page  33

1        Q.    Okay.  So this -- this one --

2        A.    This one -- one you -- the one you showed me

3   was back in 2011, I believe.  2011 --                      0:30:27

4        Q.    This one -- I -- I think there's another one.

5   I'm going to show you this one first.  But this one

6   says June 2017 --

7        A.    Oh, I --

8        Q.    -- you see that on there, right?              0:30:34

9        A.    We had one before that.  I believe it was a

10  2011.

11       Q.    Okay.  I'm going to pull another one up in a

12  second, but this -- this manual from June 2017 is one

13  that you produced in discovery.  It's 151 pages.

14  Right?                                                     0:30:47

15       A.    Yes.  Yes.

16       Q.    Okay.  And how many years were you giving

17  this manual out?

18       A.    Oh, we probably gave that out about two or

19  three years.                                               0:31:01

20       Q.    Okay.  So in 2018, did you not give a new

21  manual to the drivers?

22       A.    They would've been -- it would've been from

23  -- they probably had the same one.

24       Q.    Okay.  So for the year --                      0:31:17

25       A.    And we don't give -- we don't give them a

Page 34

1    safety manual every year.

2         Q.    Okay.  But a new one's printed every year

3    with new regulations, right?                         0:31:26

4         A.    Well, they get a -- they get one when they

5    come to work and that's usually the one they have.

6         Q.    Yeah, but what I'm saying is there's new

7    regulations, and you're supposed to get a new manual

8    every year to give to your drivers and yourself, right?    0:31:38

9         A.    I guess.  Yes.

10        Q.    You guess, or is that correct?

11        A.    That's correct.

12        Q.    Okay.  Is there a reason why you didn't get a

13   new one for 2018?                                    0:31:53

14        A.    Not that I know of.

15        Q.    Did CDL -- what is the name of the company

16   again?

17        A.    CDL Consultants.

18        Q.    Did they give you one for 2018?

19        A.    Yeah, I mean, they usually print us one and

20   give them to -- we give them to the drivers, yes.  It's

21   not -- it's not -- nothing as big as that one there.    0:32:13

22        Q.    Okay.  I'm going to bring up another document

23   here, so bear with me.  I think that's the one you were

24   talking about.

25             Okay.  So this is the other one, and I

Page 35

1    believe this is the one -- it's 146 pages.  And it's --

2    I think it was described as from 2011, but I'm trying

3    to see if there's actually a date listed on it.          0:32:59

4         I'm sorry.  I'm just scrolling through here

5    quickly to see if there's a date on it, but --

6         A.   Well, I think if you look down there on the

7    -- on the front page, you see that log book down there?

8    It was 2011.  Right there.                               0:33:16

9         Q.   Oh, okay.  I'm sorry.  So you can see where

10   I'm scrolling right now with the mouse?

11        A.   Yes, sir.

12        Q.   That's where you're talking about?            0:33:23

13        A.   Yes, sir.

14        Q.   Okay.  So it says January 15, 2011?

15        A.   Exactly.

16        Q.   Okay.  Do these come out the same time every

17   year or they come out at different times?               0:33:33

18        A.   Probably different times.

19        Q.   Okay.  Do they come out every six months?

20        A.   I guess once a year.

21        Q.   Once a year?  Okay.  So one was June 2017,

22   but this one's January 2011.                            0:33:50

23        A.   Yes.

24        Q.   Okay.  These are the only -- only two safety

25   manuals that were provided in discovery.  Are these the

Page 36

1    only safety manuals that you still have?                    0:34:04

2         A.   Yes, it is.

3         Q.   Okay.  You don't have any more?

4         A.   None that big, no.  We have some from CDL

5    Consultant that's printed off to us.  I give to the

6    drivers and they've signed and said they received.          0:34:18

7         Q.   Okay.  So did Jimmie -- which -- which manual

8    did Jimmie Dale Cox have?

9         A.   Well, he would've had both of them too.

10        Q.   The June 2011 and June 2017?                       0:34:31

11        A.   Yes, sir.

12        Q.   Okay.  Those are the two manuals that he had?

13        A.   Yes, sir.

14        Q.   You didn't have any other manuals?

15             MR. HENDERSON:  Objection.  Objection.

16   Mischaracterizes testimony.  It's Nathan.                    0:34:44

17   BY MR. DEFFET:

18        Q.   Did -- did he have any other manuals besides

19   June 2017, June 2011, Missouri Department of

20   Transportation?

21        A.   He got some from CDL Consultants, sir.            0:34:56

22        Q.   Okay.  Well, why haven't those been produced

23   in discovery then?

24        A.   I thought they was in there.

25             THE WITNESS:  Wasn't they in the binder

Page 37

1    there?                                                        0:35:06

2              MR. HENDERSON:  No -- well --

3              THE WITNESS:  No.

4    BY MR. DEFFET:

5        Q.    These are the only two manuals that were

6    provided in discovery.  You're saying there's

7    additional manuals that were provided to Jimmie Dale

8    Cox?                                                          0:35:16

9        A.    Well, it's some that I got from CDL

10   Consultants.

11       Q.    Do they just email you a PDF and then you're

12   responsible to print it out?

13       A.    Yes.

14       Q.    Okay.  Are you printing out hundreds of pages

15   and giving them to each driver all the time?             0:35:31

16       A.    They're -- like I told you long ago, they're

17   not that thick.  They're just updated.

18       Q.    Oh, you're just saying there's updated pages?

19       A.    Yes.                                                0:35:43

20       Q.    Okay.  Well, June 2011 and '17 are both about

21   140 pages, though.

22       A.    What --

23             MR. HENDERSON:  What -- what's the question,

24   Counselor?                                                   0:35:54

25             THE WITNESS:  Yeah.

Page 38

1          MR. DEFFET:  I -- I'm just trying to figure

2   out what exactly has been produced, because the only

3   two manuals I got were 140 pages for June 2017 and

4   about the same for June 2011.                        0:36:05

5          So if there's -- if there's amendments or

6   only a few pages, why weren't they produced in

7   discovery?

8          MR. HENDERSON:  We will certainly go back and

9   look and see if we have any amendments.  We had not

10  found those in -- in review of the documents.        0:36:22

11         We've given you what we have.  So if we have

12  them, we will give them to you.

13         MR. DEFFET:  Well, we're taking his

14  deposition now and we've been in litigation for a long

15  time, but I'll move on.                              0:36:33

16  BY MR. DEFFET:

17     Q.   So are you keeping these documents, Mr.

18  Murray?

19     A.   Yes.  We keep these documents.

20     Q.   Where do you keep --

21     A.   We --

22     Q.   -- them?                                     0:36:41

23     A.   We keep the safety manuals in a file cabinet.

24     Q.   Do you keep them on a computer?

25     A.   No, sir.  We don't do very much stuff by

Page 39

1   computers.

2       Q.   Okay.  So all the safety manuals you had were

3   kept in a file cabinet?                              0:36:58

4       A.   Yes, sir.

5       Q.   Okay.  Why were they not provided to your

6   attorneys?  Again, I don't want a discussion.  I just

7   want to know why you didn't provide these other manuals

8   to your attorneys.                                   0:37:07

9            MR. HENDERSON:  I -- I think there may be a

10  -- a difference in language here.  When -- when you're

11  saying manuals, he's referring to these two that he has

12  in front of him.                                     0:37:16

13           MR. DEFFET:  Yeah, they're --

14           MR. HENDERSON:  Those --

15           MR. DEFFET:  -- safety manual.

16           MR. HENDERSON:  Right.  But he believes -- I

17  don't think he's incorporating these updates in your

18  definition of manuals.                               0:37:25

19           So if we could -- if we could just clear that

20  up for him, maybe he could give you better answers.

21           MR. DEFFET:  There's no clearing up.  It's a

22  safety manual.  I'm using the correct term.          0:37:33

23  BY MR. DEFFET:

24      Q.   So why did you not provide the other safety

25  manuals to your attorneys?

Page 40

1      A.   I guess I'm -- we have the big ones.          0:37:41

2      Q.   Okay.  So those are the only two that you had

3  in the cabinet.

4      A.   Yes.

5      Q.   Those were the only two you had in your

6  possession.

7      A.   Yes.                                           0:37:49

8      Q.   You did not provide Jimmie Dale Cox with any

9  other manuals besides June 2011 and June 2017.

10 Correct?

11     A.   That's the ones he has.  That's correct.      0:37:59

12     Q.   Okay.  How many states does Murray Brothers

13 operate in?

14     A.   Forty-eight states.

15     Q.   What are the number of employees working

16 full-time in the area of hiring and screening of

17 employees?                                               0:38:13

18     A.   The number of employee -- it would just be

19 myself.

20     Q.   Okay.  What are the number of employees

21 working full-time in the areas of safety and accident

22 prevention and reporting?                                0:38:26

23     A.   It would be -- be myself.

24     Q.   What are the number of employees working

25 full-time in the areas of driver supervision and

Page 41

1    inspection of logs?

2        A.    Myself.                                          0:38:37

3        Q.    Can you describe how at Murray Brothers, LLC,

4    the organization of hiring and screening of employees

5    happens?

6        A.    Well, when somebody's looking for a job, I

7    take their information down, send it to our insurance

8    company, PJC Insurance Company.                            0:38:59

9            They run their MVR, which takes about 48

10   hours.  They will call me back and ask if it's okay to

11   hire them.  If it is, I will give them an application.     0:39:12

12           They will fill out their application.  I will

13   go over it.  I'll usually make a couple phone calls to

14   their other employees and set down and have a talk with

15   them.  And if they seem to be okay, we will hire them.     0:39:25

16       Q.    Okay.  I'm sorry.  Who did you say you get

17   the MVR from?

18       A.    PG- -- PJC Insurance Agency out of

19   Springfield, Missouri.

20       Q.    Is that your broker?

21       A.    Yes, it is.

22       Q.    Was that your broker in 2018?                    0:39:45

23       A.    It was.

24       Q.    How many policies of -- of insurance do you

25   have with PJC in 2018?

In Demand Electronic Court Reporting, Inc.        www.InDemandReporting.com                    (773) 239-6008

Page 42

1        A.   How many what, sir?                              0:39:54

2        Q.   Sorry.  That was a bad question.  How many

3   policy -- policies of insurance did you have with PJC

4   in the year 2018?

5        A.   Well, we would've just had the one policy.      0:40:08

6        Q.   What policy?

7        A.   Their insurance policy was Progressive.  I

8   guess that's what you're asking.

9        Q.   So that's one policy.  What -- what was the

10  amount of the policy?                                       0:40:19

11       A.   It was a million dollar policy.  Is that what

12  you're asking?

13       Q.   I'm asking any and all insurance policies you

14  had in 2018 for the business.                               0:40:31

15       A.   It would've been one.

16       Q.   Okay.  So that's the only one.

17       A.   Yes, sir.

18       Q.   Okay.  You did not have any excess or

19  umbrella insurance policies.                                0:40:41

20       A.   No, sir, we did not.

21       Q.   Can you describe the organization of the

22  safety and accident prevention and reporting at Murray

23  Brothers, LLC?

24            MR. HENDERSON:  Objection.  Vague.               0:40:57

25            THE WITNESS:  Rephrase the question, please.

Page  43

1    I mean, I don't -- what are you asking?  How do --

2    BY MR. DEFFET:

3         Q.    Sure.

4         A.    -- we report an accident?                        0:41:03

5         Q.    Sure.  I'm asking how at Murray Brothers, LLC

6    -- how is safety and accident prevention and reporting

7    organized within the company?                               0:41:14

8              MR. HENDERSON:  Same objection.

9              THE WITNESS:  I don't -- I don't know what

10   he's asking.

11             MR. HENDERSON:  Yeah, I'm not real clear what

12   you're asking either, Counselor.  If you could clear --     0:41:24

13             THE WITNESS:  I don't --

14             MR. HENDERSON:  -- that up.

15             THE WITNESS:  I don't know what he --

16             MR. DEFFET:  What -- what is not clear about

17   the question?                                               0:41:29

18             THE WITNESS:  I don't know what --

19             MR. HENDERSON:  If I knew what was --

20             THE WITNESS:  What are you --

21             MR. HENDERSON:  -- not clear about it --

22             THE WITNESS:  -- what are you asking about?

23   I mean what are you --                                      0:41:35

24   BY MR. DEFFET:

25         Q.    You just answered this question about hiring

Page 44

1   and screening of employees.  I'm asking the same

2   question now about safety and accident prevention and

3   reporting for Murray Brothers, LLC.                        0:41:44

4            How is it organized at Murray Brothers, LL-

5   -- strike that.  I'll ask it differently.

6            How is safety and accident prevention and

7   reporting organized at Murray Brothers, LLC?              0:41:55

8            MR. HENDERSON:  Same objection.  I think

9   that's the same words you used before.

10  BY MR. DEFFET:

11       Q.   You have to answer the question unless your

12  -- your attorney directs you not to.                      0:42:05

13            MR. HENDERSON:  You can answer the question

14  if you understand it.  Don't answer --

15            THE WITNESS:  I --

16            MR. HENDERSON:  -- a question you don't

17  understand.

18            THE WITNESS:  I do not understand what he's

19  asking.  I don't know what -- I don't know what he's

20  asking.                                                   0:42:14

21  BY MR. DEFFET:

22       Q.   What do you not understand?

23       A.   Well -- well, how am I going to report an

24  accident with a driver?  Is that what you're asking?      0:42:22

25       Q.   Is that your full knowledge of safety and

Page 45

1    accident prevention and reporting for Murray Brothers,

2    LLC?

3         A.   I would say so, I guess.  I don't really

4    understand what you're saying.                          0:42:33

5         Q.   Okay.  How -- how -- in your company at

6    Murray Brothers, LLC, you spoke earlier, and we went

7    through very detailed questions about safety and

8    accident prevention and reporting.  You remember that,

9    right?                                                  0:42:48

10        A.   Yeah.

11        Q.   Okay.

12        A.   I'm talking about reporting and a -- when a

13   driver has an accident.

14        Q.   No.  That's not all I'm talking about.  I'm

15   talking about safety accident prevention and reporting.

16   Do you understand now?                                  0:43:03

17        A.   We have an accident policy in place.

18        Q.   Okay.  Yeah, that's -- I'm -- I'm trying to

19   figure out -- I'm not trying to trick you.  I'm trying

20   to figure out what are you doing in accident prevention

21   and reporting at your company, Murray Brothers, LLC?    0:43:19

22             MR. HENDERSON:  Objection.  Vague.

23             THE WITNESS:  We just have them to sign a

24   policy, have them to read a policy and then sign it and

25   make sure they went through the policy that we have in

Page 46

1   place.                                                        0:43:31

2           The guidelines and -- and the -- the company

3   policies we have in the guidelines.  That we have --

4   BY MR. DEFFET:

5       Q.   So how much --

6       A.   -- in place.                                          0:43:37

7       Q.   -- time -- how much time do you spend on

8   safety accident -- safety and accident prevention at

9   Murray Brothers, LLC?

10          MR. HENDERSON:  Objection.  Vague.               0:43:48

11          THE WITNESS:  You mean do we have a training

12  thing or something?

13  BY MR. DEFFET:

14      Q.   How much time do you spend on safety and

15  accident prevention training at Murray Brothers, LLC?   0:43:58

16          MR. HENDERSON:  Are you talking about him

17  personally, him with the drivers?

18          MR. DEFFET:  Stop --

19          MR. HENDERSON:  Him with --

20          MR. DEFFET:  -- the speaking objections,

21  please.  If you --

22          MR. HENDERSON:  Okay --

23          MR. DEFFET:  -- have a valid objection, put

24  it forward.  Otherwise, let him answer the question.    0:44:08

25          MR. HENDERSON:  Objection.  Vague.  Compound.

Page  47

1          THE WITNESS:  I don't really understand the

2     question you're asking, sir.  I don't really know how

3     to answer it.                                          0:44:17

4     BY MR. DEFFET:

5          Q.   How much time do you spend at Murray

6     Brothers, LLC, working on safety and accident

7     prevention?

8          MR. HENDERSON:  Same objections.                  0:44:27

9          THE WITNESS:  I mean, we talk -- we -- we

10    have discussions about it.  I talk to my drivers every

11    day.

12    BY MR. DEFFET:

13         Q.   Okay.  Tell me the complete program you have

14    for safety and accident prevention.                    0:44:40

15         MR. HENDERSON:  Same objections.

16         THE WITNESS:  I don't really know how to

17    answer that.

18    BY MR. DEFFET:

19         Q.   Okay.  You don't know how to answer that.     0:45:02

20         A.   No, sir.

21         Q.   Okay.  Describe how Murray Brothers, LLC, is

22    organized to deal with driver supervision and

23    inspection of logs.

24         A.   I go through their logs once a month.          0:45:21

25         Q.   Is once a month enough under the federal

In Demand Electronic Court Reporting, Inc.          www.InDemandReporting.com                    (773) 239-6008

Page 48

1   rules?

2             MR. HENDERSON:  Objection --

3             THE WITNESS:  As --

4             MR. HENDERSON:  -- calls for a legal

5   conclusion.                                                  0:45:29

6             THE WITNESS:  As far as I know, yes.

7   BY MR. DEFFET:

8        Q.   That's your understanding, that you only have

9   to check the driver logs once a month?                      0:45:38

10       A.   Yes.

11       Q.   What else do you know about the driver logs?

12            MR. HENDERSON:  Objection.  Vague.

13   BY MR. DEFFET:

14       Q.   What do you know about keeping driver logs

15   and what your responsibilities are and your drivers'

16   responsibilities are under federal and state law?          0:45:55

17            THE WITNESS:  I don't understand what he's

18   saying.

19            MR. HENDERSON:  Object to vague again.  He --

20   he doesn't understand the question.

21            MR. DEFFET:  If this line continues, I'll

22   probably move that he be redeposed.  Just so you're

23   aware.  I think that question's pretty clear.              0:46:20

24   BY MR. DEFFET:

25       Q.   What is your understanding of your

In Demand Electronic Court Reporting, Inc          www.InDemandReporting.com                    (773) 239-6008

Page  49

1    responsibility --

2         A.    I check and make sure they don't go over -- I

3    mean, they do their logs right, they're done -- they

4    don't go over their 70-hour week.                    0:46:31

5              They take their 10-hour breaks.  They do

6    their inspections in the morning, 15-minute

7    inspections.  Make sure they have their fuel -- their

8    fuel stops down and they log their fuel stops.       0:46:47

9              They take their sleeper berths.  I mean, that

10   -- I mean, if that's what you're asking, that's what I

11   check.

12        Q.    Yes.  I want to know your full breadth of the

13   knowledge you have regarding what your responsibility

14   is with your drivers on the road.                    0:47:01

15        A.    They have to take a 10-hour break.  They have

16   to -- they have to do a pre-trip inspection every

17   morning.  They have to show their fuel stops.        0:47:10

18             They have to show loading and unloading.

19   They have to show swapping trailers.  Down on line 4.

20        Q.    Whey do they have to take a 10-hour break?  0:47:20

21        A.    After 11 hours of driving.  Oh, well, they

22   have to take a break in between the 11 hours.  They

23   have to take a 30-minute break and then -- but they get

24   to drive 11 hours.                                   0:47:31

25        Q.    What are they required to look for in a

Page 50

1   pre-trip inspection report?

2       A.   They need to a walkaround inspection.  Tires,

3   brakes, air lines.  Oh.  Steering axle.  Stuff as --

4   stuff as like this.  Lights.                          0:47:49

5            Just a -- just a walkaround every morning

6   before they start driving.  Make sure everything --

7   windows.  Everything's -- clean windows, clean mirrors.   0:48:03

8       Q.   Did Jimmie Dale Cox have any violations in

9   2013 working for Murray Brothers, LLC?

10      A.   Violations such as what, sir?  Any kind?

11  What are you talking about?                            0:48:20

12           Accidents?  Tickets?  Violations of what,

13  sir?

14      Q.   My question is clear.  Please answer the

15  question.

16      A.   Did he have any violations in 2013 is what

17  you're asking.                                         0:48:36

18      Q.   Correct.

19      A.   He could've had a -- he could've had a

20  logbook violation.

21      Q.   He did have --

22      A.   I don't --

23      Q.   -- a logbook violation?                       0:48:52

24      A.   I don't -- I really do not recall back in

25  2013, sir.

Page 51

1      Q.    Okay.  Did he have any other violations in

2    2013?

3      A.    Not that I recall.  That's seven years ago.

4      Q.    Okay.  But you are the corporate

5    representative for Murray Brothers, LLC, so you

6    understand you're required to review documents to

7    prepare, right?                                    0:49:16

8      A.    I can review documents.  That don't mean I'm

9    going to remember everything that happened seven years

10   ago.

11     Q.    That's -- that's fair.  You're free to review

12   any documents you have right now.  If you want -- if

13   you want help.                                     0:49:27

14         Is there anything that would help you answer

15   the question?

16         MR. HENDERSON:  Give us two minutes.  We'll

17   look and see if -- if we have anything on 2013,

18   Counselor.

19         MR. DEFFET:  Okay.  I'll -- I'll point to a

20   few things.                                        0:49:36

21   BY MR. DEFFET:

22     Q.    So it looks like he was pulled over in March

23   6, 2013, for an inspection.  Do you recall anything

24   about that?

25     A.    I believe I did see something in there about

Page 52

1    that, yes.  Maybe.  I don't know.  I don't remember.

2    It was 2013.                                            0:49:54

3             But -- but yeah, he probably got an

4    inspection.  That happens quite often.

5        Q.   Okay.  Give me one second.  Let me see if I

6    can find it, okay?  I'm not trying to trick you, but --   0:50:03

7        A.   We do get --

8        Q.   -- let's see if I can --

9        A.   -- we do get -- we do get roadside

10   inspections, yes.  And it's very common.                 0:50:09

11       Q.   Okay.  Give me one --

12       A.   Part of his --

13       Q.   -- second --

14       A.   -- job.

15       Q.   -- let me see if I can find the page, okay?

16   And --

17       A.   Okay.

18       Q.   -- I'll share.  Do you recall Jimmie Dale Cox

19   having any air leak violations, being pulled over

20   driving your trucks, before this incident?               0:50:41

21       A.   I'm saying it's very possible.  I don't

22   recall right offhand, no, I do not recall, but it's

23   very possible it could've happened.                      0:50:53

24       Q.   Okay.  So you think it did happen?

25       A.   I said it's possible it could happen, yes.

Page 53

1      Q.   Okay.  Bear with me.  Okay.  Page 40 on

2  Jimmie -- on Jimmie Dale Cox's personnel file.  I'm

3  going to share it right now.  Okay?                    0:51:31

4      A.   Yes, sir.

5      Q.   Are you able to view that on the screen okay?

6      A.   Yes.  I see it now.  Yes, sir.

7      Q.   Okay.  Do you recognize this document?        0:51:44

8      A.   Yeah, I mean, it's a -- it's a safety

9  inspection for the State of Missouri.

10     Q.   Okay.  And what do you see where I'm

11  scrolling here?  What does that say in the violations

12  area?                                                  0:51:58

13     A.   Air leak from service valve between truck 2

14  and 3.  Axles 2 and 3 and -- he looks like he had an

15  air leak on the tractor.

16     Q.   It says audible air leak from service valve

17  between axle 2 and 3, right?                           0:52:12

18     A.   Yes, sir.  Uh-huh.  There's 20 10 axle on the

19  tractor, yes, sir.

20     Q.   Okay.  He also listed an unsecured fire

21  extinguisher.  Correct?

22     A.   I see that, yes, sir.                          0:52:21

23     Q.   And also that the left and right stop lamps

24  were inoperative?

25     A.   I see that, yes, sir.

Page 54

1      Q.   Okay.  Is it true that the -- the stop lights

2  were inoperative when it -- found by the Illinois State

3  Police for this violation on April 29, '18?        0:52:36

4      A.   Rephrase, sir?  What'd you say?

5      Q.   Sure.  Is it true that when you had this

6  incident with Jimmie Dale Cox on April 29, '18, that's

7  the subject of this lawsuit, the air -- the lamps were

8  not working also and that was stated in the police

9  report?                                           0:52:54

10      A.   I never seen nowhere in the police report on

11  -- on April 29th that he had no brake lights.  I seen

12  that nowhere.  That was --                        0:53:07

13      Q.   You don't remember that?

14      A.   Where did you -- no, sir.  Where did you see

15  that at?

16      Q.   The police report.

17      A.   On the police report it said that his brake

18  lights wasn't working?                            0:53:16

19      Q.   You're -- you're the one answering the

20  questions here.  I'm not supposed to answer the

21  questions.  Do you recall if there was a violation of

22  the --                                            0:53:23

23      A.   No, I --

24      Q.   -- blinkers or the --

25      A.   -- don't recall.

Page 55

1      Q.    -- brake lights from the April 29, 2018,

2    incident with Mr. Cox?

3      A.    No, sir, I do not recall that.                    0:53:33

4      Q.    Okay.  Did you review the police report?

5      A.    I -- I did, and I did not see that.

6      Q.    Okay.  I also want to show you more of the

7    personnel file here.                                      0:53:46

8            Do you recall him having hours of service

9    violations in July 23, 2013?

10           MR. DRISCOLL:  Tim, can you do me a favor?

11   Can you just identify the Bates stamp number that

12   you're referencing for the record when we're talking

13   about the exhibits, please?  Thanks.                      0:54:03

14           MR. DEFFET:  Yeah, the -- the last one was

15   40, which was the personnel file, page 40, and I did a

16   share on it.  I'm pulling it up right now again.  Can

17   you see that?                                             0:54:11

18           It wasn't Bates stamped, I don't think, but

19   it's page 40 of the PDF of 128 pages, which was

20   Attachment 1 on Jimmie Dale Cox's personnel file

21   tendered to me in discovery.                              0:54:23

22           MR. DRISCOLL:  Yeah, I just wanted -- if

23   there are Bates stamp numbers, just because I'm flying

24   around, if you could do that, I'd appreciate it.          0:54:28

25           MR. DEFFET:  Sure.  I -- I -- honestly I

Page 56

1    don't think there's any Bates stamps on this document.

2             MR. DRISCOLL:  Okay.

3             MR. DEFFET:  But everyone sees this on the

4    screen right now, right?                                    0:54:36

5             MR. HENDERSON:  Yes.

6             MR. DEFFET:  Correct?

7             THE WITNESS:  I do.

8             MR. DEFFET:  Sean, can you see this on the

9    screen?

10            THE RECORDER:  It's there.

11            MR. DRISCOLL:  Yeah, I've got it.            0:54:46

12            MR. DEFFET:  Okay, okay.  All right.  I'm

13    going to go to July 23rd, '13, which is the next page,

14    page 41 of the 128-page Jimmie Cox personnel file.        0:55:00

15    BY MR. DEFFET:

16        Q.   Can you see this on the screen, Mr. Murray?

17        A.   Yes, I do.

18        Q.   Okay.  And this is for Jimmie Dale Cox,

19    right?                                                      0:55:08

20        A.   Yes, it is.

21        Q.   He was employed by you on this date, correct?

22        A.   This is correct.

23        Q.   Okay.  And there's a number of violations

24    listed here, correct?                                      0:55:19

25        A.   I see that.  Yes.

Page 57

1      Q.   It looks like there's a driving beyond eight

2  hours, there is a record duty status violation,

3  multiple record duty status violations.  Under 395.8

4  and 395.3A3, correct?                                 0:55:37

5      A.   Yes, sir.

6      Q.   Do you recall this time period?

7      A.   I do now.

8      Q.   Okay.  And what was going on at that time?    0:55:46

9      A.   Well, he looks like he had some logbook

10  violations there.

11     Q.   Okay.  So after this date, did you start

12  following his logging more closely?

13     A.   I did.                                         0:55:58

14     Q.   Okay.  If you're following the logs once a

15  month, you -- you did not know that he was not keeping

16  his logs on July 23rd --

17     A.   I --

18     Q.   -- 2013?                                       0:56:08

19     A.   I -- I had a talk with him about it, yes.

20     Q.   What was the --

21     A.   Anytime --

22     Q.   -- talk about?

23     A.   I'm telling him he's going to get his

24  logbooks better or he won't be working there.          0:56:17

25     Q.   Was he assigned any points under your policy

Page 58

1    that you had?

2         A.   I believe he got two points from just the

3    company policy.  One or -- I think it was one point.

4         Q.   What is your policy on points?                0:56:33

5         A.   Oh, I'd have to go back and look, but I can't

6    remember right offhand.

7         Q.   You don't remember what it is right now?

8         A.   No, sir.                                       0:56:44

9         Q.   Do you remember what it was in 2018?

10        A.   It would be the same as it was.

11        Q.   Same as it was what?

12        A.   It would've been the same as in '13.           0:57:01

13        Q.   Okay.  What was it in '13?

14        A.   The same as it would be in 2018.  It's the --

15        Q.   What --

16        A.   -- same policy.

17        Q.   -- is the policy, Mr. Murray?                  0:57:11

18        A.   I --

19             THE WITNESS:  The logbook -- what's he

20    talking about?

21             MR. HENDERSON:  You can look at the policy

22    and -- and you can refer to the policy.                 0:57:24

23    BY MR. DEFFET:

24        Q.   What is your safety policy for --

25        A.   Just --

Page 59

1      Q.   -- points --

2      A.   -- a second.

3      Q.   -- at work?

4           THE WITNESS:  It would be in -- it's in that

5      binder, isn't it?                                    0:57:33

6  BY MR. DEFFET:

7      Q.   Here.  I'll pull something up.  I have four

8      pages that are listed as company vehicle policy.  Give

9      me one second, okay?                                 0:57:43

10     A.   Yes, sir.

11          MR. HENDERSON:  (INAUDIBLE)

12          THE WITNESS:  I think it's in the very front

13     of them binders.

14          MR. HENDERSON:  Okay.                            0:57:55

15       (Exhibit No. 2 marked for identification.)

16  BY MR. DEFFET:

17     Q.   I got it, I think.  Hold on.  Okay, so this

18     is page 45 of the same document.  I'm going to identify

19     this as Exhibit 2 for the deposition.                0:58:13

20          This is Jimmie Dale Cox's personnel file.

21     It's 128 pages provided by Murray Brothers, LLC with

22     their production response.  On page 45, it starts

23     Company Vehicle Policy with, in parentheses, General

24     Guidelines, and then it goes on to page 48 and it

25     stops.                                               0:58:35

Page 60

1        So it's actually one, two, three pages and

2   then at the fourth page, Jimmie Dale Cox signs it on

3   January 12, 2013.  Right?

4        A.   Yes, sir.                                    0:58:47

5        Q.   Okay.  So why was Jimmie Dale Cox signing

6   this in January 12th, 2013?

7        A.   Why was he signing it?

8        Q.   Yes.

9        A.   Because we had just probably put it in place

10  at the time from CDL Consultants.                       0:59:05

11       Q.   Okay.  So is this the first time your policy

12  came into effect?

13       A.   Probably this policy here, yes, sir.

14       Q.   Okay.

15       A.   From before -- from before the safety policy,

16  sir.                                                    0:59:21

17       Q.   Was -- was this --

18       A.   Safety --

19       Q.   -- the policy --

20       A.   -- safety -- the safety manuals.

21       Q.   I'm sorry.  I didn't mean to cut you off.  Go

22  ahead?

23       A.   I said we had the safety manual back in 2011.  0:59:33

24       Q.   Okay.  But this is your specific policy for

25  Murray Brothers, LLC, right?

Page 61

1          A.    Yes, sir.  That's after we hired CDL

2     Consultants.

3          Q.    Okay.  So this came into effect in 2013?          0:59:46

4          A.    Yes, sir.

5          Q.    Okay.  And so on page 2 -- do you have it in

6     front of you now?

7          A.    Yes.  I'm -- yes.                                  0:59:56

8          Q.    On page 2, it talks about disqualification

9     standards, which is page 4 of Exhibit 2, the Jimmie

10    Dale Cox personnel file.  You see that, right?

11         A.    Yes.                                               1:00:11

12         Q.    And it says individuals who receive

13    violations of six or more points within 36 months lose

14    the right to drive a company vehicle.  Correct?

15         A.    Correct.                                           1:00:21

16         Q.    Okay.  Did you ever take away Jimmie Dale

17    Cox's right to drive a company vehicle?

18         A.    I did not.

19         Q.    Are you -- did Jimmie Dale Cox ever get six

20    points within 36 months?                                     1:00:38

21         A.    Not that I remember.

22         Q.    So for the March 6th, '13 violations that

23    were listed that we just went over, how many points

24    would he be assessed for that?                               1:00:56

25              MR. HENDERSON:  Object to the relevance of

Page 62

1    the 2013 incident.

2          THE WITNESS:  I don't even see where 2 points

3    violations -- I see where he would not have been

4    assessed no points at all from just getting a -- a DOT

5    inspection on the side of the road.                    1:01:27

6    BY MR. DEFFET:

7       Q.    But it wasn't just a DOT inspection.  He was

8    assessed with a violation of an --

9       A.    right --

10      Q.    -- audible air leak coming from axle 2 and 3,

11   an unsecured fire extinguisher, and the left and right

12   stop lamps were inoperative.  Correct?                 1:01:42

13      A.    Yes.  That was all fixed at the time.

14      Q.    It wasn't fixed when he was pulled over at

15   the inspection, correct?

16      A.    He did not receive a ticket, sir.            1:01:53

17      Q.    He was cited for these violations on this

18   date, correct, on March 6th, 2013?

19      A.    He was stopped for them, but he never

20   received a ticket.

21      Q.    So under your policy, he would be assessed no

22   points for these violations that were listed by the

23   Missouri State Highway Patrol.                         1:02:12

24      A.    I see on this policy -- I don't see nowhere

25   it would've been, no, sir.

Page 63

1      Q.    Okay.   Is there a reason why these violations

2   would not be listed as gaining points under your policy

3   for Murray Brothers, LLC?                                     1:02:25

4      A.    Because they're -- I -- I would not know that

5   -- I don't really know, sir.

6      Q.    Okay.   Don't you think that these things are

7   dangerous if someone's operating your trucks on the

8   road and these violations have occurred?                      1:02:35

9           MR. HENDERSON:   Object to form.

10          THE WITNESS:   I'm sure it's not real safe.

11   Yes.

12   BY MR. DEFFET:

13      Q.    Okay.   So why doesn't your policy assess

14   points for someone who violates these federal

15   regulations?                                                 1:02:50

16      A.    Sir?  Ask again --

17      Q.    Why does your --

18      A.    -- please?

19      Q.    -- safety policy not assess points for

20   someone who violates the federal statutes?                   1:03:03

21          MR. HENDERSON:   Object to form.  Relevance,

22   speculation.

23          THE WITNESS:   Well, I figure if they're not

24   ticketed, it's fixable.

25   BY MR. DEFFET:

Page 64

1       Q.    They are ticketed.   In fact, it's an out of

2    service violation to have left and right stop lamps

3    inoperative, and that's what it states on there, right?    1:03:21

4       A.    Did he get a ticket -- he did not get a

5    ticket for that, did he?

6       Q.    He was cited for these three violations.   Are

7    you disagreeing with that?                                 1:03:29

8       A.    He was wrote up for them, but he was not

9    ticketed and put out of service.

10       Q.   Okay.   So you're saying because he didn't

11    have to go into court, then these violations don't

12    exist.                                                     1:03:40

13       A.   Oh, I didn't --

14            MR. HENDERSON:   Objection.   Mischaracterizes

15    testimony.

16            THE WITNESS:   I did not say that.

17    BY MR. DEFFET:

18       Q.   Okay.   Are you saying that these citations

19    were not true at the time?                                1:03:50

20            MR. HENDERSON:   Same objection.

21            THE WITNESS:   No, I'm saying I guess they're

22    -- yeah, I'm sure they was true.

23    BY MR. DEFFET:

24       Q.   Okay.   But you didn't think it was serious

25    enough -- serious enough under your policy to dock him

Page 65

1    points under your disqualification guidelines.                1:04:07

2            MR. HENDERSON:  Objection.  Misstates

3    testimony.

4            THE WITNESS:  No, sir.

5    BY MR. DEFFET:

6        Q.    In fact, you don't even have that type of

7    incident listed on your three-page accident, quote,

8    violation disqualification guideline, do you?                 1:04:20

9        A.    No, sir.

10       Q.    I don't see anything in your safety policy

11   accident violation disqualification guidelines about

12   any hours of service violations that would gain points.

13   Correct?                                                       1:04:35

14       A.    Correct.

15       Q.    Is there a reason why that's not listed in

16   your guidelines?  And I'm sorry to be nitpicky, but

17   right now I can't see your face.  Could you move into

18   the light, please, if there's light there?                    1:05:00

19       A.    Can you --

20       Q.    There you go.

21       A.    -- see me now?

22       Q.    Yes.  Thank you --

23       A.    Oh.

24       Q.    -- very much.  I appreciate it.                      1:05:05

25            THE WITNESS:  But there's not no thing in

Page 66

1    there, is there?

2    BY MR. DEFFET:

3        Q.   Is --

4        A.   No, it's not list -- it's not listed there,

5    sir.

6        Q.   Okay.  Why is it not --

7        A.   Yeah.

8        Q.   -- listed in your policies?                    1:05:16

9            MR. HENDERSON:  Objection.  Speculation.

10           THE WITNESS:  Like I said, I had CDL

11   Consultants.  This is from them.  And this is what we

12   got from them.

13   BY MR. DEFFET:

14       Q.   Okay.  But you're responsible --

15       A.   That's who --                                  1:05:30

16       Q.   I'm sorry --

17       A.   -- that's who we use --

18       Q.   -- go ahead.

19       A.   That's who we use for our safety, sir.

20       Q.   Yeah, but you're the person enforcing the

21   safety for your company, right?                         1:05:38

22       A.   Yes, sir.

23       Q.   Okay.  The company that you hired is not the

24   one exercising discipline against your employees; it's

25   you, right?

Page 67

1       A.   Correct.                                              1:05:48

2       Q.   Okay.   And you're responsible for putting

3  these drivers on the road in a safe manner, right?

4       A.   Yes, sir.

5       Q.   And it's your responsibility to teach them

6  what the federal regulations are, correct?                      1:05:59

7            MR. HENDERSON:   Objection.   Calls for a legal

8  conclusion.

9            THE WITNESS:   Yeah, we hand them a book and

10  they're supposed to read it, yes, sir.

11  BY MR. DEFFET:

12       Q.   Okay.   So you're saying you give them the

13  book and then that's -- that's the end of it?                  1:06:11

14       A.   Well, they're supposed to read it and we're

15  -- and -- and we talk about it also.

16       Q.   Do you test them?

17       A.   Test them?                                           1:06:21

18       Q.   Yes.

19       A.   You -- you mean like give them a test?   What

20  do you mean, test them?

21       Q.   Do you test them?

22       A.   I rode with each and every driver and make

23  sure they can drive and stuff.                                 1:06:37

24       Q.   Okay.   Now, let's go back to July 23rd, 2013.

25  There's one, two, three, four, five, six, seven record

Page  68

1    duty status violations and hour service violations

2    listed, correct?                                      1:06:51

3        A.   Yes, sir.

4        Q.   Okay.  What did you do, if anything, to dock

5    Jimmie Dale Cox points under your policy after this

6    incident happened?

7            MR. HENDERSON:  Objection.  Relevance.        1:07:05

8            THE WITNESS:  I actually don't remember.

9    Probably -- I really don't remember, sir.  I really

10   don't remember.

11   BY MR. DEFFET:

12       Q.   Okay.  Would you -- would you agree that

13   audible air leak problems is -- in a truck -- sorry,

14   strike that.                                           1:07:28

15           If someone had audible air leak problems in

16   your trucks and was driving your vehicle, would be

17   negligent operation of a motor vehicle?

18           MR. HENDERSON:  Objection.  Improper

19   hypothetical.  Calls for speculation.                  1:07:44

20   BY MR. DEFFET:

21       Q.   I'm using the words from your safety policy

22   in the incident section for six points and it's stated

23   serious.  There's listed negligent operation of a motor

24   vehicle.                                               1:07:57

25           So would operating a truck that you own

Page  69

1   having audible air leak problems -- would that be

2   considered negligent in operation of a motor vehicle?

3          MR. HENDERSON:  Same objection.  Calls for

4   speculation, improper hypothetical.                    1:08:10

5   BY MR. DEFFET:

6       Q.   You -- you have to answer the question unless

7   your attorney directs you not to.

8          MR. HENDERSON:  You can answer it if you

9   understand the question.                                1:08:27

10          THE WITNESS:  I don't really understand.  It

11   could've happened when he's --

12          MR. DEFFET:  I'm going to --

13          THE WITNESS:  -- driving down the road.  When

14   --

15          MR. DEFFET:  -- strike -- move to strike the

16   speaking objection.  If you ask -- if you tell him

17   again -- if you answer it, I'm going to move for costs

18   and fees.                                              1:08:37

19          You can have a valid objection, but you

20   cannot say answer the question if you understand it.

21   That's a speaking objection.  I move to strike that

22   from the record.                                       1:08:47

23   BY MR. DEFFET:

24       Q.   If you don't --

25          MR. HENDERSON:  I'm not going to --

Page  70

1    BY MR. DEFFET:

2        Q.    -- understand something, Mr. Murray, you tell

3    me what you don't understand, and I will rephrase the

4    question.   Otherwise, the commentary by your attorney

5    should stop.                                              1:08:57

6        A.    So what was the question again?

7        Q.    Do you know what negligent operation of a

8    motor vehicle under your policy means?

9        A.    Yes.                                            1:09:11

10       Q.    What situations does that come into play?

11       A.    Well, that would've come under play, but it

12   might've happened when he was driving on the road.   He

13   -- when he done his daily inspection, that might not

14   have been leaking at the time.   Stuff like that happens

15   driving down the highway.

16       Q.    Would you consider an audible air leak

17   violation to be negligent operation of a motor vehicle

18   under your policy?

19           MR. HENDERSON:   Objection.   Vague, calls for

20   speculation.                                              1:09:36

21           THE WITNESS:   No.

22   BY MR. DEFFET:

23       Q.    What about an unsecured fire extinguisher?

24           MR. HENDERSON:   Same --

25           THE WITNESS:   No.

Page 71

1           MR. HENDERSON:  -- objections.

2    BY MR. DEFFET:

3        Q.   What about the left and right stop lamps

4    being inoperative?                                 1:09:47

5           MR. HENDERSON:  Same objection.  Also

6    relevant -- irrelevant.

7           THE WITNESS:  No.

8    BY MR. DEFFET:

9        Q.   What about the six or so hours of service and

10   logging violations listed from July 23rd, 2013?  Would

11   you agree that's negligent operation of a motor

12   vehicle?                                           1:10:06

13          MR. HENDERSON:  Same objection.  Lacks --

14          THE WITNESS:  No.

15          MR. HENDERSON:  -- relevance.

16   BY MR. DEFFET:

17       Q.   What did you do to take corrective action

18   against Mr. Cox after he had these violations in July

19   23, 2013?                                          1:10:17

20          MR. HENDERSON:  Objection.  Asked and

21   answered.

22          THE WITNESS:  I told you we sat down and had

23   a oral discussion about it.

24   BY MR. DEFFET:

25       Q.   Okay.  After that meeting, did he continue to

Page 72

1   have logging violations?                                  1:10:26

2        A.   Excuse me, sir?

3        Q.   After July 23rd, 2013, when you had

4   subsequent discussions, did Mr. Cox have further hours

5   of service violations?

6        A.   I'm sure he might've, but I don't remember

7   when it could've been.                                    1:10:44

8        Q.   How about the date of this incident, April

9   29, 2018?  He had logging violations on that date,

10  didn't he?

11       A.   Not that I know of, no, sir.                    1:10:58

12       Q.   Did he have --

13       A.   I did --

14       Q.   Did he have logging violations on April 29,

15  '18?

16       A.   No.

17       Q.   He did not.

18       A.   No, sir.  Not to my understanding.  At the

19  time.                                                     1:11:12

20       Q.   What is your understanding?

21       A.   To my understanding, my -- was my ELD was

22  working at the time.

23       Q.   If your ELD was -- well, first of all, I

24  didn't ask about your ELD.  But why don't you explain

25  what you're talking --                                    1:11:24

Page 73

1      A.    You --

2      Q.    -- about?

3      A.    You -- you -- you asked me if he had a

4  logbook violation on the 29th of April 2018.  No, he

5  did not.                                          1:11:34

6      Q.    You -- are -- was your ELD working on the

7  time of the incident on April 29, 2018?

8      A.    I was under the understanding it was, but I

9  found out later it was not.                       1:11:44

10     Q.    And how often do you check the ELD when

11 someone's on the road?

12     A.    I told you, once a month.

13     Q.    Okay.  Is that what the federal regulations

14 require you to do, only once a month?             1:12:00

15         MR. HENDERSON:  Objection.  Calls for a legal

16 conclusion.

17         THE WITNESS:  I believe it is.

18 BY MR. DEFFET:

19     Q.    Can you point to the regulation that state --

20 states once a month?                              1:12:10

21     A.    I cannot.

22     Q.    When was the last time the air brakes were

23 maintained or inspected prior to the April 29, '18,

24 incident?

25     A.    It would've been -- the truck was in the

Page  74

1    garage at Peterbilt in Sauget, Illinois on March 22nd,

2    2018 and it went to a 60-point inspection.  It was

3    getting serviced in there.                              1:12:38

4         Q.   Okay.

5         A.   With a --

6         Q.   Why was -- why was that truck there from

7    March 16, '18, through March 22, '18?

8         A.   It was getting an oil leak and stuff fixed.

9    It was getting some -- it was getting some work done.    1:12:55

10             And in the meantime, they do a 60-point

11   inspection in there.

12        Q.   How long have you owned this semi that was

13   involved in this incident?

14        A.   We bought it in May of 2013.  It was a 2014

15   Peterbilt.  I think May -- I think we bought it May

16   31st, 2013.                                             1:13:15

17        Q.   Okay.  In discovery, your attorneys only gave

18   me inspections starting October 23rd, 2018 [sic]

19   through the March 22, '18, date.  I have no other

20   inspections for that 2014 Peterbilt bearing VIN

21   1XPWD49XXED229547.                                      1:13:40

22             Are there --

23        A.   Well, there's --

24        Q.   -- any other --

25        A.   -- one in --

Page 75

1      Q.   -- inspection dates other than October 23,

2   '17, December 7th, '17, and March of 2018?          1:13:50

3      A.   We have -- there's one in there -- the --

4   that had a federal inspection in May of 2- -- May 20th,

5   2017's in there.  It was the last inspection.  Federal

6   inspection -- you gotta have them once a year.      1:14:02

7           We get them done once a year.  And it -- the

8   last one that would've been done was 5/20/2017.  So in

9   about another month from the accident, it would've been

10  inspected again.  It would've been -- went to another

11  federal inspection.                                 1:14:18

12     Q.   So from 2013 to 2017, it was not inspected?

13  Or -- or I have that incorrect?

14     A.   Sir, it -- no, that's incorrect.  It would've

15  been inspected every year.  You have to have a federal

16  inspection.                                         1:14:33

17     Q.   Well, I have not been tendered anything from

18  '13 and '14, I don't believe.  Can you point to those?

19     A.   Well, in '13 --

20     Q.   In 2016 -- I'll pull it up.  I'll pull it up.

21     A.   In 2013, it wouldn't had to have inspect --

22  it was a brand new truck.  The Peterbilt gives you the

23  federal inspection then.  It's good for a year.     1:14:53

24     (Exhibit No. 3 marked for identification.)

25  BY MR. DEFFET:

Page 76

1      Q.   Okay.  Can you see this on the screen right

2  now?

3      A.   No, not really.  There.  Okay, yeah.          1:15:01

4      Q.   All right.  I'm flipping it over.  Can you

5  see that okay?

6      A.   Yes, sir.

7      Q.   Okay.

8      A.   That was --

9      Q.   I'm going to designate this --

10     A.   -- when -- this is when the truck was brand

11  new, right?  I -- scoot down --                        1:15:12

12     Q.   Please give me --

13     A.   -- and let me see --

14     Q.   -- one -- give me one second, okay?  I just

15  want to identify it.  I'm identifying this as Exhibit

16  3.  This is a two-page Attachment 7.  It was designated

17  by Murray Brothers in their answers to discovery in the

18  production response.                                   1:15:26

19         And it's two pages.  And it's a DOT

20  inspection report listed for 2016 and '17.  Okay.  You

21  recognize these documents, Mr. Murray?                 1:15:37

22     A.   Yes.  Uh-huh.

23     Q.   Okay.  And that's for the -- the Peterbilt

24  involved in this incident?

25     A.   Yes.  It looks like it is, yeah, mm-hmm.       1:15:46

Page  77

1      Q.   Okay.  Aside from 2016 and '17, were there

2   any other inspections done before that date or after

3   that date?

4      A.   There would've been one in 2013, '14, '15,

5   '16, and '17.  Told you once a year.                    1:16:05

6      Q.   Okay.  Why were those not provided in answers

7   to discovery?

8      A.   I -- to -- I don't really know why they're

9   not in there, but we do -- we would have them.          1:16:16

10     Q.   You would have them?

11     A.   I'm sure they're in the file cabinet

12  somewhere, yes.

13     Q.   Is there a reason why they weren't provided

14  in discovery?

15     A.   I do not know that, no, sir.                     1:16:28

16     Q.   So right now I don't have one for '13, '14,

17  '15.  And when would you normally do it in 2018?  Is

18  there a certain time period you would do it?            1:16:41

19     A.   Yes.  I told you, sir.  It would've been in

20  May of 2018.  One -- one year from the original -- from

21  the original -- it's an -- it's a 12-month inspection,

22  sir.                                                    1:16:52

23     Q.   Okay.  Forgive me.  So every year, once a

24  year in May you would do it?

25     A.   Yes, sir.

Page  78

1        Q.    Okay, okay.  Sorry about that.  All right.        1:17:00

2        A.    That's all right.

3        Q.    Okay.  So if we're looking at the -- I'm

4    going to try to pull these up again, okay?        1:17:09

5        A.    Okay.

6        Q.    I'm pulling up Attachment 1, which is five

7    pages of maintenance records that were given only in

8    the 2016 and 2017 inspections.  This is the entirety of

9    the maintenance and inspection records I was given

10   regarding this Peterbilt.  Are there additional records

11   that were not provided?

12       A.    Yes.        1:17:41

13       Q.    And what additional records are there that

14   were not provided?

15       A.    Well, there would be PM services and there

16   would be some other work done to the truck.  It was

17   overhauled from Cummins in St. Louis when it had about

18   300,000 miles on it.  I remember that.        1:17:59

19       Q.    Okay.  When was that?

20       A.    It would've probably -- it would've been in

21   probably 2015.  Cummins diesel in St. Louis, Missouri

22   overhauled that truck.

23       Q.    When they --

24       A.    I --

25       Q.    -- overhauled it, what did they do?        1:18:13

Page  79

1         A.    They rebuilt the whole engine.

2         Q.    Did they work on the brakes?

3         A.    They would not have done that, no, sir.

4         (Exhibit No. 4 marked for identification.)

5    BY MR. DEFFET:

6         Q.    Okay.  I'm going to pull this up real quick.

7    I think I may be at 4 hopefully.  I'm going to identify

8    this as Exhibit 4.  It's five pages, which is the

9    maintenance records that were given for the 2014

10   Peterbilt involved in this incident.                    1:18:55

11        A.    Okay.

12        Q.    And do you recognize these documents?

13        A.    I can't really see.  What's the date on them?

14        Q.    Sure.  I'll try to scroll through them a

15   little bit.  There's five pages.                        1:19:08

16        So the first one is from October 23, '17.

17   You see that?

18        A.    Yeah.

19        Q.    Okay.  And then the next one on page 2 of

20   this exhibit is December 7 to December 9, '17?

21        A.    Okay.                                         1:19:31

22        Q.    You see that?

23        A.    Yes, sir.

24        Q.    Okay.  Can you explain what a blower resistor

25   is?

Page 80

1        A.    Yeah.   It's for the blower motor for the

2   heater.                                                    1:19:42

3        Q.    Okay.   So that was fixed on that date?

4        A.    Looks to be, yes.

5        Q.    Okay.   And then on March 16, '18, you brought

6   it in and it was not ready till March 22, '18, right?     1:19:56

7        A.    This is correct.

8        Q.    Okay.   Is there a reason why so many things

9   were performed on these dates just prior to the April

10  29, '18, incident with my client?                          1:20:07

11        MR. HENDERSON:   Objection.   Vague,

12  speculation.

13        THE WITNESS:   What -- what are you -- reask

14  the question, sir.

15  BY MR. DEFFET:

16        Q.    Sure.   Let's -- let's look through those

17  records, okay?   Give --                                   1:20:21

18        A.    Okay.

19        Q.    -- me a second here.

20        A.    Why was so much work done to that?

21        Q.    Yes.   There's like three pages of work listed

22  here from 3 to 5 of this --                                1:20:33

23        A.    I'm not -- looks like it

24        Q.    -- exhibit.

25        A.    -- looks like it had a pretty good oil leak

Page 81

1    in it.

2         Q.   Okay.  So a major oil leak.  Okay --

3         A.   Uh-huh.

4         Q.   -- and then they had to remove the starter,

5    right?                                                1:20:46

6         A.   Right.  And -- yes.

7         Q.   Okay.

8         A.   Looks like they did about $2,500 worth of

9    work to it, yes.

10        Q.   Okay.  And did they redo the transmission?   1:20:59

11        A.   No, I think they just -- it looks like they

12   just took the transmission out to fix an oil leak.

13        Q.   Okay.

14        A.   Or a rear -- rear main seal or something,

15   yes.                                                  1:21:12

16        Q.   They adjusted --

17        A.   That's what it looks like.

18        Q.   -- the clutch?

19        A.   Yes.  Uh-huh.                               1:21:17

20        Q.   Okay.  And -- and it says air fitting for the

21   shifter are leaking badly.  What does that mean?

22        A.   Well, you have to have air for the

23   transmission to shift from high to low.  So just --

24        Q.   Okay.

25        A.   -- little spaghetti -- they're just little

Page 82

1   air lines.  Small.  Small air lines.                    1:21:34

2       Q.   Okay.  So at this point in time, you believed

3   the brakes were working okay?

4       A.   Yes, I believe they -- if they wouldn't have

5   been, I believe Peterbilt would've had -- would've

6   called me about it.  Yes.                               1:21:56

7       Q.   Okay.  Who's the one --

8       A.   My understanding they do a -- they do a

9   60-point inspection about every time we take our trucks

10  up there to get work done.  You know, if they find

11  something that we -- if they find something that the

12  driver didn't report, they will call me and ask me if

13  the -- if we need it fixed.                             1:22:12

14      Q.   Okay.  When did the air leaks first -- first

15  start happening in 2018 to that Peterbilt?

16          MR. HENDERSON:  Objection.  Vague.

17          THE WITNESS:  Air leak?  What air leak are

18  you talking about, sir?                                 1:22:27

19  BY MR. DEFFET:

20      Q.   The air leak on the Peterbilt.  When did that

21  first start?

22          MR. HENDERSON:  Objection.  Vague.

23          THE WITNESS:  Well, there's all kinds of air

24  lines.  I don't know what air leak you're -- you're

25  specifically talking about.                             1:22:39

Page 83

1   BY MR. DEFFET:

2        Q.   Well, you tell me.  What air leaks do you

3   think I'm talking about?

4        A.   I have no idea.                              1:22:47

5        Q.   What air leaks are you aware of that happened

6   on that Peterbilt in 2018?

7        A.   The time of the wreck?

8        Q.   In the year 2018, what air leaks were you

9   aware of on the Peterbilt involved in this incident?    1:23:02

10       A.   I was not aware of no air leaks at -- at --

11   before the accident.

12       Q.   Okay.  So you agree there was an air leak

13   found after the accident?

14       A.   I seen in the report, yeah, there was an air

15   leak.                                                  1:23:17

16       Q.   But that's not what I asked you.  Would -- do

17   you agree there was an air leak in the Peterbilt Murray

18   Brothers, LLC, owned?

19       A.   No, I would not agree with that.             1:23:29

20       Q.   You disagree with the police findings that

21   there was an air leak?

22       A.   The air leak could've happened during the

23   accident, sir.

24       Q.   How would that happen?                       1:23:42

25       A.   Well, if you would look at the pictures,

Page 84

1  there's black marks and stuff on the highway when Mr.

2  Cox laid on the brakes.  It could've had -- that brake

3  chamber could've blew.  That happens.                1:23:53

4      Q.   Is that what the --

5      A.   There was an air --

6      Q.   -- police -- is that --

7      A.   They were --

8      Q.   Go ahead --

9      A.   There was --

10      Q.   -- I'm sorry.                              1:23:58

11      A.   -- an air -- there -- there was an air leak

12  on axle No. 5, which is the trailer.  The brake chamber

13  was leaking.  And you can ask people that know about

14  that, that that can happen during a time when you hit

15  your brakes real hard.  It can blow the air -- it can

16  blow the brake chamber back there.                  1:24:18

17      Q.   Okay.  You would agree Mr. Cox was cited for

18  failure to reduce speed to avoid an accident for this

19  April 29, '18, incident?

20      A.   Would I agree with that?                   1:24:27

21      Q.   Yes.

22      A.   I cannot -- I cannot make that call.  I

23  wasn't there, sir.

24      Q.   I'm asking you if you're aware he was cited

25  for failure to --

Page 85

1      A.   I -- I am --

2      Q.   -- reduce speed.                              1:24:38

3      A.   -- aware of that, yes.  I'm aware he got a

4  ticket.  Yes.

5           THE RECORDER:  I just need --

6  BY MR. DEFFET:

7      Q.   Okay.

8           THE RECORDER:  -- to interject and make sure

9  that you guys let the other finish speaking so you're

10 not talking over each other for the record.           1:24:47

11          MR. DEFFET:  My fault.  I apologize.

12 BY MR. DEFFET:

13     Q.   Are you aware that Mr. Cox was cited for no

14 driver's record of duty status and failure to repair

15 the ELD within eight days on April 29, '18?           1:25:03

16     A.   I was aware after the fact, sir.

17     Q.   Okay.  When was the last -- last time you

18 spoke to Mr. Cox before the incident happened on April

19 29, '18?

20     A.   The last time I spoke to him before the

21 accident would've been probably Saturday morning.      1:25:21

22     Q.   Okay.  You were dispatching --

23     A.   I --

24     Q.   -- for him, right?

25     A.   Yes, sir, I dispatched him Saturday morning,

Page 86

1    uh-huh.

2         Q.    Okay.   When's the last time you actually

3    viewed the Peterbilt prior to the April 29, '18,

4    incident?                                          1:25:33

5         A.    The last time I personally looked at it?

6         Q.    Yes.

7         A.    It probably would've been a week or so before

8    that.

9         Q.    And did you see any problems with the

10   Peterbilt at that time?                            1:25:45

11        A.    I did not, sir.

12        Q.    What type -- did you do a -- an inspection of

13   it or just a general walkaround?

14        A.    Just a general walkaround, yes.   Uh-huh.   1:25:56

15        Q.    Did you have a --

16        A.    Checked the oil --

17        Q.    -- success --

18        A.    I just checked the oil -- I just checked the

19   oil and stuff like that.   Checked the water level and

20   stuff such as that.                                1:26:02

21        Q.    Okay.   When you check the oil, what type of

22   things can you see on the vehicle itself as far as the

23   brake lines and things like that?                  1:26:12

24        A.    Well, you can see -- yeah, you can look at

25   all that stuff.

Page 87

1      Q.   Okay.  Did you see pliers on the brake lines

2   at that point in time?

3      A.   No, sir, I never have seen pliers on the

4   brake line.  Never have.                              1:26:25

5      Q.   Okay.  Would you agree that pliers were used

6   to stop the air leaks on this 2014 Peterbilt involved

7   in the incident?

8      A.   On the brake line?

9      Q.   On the air -- to stop air leaks in the

10   braking tubing and hosing.                            1:26:38

11      A.   I would disagree it was on a -- it was on a

12   brake lines.  I would disagree with that a hundred

13   percent.

14      Q.   Okay.  Do you believe that pliers were used

15   at all on the 2014 Peterbilt?                         1:26:50

16      A.   Well, after the fact I seen a pair of plier

17   -- a pair of vice grips on the driver seat, which has

18   nothing to do with the brakes.

19      Q.   Well, what does it have to do with?          1:27:02

20      A.   Giving air to their seat -- the driver seat.

21      Q.   Giving air to the driver seat?

22      A.   Yes, sir, and that's all it has to do with.

23      Q.   Okay.  Meaning --

24      A.   Period.                                       1:27:12

25      Q.   -- raising -- raising up and --

In Demand Electronic Court Reporting, Inc.        www.InDemandReporting.com                    (773) 239-6008

Page 88

1       A.    Raising --

2       Q.    -- putting down the seat?

3       A.    Raising -- raising and lowering the seat,

4   yes, sir.

5       Q.    Okay.  And did you have a discussion with

6   Jimmie Dale Cox about that?                             1:27:22

7       A.    I did not until after the fact.

8       Q.    And what did you say to him and what did he

9   say to you?

10      A.    Well, I -- when I found out about the vice

11  grips --

12      Q.    Everything --

13      A.    -- after the --

14      Q.    -- involving --

15      A.    -- ride --

16      Q.    -- the incident.                              1:27:36

17      A.    After I found out about -- he -- he just said

18  he put -- the seat was leaking air and the seat

19  wouldn't -- wouldn't stay up, so he just put a pair of

20  vice grips on it that day so the seat wouldn't be going

21  up and down.                                            1:27:52

22      Q.    Okay.  You said you did review the police

23  report for this incident, right?

24      A.    I did, sir.

25      Q.    Okay.  Would you -- would you like to take a

Page 89

1  look to refresh your memory on anything?                    1:28:05

2        A.   I can.  Yes.

3        Q.   Okay.  Give me one second here.  I -- I just

4  put it up on the screen.  Now, this is two pages taken

5  from the police report.  Okay?                              1:28:25

6             This is the driver --

7        A.   Okay.

8        Q.   -- vehicle inspection report with violations

9  --

10       A.   Yes, sir.

11       Q.   -- listed.  Can --

12       A.   I see it.

13       Q.   Can you see that on the screen?                   1:28:34

14       A.   I can.

15       Q.   Okay.  And so at the bottom, you see where

16  I'm scrolling with the mouse?

17       A.   Yes, sir.

18       Q.   Okay.  So there's one, two, three, four,

19  five, six violations listed here.  Correct?                 1:28:50

20       A.   I see that, yes.

21       Q.   Okay.  One is failure to reduce speed to

22  avoid an accident, right?

23       A.   I see that.                                       1:29:01

24       Q.   Okay.  The second one is no driver's record

25  of duty status, failed to repair ELD within eight days

Page 90

1   or request waiver, correct?

2        A.   I see that.                                 1:29:11

3        Q.   The third one is discharged an unsecured fire

4   extinguisher, correct?

5        A.   Yes.

6        Q.   Okay.  And that's the same violation that

7   occurred in 2013 that you did not discipline Mr. Cox

8   for, correct?                                         1:29:25

9        A.   Correct.

10        Q.   And then there's audible air leak at other

11   than proper connection.  And what is that -- your

12   understanding that that is?

13        A.   That looks like that is a pair of vice grips

14   that was underneath the seat, driver seat.           1:29:41

15        Q.   Okay.  Your understanding is that that was in

16   relation to only working the seat itself.

17        A.   Yes, sir.

18        Q.   Okay.  And then there's audible air leak at

19   brake chamber axle 5 left.  And what is your

20   understanding about what that violation is?          1:30:02

21        A.   I believe I explained that a while ago.  That

22   could've happened during the accident when Mr. Cox

23   slammed on his brakes.  If you look at the pictures of

24   the thing, he left a lot of black marks there.  He was

25   --                                                   1:30:14

Page 91

1      Q.    Okay.

2      A.    -- hitting his brakes pretty hard and that

3  could've -- that could've happened during the accident

4  very easily --

5      Q.    But --

6      A.    -- very easily.                              1:30:20

7      Q.    But you agree that that's a violation.  You

8  just don't believe it happened before the incident --

9      A.    No, I -- I believe it happened during the

10  accident is what I believe.                            1:30:29

11     Q.    Okay.  If it didn't happen during the

12  accident, you would agree that is a violation of the

13  federal code, right?

14        MR. HENDERSON:  Objection.  Improper

15  hypothetical.                                          1:30:38

16        THE WITNESS:  Yeah, I mean, that's -- who

17  know -- who knows when it was leaking.  I'm saying it

18  wasn't leaking before.  But that's my opinion and -- I

19  think it happened during the accident is what I'm going

20  to say.                                                1:30:48

21  BY MR. DEFFET:

22     Q.    If it was -- if it had been noted before the

23  incident, you agree that's a federal violation and

24  Jimmie Dale Cox should not be driving that truck.      1:30:57

25        MR. HENDERSON:  Same objection.  Calls --

Page 92

1           THE WITNESS:  That's hyp- --

2           MR. HENDERSON:  -- for a legal conclusion.

3           THE WITNESS:  Yeah, what's hypothetical?  Who

4    knew -- who knows when it was leaking?  Nobody --       1:31:04

5    BY MR. DEFFET:

6        Q.   If --

7        A.   -- nobody can --

8        Q.   -- if your --

9        A.   -- say that.

10       Q.   -- truck -- please listen to the question I'm

11   asking.  And give me a chance to ask you before you

12   answer, okay?  Because the court reporter has to take

13   this down.  I know I've been guilty of it, but let's

14   try to do better, okay?  All right.

15           So if this air leak was noted on a truck that

16   your drivers were driving, absent an accident

17   occurring, you would agree it's unsafe to drive this

18   truck with that problem.  Correct?                      1:31:31

19           MR. HENDERSON:  Same objections.

20           THE WITNESS:  I would agree with that, but

21   who -- who said it was leaking before?

22   BY MR. DEFFET:

23       Q.   Okay.  Now, the next one has brake tubing and

24   hose adequacy, pliers used to stop air leak, front

25   passenger cabin.                                        1:31:48

Page 93

1      What is -- what is your understanding about

2  that?

3      A.   I don't think that -- I don't think there was

4  a -- any pliers on the right side.  Never -- I know --

5  and I never found them.                                    1:32:03

6      Q.   So you disagree --

7      A.   My brother --

8      Q.   -- with the -- the police on that.

9      A.   On the pliers.  I do on that -- on the right

10  side, yes, I do.                                           1:32:10

11      Q.   Okay.  And then the second page of this I'm

12  going to show you.  And do you see that --

13      A.   I read that.

14      Q.   Okay.  It says Trooper Mott stated there was

15  an air leak at axle 5 brake change -- chamber, right?      1:32:33

16      A.   Yes.  We discussed --

17      Q.   And it says --

18      A.   -- that.

19      Q.   Okay.  Please -- I know I'm long-winded, but

20  just give me a chance here for a sec, all right?           1:32:41

21      It says he stated the leak was present when

22  the brakes were released and air was being used to keep

23  the emergency brake from activating.  There were pliers

24  used to stop air leak from under the passenger side of

25  the cab.  And I saw pliers used to stop air leak on the

In Demand Electronic Court Reporting, Inc.          www.InDemandReporting.com                    (773) 239-6008

Page 94

1   driver side also.                                      1:33:01

2          And what is your understanding about that,

3   that the police officer put in the report?

4          MR. HENDERSON:  Objection.  Calls for

5   speculation.

6          THE WITNESS:  As once again, I'll say the

7   brake chamber probably happened during the accident.  I

8   believe that all the way.                              1:33:22

9          And there was a pair of pliers on the driver

10  seat is all I know about.

11  BY MR. DEFFET:

12     Q.   When did you see the -- the semi that Murray

13  Brothers, LLC, owns to see that the pliers were on the

14  seat of the truck on the driver side?                  1:33:37

15     A.   My brother Larry went up there and looked at

16  it about three weeks and he said that was the only set

17  of pliers he seen --

18     Q.   Okay.

19     A.   -- period.

20     Q.   So is that -- so you have not seen the truck

21  and you did not --                                     1:33:50

22     A.   I have --

23     Q.   Hold on.  You did not view the pliers and you

24  did not see the truck with the pliers on the driver

25  seat.

Page 95

1        A.    This is correct.  I have not seen it myself

2   personally.                                              1:34:02

3        Q.    Okay.  And you're stating that your brother

4   talked about seeing it three weeks ago with the pliers

5   on the driver side seat?

6        A.    Yes.                                           1:34:12

7        Q.    Okay.  Did anyone tell you that they saw the

8   pliers on the driver seat right after the incident on

9   April 29, 2018?

10       A.    Well, like who would've told me?             1:34:28

11       Q.    I'm -- I'm asking you.

12       A.    Nobody told me there was pliers on there

13  until I -- no, until -- I didn't find out until after

14  the inspection.

15       Q.    Okay.  The inspection by the police?         1:34:43

16       A.    Yes, sir.

17       Q.    Okay.  Where do you see in the police report

18  that it notes that the pliers are on top of the seat in

19  any manner?

20            MR. HENDERSON:  Mischaracterizes testimony.   1:34:56

21            THE WITNESS:  They wasn't on top of the seat.

22  They was underneath the -- they was underneath the cab

23  of the truck.

24  BY MR. DEFFET:

25       Q.    Okay, I'm sorry.  So where in the police

Page 96

1   report do you see that they are under the seat?                1:35:10

2        A.   Well, you just got done showing me.  I'd read

3   that -- I'd read that police report.

4        Q.   You're stating that it says that they're

5   under the seat?

6        A.   No, I seen a picture of it.                          1:35:25

7        Q.   I only showed you two pages.  There's no

8   pictures in the pages I showed you.

9        A.   There is in the police report, sir.  There's

10  a picture right here in this -- this thing here.               1:35:37

11       Q.   Your attorney can pull it up on the screen if

12  he wants.  I -- I'd be happy to -- to look at it if

13  your attorney wants to pull it up.                             1:35:48

14            MR. HENDERSON:  We're working on it.

15            THE WITNESS:  Okay.

16            MR. HENDERSON:  He wants the picture of --

17            THE WITNESS:  The picture of the pliers is --

18            MR. HENDERSON:  No --

19            THE WITNESS:  -- under this that's back here

20  -- it's back here in the accident --                          1:35:55

21  BY MR. DEFFET:

22       Q.   Hold on.  I got the report.  Give me a sec.

23  I'll find it.

24            MR. HENDERSON:  Can you tell me what the

25  picture -- what page so I can help counsel?                   1:36:06

Page  97

1          MR. DEFFET:  Give me a second.  I think I'll

2    be able to find it here.

3          THE WITNESS:  Oh, this is yours, ain't it?

4          MR. HENDERSON:  Oh yeah, yeah.  You can use

5    that --

6          THE WITNESS:  Okay.  It's --

7    BY MR. DEFFET:

8       Q.   Okay.  Is this --

9       A.   You got it.  You're -- you're getting close

10   -- yeah, that's -- that's it right there, sir.          1:36:25

11      Q.   Okay.

12      A.   That's what I'm talk -- that's the one --

13      Q.   Okay.

14      A.   -- I'm talking about.  Yes.  That's the only

15   thing I've seen --                                       1:36:37

16      Q.   Okay.

17      A.   -- period.

18      Q.   So this is page 27 of the 33-page Illinois

19   State Police report.  Okay?

20          And it states here it was noted that a pair

21   of pliers was observed on air lines under the driver

22   side of the cab as well as the passenger side of the

23   cab.                                                     1:36:56

24          And this is a photograph of the pliers as

25   they were positioned at the tow lot on May 3, 2018.

Page 98

1    Right?

2         A.    Correct.

3         Q.    Okay.  You're -- you're state -- you believe

4    that this is in regard to the driver's seat.          1:37:13

5         A.    It is.

6         Q.    Okay.  Okay.  All right.  I'll move on.

7               Can you tell me when you hired Jimmie Dale

8    Cox?

9         A.    July 6, 2006.                               1:37:33

10        Q.    And as you stated earlier, when you hire

11   somebody, you order a report on their driving history,

12   right?

13        A.    This is correct.                            1:37:42

14        Q.    And what violations did you find regarding

15   Jimmie Dale Cox before you hired him?

16        A.    Well, like I said, I run -- PJC Insurance

17   does that for me, sir.                                 1:37:51

18        Q.    And then they give it to you, right?

19        A.    Well, some -- no, they will not give it to

20   me.  They will tell me if it's -- if he's okay to hire.

21   They will not send it to me.                           1:38:01

22        Q.    Okay.

23        A.    Because of privacy -- because of the privacy

24   act.

25        Q.    So you -- you don't have any --

Page 99

1        A.    They will not --

2        Q.    -- discretion over who you hire for drivers.    1:38:09

3             MR. HENDERSON:  Objection.  Misstates

4    testimony.

5             THE WITNESS:  We -- well, what are you --

6    what are you saying?  What do you mean, I don't have no

7    discretion?

8    BY MR. DEFFET:

9        Q.   Well, I'm -- I'm asking -- you said that you

10   -- you don't review what's given to you of the driver's

11   record.  Is -- is that correct?                         1:38:27

12            MR. HENDERSON:  Objection.  Misstates --

13            THE WITNESS:  I --

14            MR. HENDERSON:  -- testimony.

15            THE WITNESS:  No, that's not what I said,

16   sir.  What I said -- I meet with my drive -- I meet

17   with somebody who's looking for a job.                  1:38:35

18            I have a discussion with them.  I'm talking

19   to him.  And we have a talk about stuff.  And then the

20   very next step I take is get their MVR and I run it

21   through PJC Insurance.                                  1:38:47

22            And that is the next step to see if their --

23   if their MVR is good enough to drive.  And that's PJC's

24   call.

25   BY MR. DEFFET:

Page 100

1      Q.   What step --                                     1:38:56

2      A.   PJC makes all -- PJC Insurance Agency makes

3  the call if a driver is qualified enough to drive for

4  them to put on their insurance.

5      Q.   That -- that's what I'm trying to nail down.

6  So if PJC said it's okay and their driver's record is

7  okay, then you're going to hire them.                     1:39:14

8           MR. HENDERSON:  Objection.  Misstates

9  testimony.

10          THE WITNESS:  Not necessarily.  I said that's

11 number -- that's the No. 2 step is checking their MVR.

12 The No. 1 step is talking to them.                        1:39:24

13 BY MR. DEFFET:

14     Q.   Okay.  What did you review in his driving

15 record before you hired him?

16     A.   I will not hire nobody -- I -- if PJC --

17 sometimes they'll run somebody through, and if they

18 don't qualify to drive for PJC --                         1:39:37

19     Q.   I'm not --

20     A.   -- then --

21     Q.   -- asking about PJC.  I'm asking about you.

22 What did you --

23     A.   Well, you're ask --

24     Q.   -- review in Mr. Cox's driving record before

25 you hired him?                                            1:39:46

Page 101

1            MR. HENDERSON:  Objection.  Assumes facts.

2   Misstates testimony.

3            THE WITNESS:  Well, first of all, I knew even

4   -- I knew the guy he was driving for.

5   BY MR. DEFFET:

6       Q.   Okay.                                    1:39:56

7       A.   Before -- before he come to work for me.

8       Q.   Okay.  So first of all, answer the question.

9   What did you review of Mr. Jimmie Dale Cox's driving

10  record before you hired him?                      1:40:08

11           MR. HENDERSON:  Same objections.

12           THE WITNESS:  As I stated, PJC Insurance ran

13  him through, and if it's okay with PJC, if it clears

14  through PJC --

15           MR. DEFFET:  Move to --

16           THE WITNESS:  -- I --

17           MR. DEFFET:  -- strike as non-responsive.   1:40:22

18  BY MR. DEFFET:

19      Q.   What did you review in Mr. Cox's driving

20  record before you hired him?

21           MR. HENDERSON:  Objection.  Asked and

22  answered.                                         1:40:29

23  BY MR. DEFFET:

24      Q.   Did you review his driving record before you

25  hired Jimmie Dale Cox?

Page 102

1        A.    Through PJC Insurance.                          1:40:42

2        Q.    What did you review from PJC Insurance

3    regarding Mr. Cox's driving record?

4        A.    If he was good enough to hire through PJC

5    Insurance.  If they would put him on the insurance

6    before I hired him.                                       1:40:55

7        Q.    Did you review anything in Mr. Cox's record

8    yourself before you hired him to drive for your

9    company, Murray Brothers, LLC?

10       A.    I told you PJC will not give me their MVR

11   because it's against the policy.                          1:41:11

12            MR. DEFFET:  Move to strike as

13   non-responsive.

14   BY MR. DEFFET:

15       Q.    Did you review anything of Mr. Jimmie Dale

16   Cox's driving record before you hired him?                1:41:20

17            MR. HENDERSON:  Objection --

18            THE WITNESS:  No.

19            MR. HENDERSON:  -- asked and answered

20   repeatedly.

21   BY MR. DEFFET:

22       Q.    That answer was "no," correct?                  1:41:25

23       A.    That's right.

24       Q.    So you did not review anything in his driving

25   history before you hired Jimmie Dale Cox --

Page 103

```
1        A.   That is --
2             MR. HENDERSON:  Objection --
3             THE WITNESS:  -- not --
4             MR. HENDERSON:  -- asked and answered.        1:41:34
5             MR. DEFFET:  I'm going to keep asking him
6   until you stop the objections and I get a clear answer.
7   I'll keep asking him -- we'll go on for this for two
8   hours.  So continue --                                 1:41:43
9             MR. HENDERSON:  it's a fair objection --
10            MR. DEFFET:  -- objecting.
11            MR. HENDERSON:  -- Counselor.
12            MR. DEFFET:  We'll be here all day.
13  BY MR. DEFFET:
14       Q.   Did you review anything of Mr. Jimmie Dale
15  Cox's driving record before you hired him for Murray
16  Brothers, LLC?                                         1:41:54
17       A.   His driving record, no.
18       Q.   So you did not review his driving record at
19  all before you hired him.
20            MR. HENDERSON:  Objection.  Asked and
21  answered.  You got your clear answer.  You can move on
22  now.                                                   1:42:05
23            MR. DEFFET:  No, I didn't.  I got hemming and
24  hawing.
25  BY MR. DEFFET:
```

Page 104

1    Q.   You did not review anything in Jimmie Dale

2   Cox's driving record before you hired him.              1:42:14

3         MR. HENDERSON:  Objection.  Asked and

4   answered.  I'm going to keep objecting asked and

5   answered until you move on.  We can be here all day.    1:42:19

6   BY MR. DEFFET:

7    Q.   Go ahead and answer.

8    A.   I -- I said no.

9    Q.   Okay.  Thank you.  Now, you said you did

10   other things before you hired him.                      1:42:29

11        What else did you do before you hired him to

12   review his application and employment history?

13   A.   I called the people he worked for before.

14   Q.   And who --

15   A.   Talked --

16   Q.   -- was that?                                       1:42:39

17   A.   -- to them.  That was A&K Trucking and

18   Coleman Trucking.

19   Q.   And who did you speak to at each of those

20   places?

21   A.   I think at A&K was Kellie, and at Coleman I

22   actually forgot who I talked to.  That was 14 years

23   ago, so.                                                1:42:58

24   Q.   When you said Kellies, is that a first name

25   or a last name at A&K Trucking?

Page 105

1      A.    That is a first name and that is a lady.

2      Q.    And where is A&K Trucking located?          1:43:10

3      A.    Mineral Point, Missouri.

4      Q.    And how long was he working for those guys?

5      A.    I think he worked there, oh, two years.

6      Q.    What position did he have?          1:43:22

7      A.    He was an over road truck driver.

8            MR. HENDERSON:  Hey, Counselor, I'm sorry to

9      interrupt, but we've been going about two hours, and --

10     and frankly, I have to use the restroom.          1:43:31

11           Could we -- is this a good time to break?

12           MR. DEFFET:  Okay.

13           MR. HENDERSON:  I appreciate it.

14           MR. DEFFET:  Let's take a five-minute break,

15     okay?  Thank you.

16           THE RECORDER:  Going off the record at 12:47

17     p.m.          1:43:40

18                     (Off the record.)

19           THE RECORDER:  We are back on the record at

20     1:03 p.m.

21     BY MR. DEFFET:

22     Q.    Okay.  Before the break, Mr. Murray, I was

23     asking you what other things you did to check on Mr.

24     Cox's record before you hired him.          1:44:06

25           You talked about a woman named Kellie at A&K

Page 106

1   Trucking.  Do you know that woman's last name?

2       A.   Her last name was Coleman.                    1:44:16

3       Q.   Oh.  It was Kellie Coleman?

4       A.   Well, she -- it was -- yeah -- yeah.  She's

5   Kellie Coleman, but she was married to -- I forget -- I

6   forget her last name, but her maiden name is -- is

7   Coleman, yes.  It was.                               1:44:32

8       Q.   Okay.  So when you said A&K Trucking and

9   Coleman, that was only one place you were talking

10  about.

11      A.   No, sir, that's two companies.

12      Q.   Okay.  So Coleman is a separate company.  And

13  who'd you talk to at Coleman?                         1:44:44

14      A.   I --

15      Q.   Kellie Coleman?

16      A.   -- like I said, I -- I don't really remember.

17  It might've been Joe.  He was the owner.

18      Q.   Okay.

19      A.   I said that was 14 years -- about 14 years

20  ago, so.                                             1:44:55

21      Q.   Okay.  Did anyone --

22      A.   A long time.

23      Q.   -- did anyone tell you anything on his record

24  that you talked to?

25      A.   No.  They just -- no.  They just said he was

Page 107

1    a pretty -- pretty honest, dependable guy.                    1:45:06

2         Q.    Okay.   You -- you ran -- sorry.   We'll get --

3    you already said you ran a record -- we'll get -- we'll

4    -- we'll go beyond that.                                      1:45:14

5              After he was hired by you, he had violations

6    on October 11, 2011, where he was convicted of speeding

7    in excess of 10 miles an hour in Missouri in Elsberry

8    County, correct?                                              1:45:26

9         A.    This is correct.

10        Q.    On February 2nd, '14, he was involved in an

11   accident on Missouri Highway 32, correct?

12        A.    This is correct.                                   1:45:35

13        Q.    On October 21, '15, he was convicted of

14   improper backing in Illinois.   Correct?

15        A.    Yes, he --

16             MR. HENDERSON:   Objection --

17             THE WITNESS:   -- was.

18             MR. HENDERSON:   -- calls for a legal

19   conclusion.                                                   1:45:45

20   BY MR. DEFFET:

21        Q.    That's the ticket.   The ticket states that,

22   that you provide in discovery.   On October 21, '15, he

23   is convicted of improper backing in Illinois.   Correct,

24   Mr. --

25             MR. HENDERSON:   Same --

Page 108

1    BY MR. DEFFET:

2        Q.    -- Murray?                                    1:45:57

3             MR. HENDERSON:  Same objection.  You're using

4    the word "convicted."  I don't think that was on the

5    ticket.

6             THE WITNESS:  Yeah, I don't think he was ever

7    convicted of nothing.  He -- no, he wasn't convicted.    1:46:06

8    BY MR. DEFFET:

9        Q.    You're saying he was not convicted now.

10       A.    I asked Mr. Cox about that.  He don't even

11   remember that happening, so I don't even know where

12   that come from.                                          1:46:20

13       Q.    Do you believe him, that he doesn't remember

14   it happening?

15       A.    I believe he's -- yeah, I believe he says he

16   don't remember it happening, yeah.

17       Q.    Do you believe him, that he did not have that

18   violation?                                               1:46:32

19       A.    I believe the violation happened, but I can

20   believe that he didn't maybe remember it.

21       Q.    Okay.  You pulled a report that has the

22   violation.  That was provided in discovery, right?       1:46:42

23       A.    Yes, sir.  Yes, sir.

24       Q.    Okay.  So you saw it on paper, right?

25       A.    I have.

Page 109

1      Q.    Okay.  So if he didn't remember, that means

2   he lied to you, right?                                      1:46:52

3            MR. HENDERSON:  No.

4            THE WITNESS:  No, it --

5            MR. HENDERSON:  Objection.

6            THE WITNESS:  -- does not.

7            MR. HENDERSON:  Misstates testimony.

8   BY MR. DEFFET:

9      Q.    Then -- then how did you find out about it to

10  pull it?                                                    1:46:59

11     A.    I found out about it from PJC Insurance.

12     Q.    Okay.  How many reports has PJC Insurance

13  done on Mr. Cox for you?

14     A.    They do one a -- one every February of every

15  year.                                                       1:47:16

16     Q.    Okay.  How come that wasn't provided in

17  discovery?

18     A.    Wasn't asked for it, I guess.  Who asked --

19     Q.    Okay.

20     A.    Did somebody asked for it?

21     Q.    It was asked for.  And we only had one -- I

22  think we only had one record.  But I'll move on.            1:47:31

23            On December 18, 2015, Mr. Cox struck a diesel

24  pump in Batesville, Mississippi -- Mississippi, right?

25     A.    This is correct.

Page 110

1      Q.   On April 25, '16, he was involved in an

2  accident in Pocahontas, Illinois, correct?                    1:47:46

3      A.   Pocahontas, Arkansas, sir.

4      Q.   I'm sorry.  Pocahontas, Arkansas?

5      A.   Yes, sir.

6      Q.   Okay.  April 25, '16, Jimmie Dale Cox was

7  involved in an accident in Pocahontas, Arkansas.              1:47:58

8      A.   This is correct.

9      Q.   On July 13th, '16, Jimmie Dale Cox was

10  convicted of speeding in excess of 10 miles per hour in

11  Wisconsin.

12     A.   Correct.                                              1:48:08

13     Q.   On January 25, '18, Jimmie Dale Cox was

14  involved in an accident in Grenada, Mississippi.

15     A.   Correct.

16     Q.   And on an unknown date prior to April 29,

17  '18, Jimmie Dale Cox was involved in an accident on

18  Highway 55 in Mississippi.                                    1:48:25

19     A.   I did see that.  I don't remember that.  But

20  I did see that, yes.

21     Q.   Okay.  Where did you see it?

22     A.   In that discovery.  I did see that.  I did,

23  but I don't remember nothing about that, but I did see

24  that, yes.                                                    1:48:41

25     Q.   Did PJC provide you information regarding

Page 111

1   that accident on Highway 55 in Mississippi?

2        A.    I do not remember that at all, sir.  No, sir,

3   I do not.  The first time I seen it was on that

4   discovery.                                              1:48:52

5        Q.    Okay.  All these other incidents that I

6   mentioned -- were you aware of those incidents?

7        A.    Most certainly was.  Yes, sir.

8        Q.    Okay.  So let's go back to your policy.  So

9   due to all these incidents, did you dock Mr. Cox under

10  your policy for any points for any of these incidents?   1:49:09

11       A.    Well, the only incident that Mr. Cox would've

12  been -- the Batesville, Mississippi was he was at

13  fault.  The Farmington, Missouri he was not at fault.

14  Zero was at fault, not at a fault at all.                1:49:23

15            He was not at fault in Pocahontas, Arkansas.

16  He was not at fault.  The car hit him.  In Grenada,

17  Mississippi, a car passed him, swerved over in front of

18  him.  He was not at fault at that.                       1:49:34

19            And the -- of course the speeding ticket he

20  was -- that's his fault, but -- so basically he had the

21  Batesville, Mississippi was just property damage only.

22  It was a fuel pump.  And then the speeding ticket.       1:49:48

23       Q.    Did you assess him any points under your

24  policy for any of these violations?

25       A.    I did not.

Page 112

1       Q.    Why did you not do this?                     1:49:58

2       A.    Well, I mean, I -- I assessed him points, but

3   I mean that was just -- then we had a verbal -- a

4   conversation and stuff.  Yes.                          1:50:05

5       Q.    Okay.  There's -- there's no record in the

6   personnel file that you disciplined him -- him at all

7   for any of these violations.

8       A.    Well, I just gave him oral warnings.         1:50:15

9       Q.    When did you give him oral warnings for any

10  of these incidents?

11      A.    When I found out about them, sir.

12      Q.    Can you describe any time you gave him an

13  oral warning, when the date was, who was there, what -- 1:50:28

14      A.    It --

15      Q.    -- you said to him?

16      A.    -- no.  It -- it would've just been me and

17  him, sir.

18      Q.    But when?

19      A.    It would've been like right after they

20  would've happened.                                     1:50:36

21      Q.    But you said you didn't know about some of

22  them, so I'm asking you for a specific --

23      A.    The only --

24      Q.    -- date.

25      A.    The only one I said I didn't know about was

Page 113

1   the one on Interstate 55 in Mississippi.  Everything

2   else I know about.                                        1:50:48

3        Q.   Okay.  How did you find out about the other

4   incidents?

5        A.   He reported them to me.

6        Q.   He reported all of them to you?

7        A.   Yes, he did.                                     1:51:01

8        Q.   Okay.  And what did you -- what did you tell

9   him to remedy the situation once he had all these

10  violations?

11       A.   I will say he reported everybody -- except

12  that one, that improper backing.  I do not remember

13  that.                                                      1:51:14

14       Q.   But what did you tell him -- as managing the

15  safety for Murray Brothers, LLC, what did you tell him

16  to do in order to get better as a driver?

17       A.   You're just going to have slow down and be

18  careful.  But when it's -- when you're setting

19  somewhere and somebody hits you, you -- there ain't a

20  whole lot you can do about that sometimes, sir.           1:51:32

21       Q.   Okay.  But there's like ten violations.

22  They're not all where someone's sitting down and

23  someone hits you.  Right?

24            MR. HENDERSON:  Objection.  Misstates

25  evidence.                                                  1:51:40

Page 114

1        THE WITNESS:  There's only seven incidents,

2   sir.

3   BY MR. DEFFET:

4        Q.   Okay.  So -- but not all seven incidents

5   where somebody hit him from behind, right?              1:51:52

6        A.   Seven incidents in about eight years.  Seven

7   years.

8        Q.   Okay.  So you didn't feel that he should be

9   assessed any points for any of these violations.

10        MR. HENDERSON:  Objection.  Misstates

11   testimony.                                               1:52:04

12        THE WITNESS:  Yes.

13   BY MR. DEFFET:

14        Q.   Okay.  Where are Jimmie Dale Cox's logs?

15        A.   His logs now?  For --

16        Q.   Ever.

17        A.   -- like the last six --                        1:52:16

18        Q.   Any logs.  Any logs, period.

19        A.   His -- any logs for the last six months.

20   That's a law that you only have to keep them for six

21   months, and the last six months are in his -- in his

22   file cabinet.                                            1:52:27

23        Q.   No logs have been produced in discovery from

24   Jimmie Dale Cox.  You're saying you have logs?

25        A.   For the last -- for 2020.                      1:52:39

Page 115

1      Q.   What about in 2018?

2      A.   Do not have -- they -- they had all been

3  throwed away.  You only got -- we've only gotta keep

4  them six months, sir.

5      Q.   So when did you throw them away?                    1:52:49

6      A.   We -- about every month we throw them away.

7  We just keep six months on file.

8      Q.   Okay.  So when the time this accident

9  happened, you didn't think you should preserve any

10  logs?                                                        1:53:01

11      A.   I do.  When this happened, at the time, he

12  had an ELD.  Which is electronic log.  And J.J. Keller

13  would've had a copy of them.                                1:53:10

14           And until after the fact, I did not know his

15  -- his -- his ELD was not working.  So no, he did not

16  have no paper logs at the time that I had --                1:53:19

17      Q.   Okay.

18      A.   -- to keep.

19      Q.   It wasn't his ELD.  It was your truck that

20  you owned.  That ELD did not work correctly.  Right?        1:53:28

21      A.   This is correct, after the fact.  Yes.

22      Q.   Okay.  And it had not been working for at

23  least eight days, correct?

24      A.   That I found out later.  This is true.             1:53:40

25      Q.   Okay.  And you were the dispatcher for Jimmie

Page 116

1   Dale Cox, right?

2        A.   Yes, sir.

3        Q.   Okay.  You're the safety person for Murray

4   Brothers, LLC, correct?                                      1:53:49

5        A.   This is correct.

6        Q.   Okay.  And you spoke to probably Jimmie Dale

7   Cox every day when he's on the road via dispatch,

8   right?

9        A.   This is true.                                      1:53:59

10       Q.   Okay.  And were you asking him to submit his

11   logs?

12       A.   Was I asking him to -- with the ELD, we don't

13   -- that was a brand new thing, and we've only had them

14   that month.                                                 1:54:14

15            So we was both kind of in the dark about

16   everything about them.  But he did not -- you do not

17   submit electronic logs.  You have to get them off the

18   damn computer.                                              1:54:23

19       Q.   Okay.  Were you monitoring his logs on the

20   computer?

21       A.   I was not at the time.  Like I said, I check

22   them once a month, sir.

23       Q.   Okay.  Did you feel you had no responsibility

24   to monitor his logs on the computer or the written logs

25   if the electronic version was not available?               1:54:41

                                                                  Page 117

1            MR. HENDERSON:  Objection.  Misstates

2      testimony.

3            THE WITNESS:  As I said, I -- we check them

4      once a month, sir.

5      BY MR. DEFFET:

6         Q.   So no one was -- no -- only once a month

7      someone was checking his electronic logs that were

8      submitted?                                          1:54:55

9         A.   Yes.  And we didn't even have it once a

10     month.  We didn't --

11        Q.   Okay.

12        A.   -- even have it a month at -- so far, we --

13     we put them in the truck on March 31st.  They had to be

14     in the truck by April 1st, 2019.                    1:55:07

15        Q.   Okay.

16        A.   It was a brand new -- it was brand new to us,

17     sir.

18        Q.   So if that's the case, why don't you have any

19     copies of the written logs prior to that date for

20     Jimmie Dale Cox?                                     1:55:16

21        A.   I did have.

22        Q.   Yeah, but they've been destroyed?

23        A.   Yes, sir.

24        Q.   When --

25        A.   That was over --

Page 118

1    Q.   -- did you --

2    A.   -- two and a half years -- that was --

3    Q.   When --

4    A.   -- two and a half years ago, sir.               1:55:25

5    Q.   When did you destroy Jimmie Dale Cox's logs?

6    A.   I told you I keep them for six months and the

7    seventh month they get throwed away.

8    Q.   When --

9    A.   Everything --

10   Q.   -- did you -- when did you throw away Jimmie

11   Dale Cox's logs?                                      1:55:40

12   A.   Okay.  For March of 2018?

13   Q.   Let's start there.  Yes.

14   A.   They probably would've been throwed away in

15   October of 2018.

16   Q.   How did you get rid of them?                     1:55:56

17   A.   They would have --

18        THE RECORDER:  I'm sorry.  Could you repeat

19   that for the record?  I missed it.

20   BY MR. DEFFET:

21   Q.   How did you get rid of the logs in October

22   2018?                                                 1:56:07

23   A.   We just throw them in the trash, sir.

24   Q.   Threw them in the trash where?

25   A.   At the landfill.  In our trash.  And they get

Page 119

1  picked up by the garbage truck and they take them to

2  the landfill.                                        1:56:21

3       Q.   Did you feel you had no duty to keep the logs

4  when an accident had happened on April 29, '18?

5       A.   I -- I felt like -- no, I didn't have -- no.

6       Q.   Okay.  You're familiar with the Federal Motor

7  Carrier Statute, right?                              1:56:37

8       A.   Which is what?  Which one are you talking

9  about?  There's a lot of them.

10      Q.   You don't know -- you know what the Federal

11 Motor Carrier Statute is, right?                     1:56:49

12      A.   Yes.

13      Q.   Okay.  So you know when there's an accident,

14 you're supposed to preserve the logs prior to the

15 accident, leading up to the date of the accident,

16 right?                                               1:57:00

17      A.   And like I told you, sir, he had electronic

18 log, and it was all on a computer.

19      Q.   So are you saying it's --

20      A.   So we --

21      Q.   -- still available?                        1:57:09

22      A.   I would not -- I don't know.  I would say

23 J.J. Keller probably only keeps them for six months

24 too.

25      Q.   How -- who is the person at the company that

                                                          Page 120

1   monitors J.J. Keller's electronic logging for your

2   drivers and your trucks?                              1:57:25

3        A.   That would be me.

4        Q.   Okay.  And what have you done to preserve any

5   logs since the accident happened?

6        A.   I have not preserved none.                   1:57:35

7        Q.   And did you feel you did not have a duty to

8   do so even though a major incident happened where

9   approximately ten to 12 people sustained major

10  injuries?

11       A.   I did not keep no logs, sir.  They're --      1:57:49

12       Q.   Okay.

13       A.   -- all been destroyed.

14       Q.   You didn't keep the logs because you knew

15  they were not kept and there were violations of the

16  statute.  Isn't that true?                             1:57:59

17            MR. HENDERSON:  Objection.

18            THE WITNESS:  That is not --

19            MR. HENDERSON:  Argumentative.

20            THE WITNESS:  -- true.

21  BY MR. DEFFET:

22       Q.   You knew --

23            THE RECORDER:  Could you repeat --

24  BY MR. DEFFET:

25       Q.   -- that if --

Page 121

1          THE RECORDER:  -- that objection?                1:58:05

2          MR. HENDERSON:  Argumentative.

3          THE RECORDER:  Thank you.

4    BY MR. DEFFET:

5      Q.   You knew that if you provided the logs, they

6    would clearly demonstrate that your drivers were

7    violating the hours of service regulations and other

8    regulations.  Isn't that correct?                      1:58:20

9          MR. HENDERSON:  Objection.  Argumentative,

10   assumes facts not in evidence.

11         THE WITNESS:  Absolutely not.

12   BY MR. DEFFET:

13     Q.   Do you believe that Murray Brothers has a

14   duty to operate its trucks safely?                      1:58:33

15     A.   I do.

16     Q.   Is that important?

17     A.   Yes, it's important.

18     Q.   Why is that important?

19     A.   It's important for a lot of reasons.             1:58:47

20     Q.   What reasons?

21     A.   Safety, dependability, delivery on time.

22   Safety --

23     Q.   What --

24     A.   -- to community.

25     Q.   What kind of things go into operating safely?    1:59:01

Page 122

1        A.    There's quite a few.

2        Q.    Can you name some?

3        A.    What do you mean?

4        Q.    What kind of things go into operating safely?

5        A.    Safe equipment, safe drivers, rested drivers.

6   It's a --

7        Q.    Do you --

8        A.    -- pretty broad question.                    1:59:25

9        Q.    Do you think Jimmie Dale Cox is a safe

10  driver?

11       A.    I think he is.  Yes.  That's my opinion.

12       Q.    Even after this incident?

13       A.    Accidents happen every day, sir.            1:59:39

14       Q.    Yeah, but people don't get practically

15  disabled for life, incurring millions of dollars of

16  damage every day.  You'd agree with that, right?

17            MR. HENDERSON:  Objection.  Misstates

18  evidence.  And assumes facts.                           1:59:51

19            THE WITNESS:  No, I'd say somebody gets

20  mangled every day in a vehicle.

21  BY MR. DEFFET:

22       Q.    If it was someone in your family, would you

23  be so cavalier that someone got mangled and just said

24  accidents happen every day?                             2:00:01

25            MR. HENDERSON:  Object.  Mischaracterizes

                                                            Page 123

1    testimony as cavalier.

2            THE WITNESS:  No, sir, I've been down that

3    road myself.

4    BY MR. DEFFET:

5        Q.    Okay.  Are you aware that my client has

6    permanent scarring as a young female woman for life

7    that she'll never be able to get rid of?  She has to

8    carry that with her for the rest of her life.

9            MR. HENDERSON:  Objection.

10           THE WITNESS:  I'm --

11           MR. HENDERSON:  Assumes facts.

12           THE WITNESS:  No, sir, I was not -- I'm not

13   aware of it, but my prayers and heart goes out for

14   everybody that was involved in the accident.            2:00:32

15   BY MR. DEFFET:

16       Q.    I appreciate it, but prayers won't help her

17   now.  Because she's already got scarring on her face.

18   And you could've stopped Jimmie Dale Cox from driving

19   based on his record, but you didn't do it, did you?      2:00:43

20           MR. HENDERSON:  Objection.  Assumes facts,

21   argumentative.

22           THE WITNESS:  Huh.

23   BY MR. DEFFET:

24       Q.    What kind of driver would you consider to be

25   not safe?                                                2:00:56

Page 124

1        A.    That's a broad -- that's a pretty broad

2    statement, sir.

3        Q.    Have you ever suspended a driver for not

4    operating safely?

5        A.    Most certainly have.

6        Q.    Who have you suspended?                    2:01:13

7        A.    Robert Romero.

8        Q.    And when was --

9        A.    And --

10       Q.    -- that?

11       A.    And Robin Ervin.  Probably Robert Romero got

12   dismissed end -- end of 2011 and Robin was dismissed in

13   -- I think it was 2009.                              2:01:35

14       Q.    Romero, R-O-M-E-R-O?

15       A.    Exactly.  Yes, sir.

16       Q.    Ervin, E-R-V-I-N?

17       A.    Exactly.  Yes, sir.                        2:01:45

18       Q.    Okay.  What did they do that was not safe?

19       A.    Robin Ervin was -- he failed the drug policy.

20   And Robert Romero had two accidents within one week.

21   And he was --                                       2:01:59

22       Q.    When were the --

23       A.    -- let go --

24       Q.    -- accidents?

25       A.    One was in Tennessee and one was in Virginia.

Page 125

1        Q.    When were they?

2        A.    Back in 2000 -- November 2011, within the

3    week -- one week of each -- within three days of each

4    other, actually.                                      2:02:14

5        Q.    And why did you fire Mr. Ervin?

6        A.    Failure for a drug policy.

7        Q.    I'm -- I'm --

8        A.    Policy --

9        Q.    -- sorry.  Mr. -- Mr. Romero.  I mean Mr.

10   Romero.  Why did you fire Mr. Romero?                 2:02:27

11       A.    Two accidents within one -- less than a week.

12       Q.    Was anyone injured during the accidents?

13       A.    The lady in Virginia was -- no, she -- no,

14   just some car -- car damage.  But -- I mean she went to

15   a doctor, but she was fine.  She just got checked out.  2:02:47

16       Q.    What, if any, prior records did they have

17   before these incidents happened that you gave them

18   points for?

19       A.    Prior to this?

20       Q.    Yeah.  Was there anything --                2:03:05

21       A.    Prior --

22       Q.    -- that you noticed on -- on their driving

23   record prior to these accidents happening?

24       A.    No, nothing -- nothing prior -- not prior to

25   letting them go.                                      2:03:15

Page 126

1      Q.   Okay.  So they only had these accidents and

2   the drug test on the record and that's it?

3      A.   Yeah.  The drug test, yeah, it was -- that's

4   immediate dismissal.  You -- failure for a drug test

5   is, yes.                                      2:03:26

6      Q.   Okay.  Did they --

7      A.   He --

8      Q.   -- have any --

9      A.   -- he --

10     Q.   -- speeding tickets or violations prior to

11  that date?

12     A.   Mr. Romero had a couple speeding tickets,

13  yes.                                          2:03:36

14     Q.   How many speeding tickets did he have prior

15  to -- to you terminating him?

16     A.   Two.

17     Q.   Two convictions?                      2:03:43

18     A.   And then -- and then the two accidents in a

19  -- in a -- within a span of three or four days.

20     Q.   Anybody else besides these two that you

21  suspended or fired?                           2:03:55

22     A.   Not that I recall.  I think them's the only

23  two, sir.

24     Q.   Do you believe that Murray Brothers has a

25  duty to provide the management and financial support

Page 127

1   necessary to operate safely?

2        A.   Could you rephrase that, please?                    2:04:13

3        Q.   Do you believe that Murray Brothers has a

4   duty to provide the management and financial support

5   necessary to operate safely?

6        A.   Yes.                                                 2:04:24

7        Q.   Why is that important?

8        A.   It's in their -- it's important for -- you

9   mean it's -- how come safety's important?

10       Q.   I -- I'm sorry, but I can't -- I can't answer

11  questions for you.  You just have to answer the

12  questions that I ask.                                          2:04:39

13       A.   Okay.  Rephrase, please.

14       Q.   Do you believe Murray Brothers has a duty to

15  provide management and financial support necessary to

16  operate the company safely?                                    2:04:52

17       A.   Yes.  I believe we have a lot of duties to

18  do.

19       Q.   Okay.  And what have you done to encapsulate

20  those goals for Murray Brothers, LLC?

21       A.   We try to keep our equipment up, try to keep

22  safe drivers.                                                  2:05:06

23       Q.   Okay.  What do you do to train drivers when

24  they're hired?

25            MR. HENDERSON:  Objection.  Asked and

In Demand Electronic Court Reporting, Inc.        www.InDemandReporting.com                (773) 239-6008

Page 128

1    answered.

2         THE WITNESS:  What do we do to train?  We

3    don't really train them.  I mean, everybody's ever went

4    to work for us has had -- been experienced drivers.        2:05:24

5         They've all -- they -- I've not hired no

6    young drivers.  They've all had at least -- probably at

7    least ten years of service or more from somewhere else.    2:05:33

8    BY MR. DEFFET:

9         Q.   Okay.  Does that mean they're safe drivers?

10        A.   Doesn't mean they're safe drivers.  It means

11   experienced drivers.  But they were probably safer than

12   a lot of young people, yes.                                2:05:44

13        Q.   Okay.

14        A.   In my --

15        Q.   Do you --

16        A.   -- opinion.

17        Q.   Do you consider Mr. Cox a safe driver?

18        A.   I consider him a good driver.                    2:05:51

19        Q.   Did you --

20        A.   Good --

21        Q.   -- consider --

22        A.   -- depend -- good, dependable, honest driver.

23   I could -- I think Mr. Cox is.                             2:05:59

24        Q.   Did you consider him a safe driver before

25   this incident happened?

Page 129

1          A.    Yes.

2          Q.    Do you believe that Murray Brothers has a

3     duty to counsel and correct drivers who may have unsafe

4     driving habits or practices?                              2:06:11

5          A.    Sure, we'll -- we'll try.  We'll try to help

6     them any way we can.

7          Q.    How do you do that?

8          A.    Just set and explain to them we've gotta slow

9     down and just take our times.                             2:06:23

10         Q.    What else do you do?

11         A.    That's really about it.

12         Q.    Do you believe Murray Brothers has a duty to

13    prevent accidents?

14         A.    Well, we try our best.  Yes.                   2:06:40

15         Q.    Is that important?

16         A.    Sure it's important.

17         Q.    Why is that important?

18         A.    Lot of things are important in a trucking

19    company.                                                  2:06:49

20         Q.    Why is that important to prevent accidents?

21         A.    To keep the community safe, sir.

22         Q.    Do you believe Murray Brothers has a duty to

23    stop unsafe driving practices?

24         A.    Yes.                                           2:07:06

25         Q.    Why is that important?

Page 130

1        A.    As I said once before, to keep everybody safe

2   on the highways and in the community.

3        Q.    Should a good truck company learn from its

4   mistakes?                                                2:07:16

5        A.    They should.  Yes.

6        Q.    If unsafe practices result in the loss of

7   property or life, should a company learn from those

8   mistakes?

9        A.    They should -- they should try.  Yes.        2:07:31

10        Q.    Should a company make changes to ensure those

11   mistakes do not occur again?

12        A.    Yes.

13        Q.    Would it be reckless for a trucking company

14   to operate without making safety a priority?            2:07:45

15            MR. HENDERSON:  Objection.  Improper

16   hypothetical.  Vague.

17            THE WITNESS:  Could you ask that again, sir?

18   BY MR. DEFFET:

19        Q.    Would it be reckless for a trucking company

20   to operate without making safety a priority?            2:07:59

21            MR. HENDERSON:  Same objections.

22            THE WITNESS:  Yeah, I mean, safety is a goal

23   of ours, yeah.  It's one of many -- many goals that we

24   have at Murray Brothers.  Yes.                          2:08:08

25   BY MR. DEFFET:

Page 131

1        Q.    Would it be reckless for a trucking company

2   to hire drivers with unsafe driving habits or

3   practices?

4             MR. HENDERSON:  Same objection.

5             THE WITNESS:  Yes.                              2:08:19

6   BY MR. DEFFET:

7        Q.    Does Murray Brothers accept responsibility

8   for its drivers who are negligent and cause wrecks?

9             MR. HENDERSON:  Same objections.               2:08:28

10            THE WITNESS:  Would they accept what, sir?

11  BY MR. DEFFET:

12       Q.    Does Murray Brothers accept responsibility

13  for its drivers who are negligent and cause wrecks?      2:08:38

14            MR. HENDERSON:  Objection.  Vague, improper

15  hypothetical.

16            THE WITNESS:  I mean -- I mean, if they work

17  for us, I mean, yeah, I mean, we'll try our best.

18  BY MR. DEFFET:

19       Q.    Does Murray Brothers accept responsibility if

20  its employees allow unsafe practices to continue?        2:09:00

21            MR. HENDERSON:  Objection.  Vague, improper

22  hypothetical.  Calls for speculation.

23            THE WITNESS:  Yes.

24  BY MR. DEFFET:

25       Q.    Is the safety department at Murray Brothers

Page 132

1    involved in supervising drivers who have safety

2    violations?                                              2:09:13

3             MR. HENDERSON:  Same objections.

4             THE WITNESS:  Yes.

5    BY MR. DEFFET:

6        Q.   Is the safety department at Murray Brothers

7    involved in supervising drivers whose logbooks reflect

8    unsafe practices?                                        2:09:27

9             MR. HENDERSON:  Same objections.

10            THE WITNESS:  Yes.

11   BY MR. DEFFET:

12       Q.   Are -- are you -- is your testimony that

13   Jimmie Dale Cox never had a problem with his logs; he

14   kept his logs in order all the time?                     2:09:42

15            MR. HENDERSON:  Objection.  Misstates prior

16   testimony.

17            THE WITNESS:  If you're on the road very

18   long, sir, you're going to have a few logbooks

19   violations.  I'm just going to tell you.                 2:09:52

20   BY MR. DEFFET:

21       Q.   That's not the question --

22       A.   Jimmie --

23       Q.   -- I asked.

24       A.   Well --

25       Q.   Is it your --

Page 133

1    A.    -- that's the way --                              2:09:57

2    Q.    -- testimony that Jimmie Dale Cox kept his

3  logs in proper working for you?

4    A.    He kept them best he -- yeah, he kept them

5  good.  The majority of the time, yes.               2:10:09

6    Q.    Okay.

7    A.    Everybody has a -- a mistakes.  Yes.

8    Q.    What mistakes did he do with his logs?

9    A.    Well, he forgets to take a break sometimes,

10  didn't take a 30-minute break and an eight-hour break

11  sometimes, and just different little things.        2:10:26

12        Forgot to put the BL -- the BL number on a

13  log before.  Just simple -- just pretty simple stuff.

14    Q.    And what remedial things did you do to

15  correct those actions and help him to become a better

16  driver?                                             2:10:42

17    A.    Just sat down and explained to him he's going

18  to have to do a better job with his logbooks.

19    Q.    But you didn't assess him any points?

20    A.    No, sir.                                     2:10:49

21    Q.    Is the safety department at Murray Brothers

22  involved in supervising new drivers whose logbooks

23  reflect unsafe practices?

24    A.    We try, sir.                                 2:11:00

25    Q.    What are the employment qualifications for

Page 134

1   new drivers hired by Murray Brothers, LLC?

2       A.   CDL.  Good MVR.  Good past working

3   relationships with his other company.  Safe driver.        2:11:26

4       Q.   What is the purpose of logs?

5       A.   Just to keep the driver from being fatigued

6   in -- during the day, I guess.

7       Q.   Are they important?                                2:11:41

8       A.   I guess they are.

9       Q.   Why are they important?

10      A.   As I explained, to keep the driver's fatigue

11  down.

12      Q.   Do you train your drivers to complete the

13  logs accurately?                                           2:11:58

14      A.   I try my very best, yes, sir.

15      Q.   Do you evaluate your drivers based on their

16  logs?

17      A.   What -- what do you mean evaluate?  You mean

18  by pay raise or such as that or bonuses or what do you

19  mean, evaluate?                                            2:12:16

20      Q.   I think the question's --

21      A.   I don't --

22      Q.   -- clear.  Please answer the question.

23          MR. HENDERSON:  I'm going to object as vague.

24          THE WITNESS:  Yes.  We --                          2:12:27

25  BY MR. DEFFET:

Page 135

1      Q.   Do you have software for monitoring or

2  reviewing the logs?

3      A.   No, sir, we don't.  We ain't much on

4  computers or nothing, sir.                          2:12:37

5      Q.   What is your policy with regard to monitoring

6  or reviewing the logs?

7      A.   Just looking over them once a month, going

8  through them all, each driver's once a month.       2:12:47

9      Q.   Who does it, when is it done, where, how, and

10  what is done regarding the logs?

11          MR. HENDERSON:  Objection.  Compound.       2:12:57

12          THE WITNESS:  It's done at Murray Brothers'

13  office.

14  BY MR. DEFFET:

15      Q.   How is it done?

16      A.   As I say, we just take each -- each driver's

17  log -- there's only like six guys -- and just go

18  through them, just run through them and check them out

19  and make sure they're doing what they're supposed to be

20  doing.                                              2:13:18

21      Q.   Run through them how?  On a computer?

22      A.   No, sir.  I just told you we don't use

23  computers.

24      Q.   So when do you print out the logs if they're

25  all electronic, according to what you said?         2:13:29

Page 136

1        A.    We do not have electronic logs no more, sir.

2        Q.    You said they're submitted to J.J. Keller.

3   Correct?

4        A.    That was back in 2018.  We do not have that

5   no more.                                                    2:13:40

6        Q.    Okay.  So you don't have ELDs on your trucks

7   anymore?

8        A.    This is correct.

9        Q.    Okay.  In 2018, prior to the incident, how

10  did you review the logs with the drivers?               2:13:55

11       A.    Through J.J. Keller, sir.

12       Q.    And how would you do that?

13       A.    Well, you had to use a computer then.

14       Q.    Did you --

15       A.    That's why we don't --

16       Q.    -- use a computer?                               2:14:09

17       A.    Yeah, but not very well.

18       Q.    How did you go over the logs on the computer

19  with your drivers in 2018 prior to the incident?

20       A.    I would call J.J. Keller and have them walk

21  me through it.                                              2:14:23

22       Q.    So did you eventually learn how to do it?

23       A.    Not very well, sir.

24       Q.    Did anyone else at your company learn how to

25  do it?

Page 137

1      A.   No, sir.  Just Larry and myself, sir.          2:14:36

2      Q.   Okay.  And did you and Larry sit down with

3   your drivers and teach them how to complete and review

4   their own logs?

5      A.   We tried.

6      Q.   How did --

7      A.   Nobody --

8      Q.   -- you try?                                      2:14:48

9      A.   -- was willing -- Well, we just -- we -- like

10  I said, most of the guys are older.  I was probably one

11  of the younger guys there.  And nobody's really

12  interested, and that's why we don't have them no more.   2:14:57

13     Q.   Okay.  Isn't it your responsibility in 2018

14  to make sure they're interested so you know that your

15  drivers are safe on the roads so they don't destroy

16  people's lives?                                          2:15:08

17          MR. HENDERSON:  Objection.  Argumentative.

18          THE WITNESS:  Yes.

19  BY MR. DEFFET:

20     Q.   Okay.  So why did you not take it seriously

21  and just let them slough it off?                         2:15:17

22     A.   I don't --

23          MR. HENDERSON:  Objection.  Misstates --

24          THE WITNESS:  -- I --

25          MR. HENDERSON:  -- testimony.

Page 138

1              THE WITNESS:  I don't --

2              MR. HENDERSON:  Assumes facts.

3              THE WITNESS:  -- remember -- I don't remember

4      anybody saying it wasn't serious.                        2:15:25

5      BY MR. DEFFET:

6          Q.   Okay.  Well, you seem to be taking a very

7      laissez-faire approach to training them.  So why don't

8      you tell me specifically how you trained them in 2018

9      to complete and review their logs?                       2:15:36

10             MR. HENDERSON:  Objection --

11             THE WITNESS:  We --

12             MR. HENDERSON:  -- to counselor's

13     characterization of the testimony.

14             THE WITNESS:  We just went through it with

15     J.J. Keller and tried to -- tried to pick it up best we

16     could.                                                   2:15:46

17     BY MR. DEFFET:

18         Q.   Explain to me step by step how you do it with

19     J.J. Keller on the computer.

20         A.   They just got us set up on the ELD logs and

21     tried to show each driver how to do it.  And like I

22     said, we just -- it just took us a while to pick it up.  2:16:00

23             And just -- like I said, it was new to all of

24     us.  No -- nobody that ever worked there had ever

25     worked for a company that had the ELDs.  It was -- you

Page 139

1   know, they just kind of brought it on us, and we just

2   waited till the very end to put them in there because

3   they kept telling us we was going to have to -- we

4   might get exemption from having ELDs.                        2:16:22

5          Small fleet companies -- they was maybe going

6   to not let them not have -- we -- we might not have to

7   put them in our trucks.  And --

8       Q.   You --

9       A.   -- like I said, all the -- all the gentlemen

10  that work for me are older guys, and we just -- it's

11  just a little bit tougher for us.                            2:16:37

12         We wasn't young guys was computer -- was

13  computer whizzes.  None of us are.

14      Q.   You still haven't explained to me how you

15  logged in to the Keller system and how you trained

16  them.  I want you to step by step tell me how it's

17  done.                                                        2:16:49

18      A.   Well, I really don't know how it's done, sir.

19  I just -- we log in there, you give them a password,

20  and they set it up in the -- when they -- when they

21  start their trucks.                                          2:17:00

22         They gotta click onto the -- the computer.  I

23  -- I really didn't do very much of it, sir.  I didn't

24  really understand it very well.                              2:17:07

25      Q.   Then who was --

Page 140

1        A.    Just being honest.

2        Q.    -- responsible for training the drivers if

3    you didn't know how to do it?

4        A.    They just tried to train theirselves.        2:17:17

5        Q.    If a driver's logs indicated he drove at an

6    average speed of 70 miles per hour, would you consider

7    that too fast?

8        A.    Well, speed limit's 70 mile an hour in most

9    -- in -- in most states anymore, sir.                  2:17:35

10       Q.    If a driver's logs indicated he drove at an

11   average speed of 70 miles per hour, would you consider

12   that too fast?

13            MR. HENDERSON:   Objection.   Assumes facts,

14   improper hypothetical.   Vague.                         2:17:46

15            THE WITNESS:   If the state speed limit says

16   they can run 70, I guess they can run 70, sir.

17   BY MR. DEFFET:

18       Q.    But if the logs indicated an average speed of

19   70, would you consider that too fast?                   2:17:59

20            MR. HENDERSON:   Same objections.

21            THE WITNESS:   It's according to where they're

22   at.  If they're running out west and there's no traffic

23   out through there, it would be fine, I would say.        2:18:09

24            If that's -- if that's the legal speed limit

25   at the time of where they're at.

Page 141

1   BY MR. DEFFET:

2       Q.    In your answers to discovery, your attorneys

3   provided me two lease agreements with Piramal Glass,

4   one dated January 1, '19, and one dated January 27,

5   '19.                                                        2:18:34

6             Are there any other agreements that you've

7   had with Piramal at all in the existence of Murray

8   Brothers, LLC?

9       A.    I mean, we had a -- a -- no ones for the

10  truck and ones for the hauling the freight, I guess.

11  They just come out with that after the accident.            2:18:53

12      Q.    What was your agreement with Piramal Glass

13  prior to this April 29, '18, incident?

14      A.    We just -- we were just at contract hauler,

15  sir, to haul their freight.                                 2:19:09

16      Q.    What communication did you have with Piramal

17  Glass regarding where you're supposed to go, how much

18  you were going to get paid, who's responsible to

19  maintain the truck, who's responsible for insurance,

20  who's responsible to make sure the driver's safe?          2:19:25

21          MR. HENDERSON:  Objection.  Compound.

22          THE WITNESS:  The -- the person -- the -- the

23  -- talking about the people that I deal with at

24  Piramal?

25  BY MR. DEFFET:

Page 142

1      Q.   You as the owner of the company, Murray

2  Brothers --                                           2:19:38

3      A.   Uh-huh.

4      Q.   -- LLC, if you had no, quote-unquote,

5  agreement in place, who's responsible to make sure that

6  the driver is safe, who's responsible to tell you how

7  much the freight is going to be paid, who's responsible

8  to monitor the driver's logs, who's responsible to make

9  sure there's insurance?                               2:19:55

10         MR. HENDERSON:  Objection.  Compound, vague.

11         THE WITNESS:  That would be Murray Brothers.

12  Larry -- Larry Murray and Lee Murray.

13  BY MR. DEFFET:

14     Q.   So the January 1, '19, agreement states

15  specifically that Piramal Glass is the lessee and

16  Murray Brothers is the lessor.  Correct?              2:20:16

17     A.   Yes.

18     Q.   And that the lessee, Piramal Glass, will only

19  allow those drivers pre-authorized or its

20  representative to drive the tractor that you own.

21  Right?                                                2:20:30

22         MR. BLASER:  Objection.  Relevance.  And Tim,

23  can you identify the Bates number that you're looking

24  at, please?

25         MR. DEFFET:  Sure.  That's fair.  Let me pull

Page 143

1   up the agreement, okay?                              2:20:39

2            THE WITNESS:  That -- that's the --

3            MR. DEFFET:  Give me a second.

4            THE WITNESS:  -- signed agreement.  Yeah,

5   it's --

6            MR. DEFFET:  Give me one second.  Sorry.  I

7   got one.  I just want to make sure I got both, okay?  2:21:18

8            MR. BLASER:  Uh-huh.

9        (Exhibit No. 5 marked for identification.)

10  BY MR. DEFFET:

11       Q.   Okay.  Can you see this lease agreement dated

12  January 1, '19, on the screen, Mr. Murray?           2:21:46

13       A.   I can, sir.

14       Q.   Okay.  It's two pages, and this was provided

15  by your attorneys in discovery.  I'm going to make this

16  Exhibit 5 I think I'm at, okay?                      2:21:55

17       A.   That's fine.

18       Q.   Do you see where the mouse is, it says (as

19  read):  Allow only those drivers pre-authorized by

20  lessee or its representative to drive the tractor,

21  right?                                               2:22:08

22       A.   Sir, this is a -- this is one truck.  It's a

23  day cab truck they use locally --

24       Q.   Please answer the question I'm asking.  And

25  then --

Page 144

1      A.   I -- I'm --                                    2:22:19

2      Q.   -- later your attorneys can ask you questions

3  if they want to follow up.  So I'm asking you right

4  now, for this January 1, '19, agreement, the first

5  paragraph 1 here says (as read):  Lessee, meaning

6  Piramal, will only authorize drivers pre-authorized by

7  Piramal to drive the tractor.

8           Is that correct?                               2:22:38

9           MR. BLASER:  Objection to --

10          MR. HENDERSON:  Objection --

11          MR. BLASER:  -- relevance.

12          MR. HENDERSON:  -- to relevance.

13          THE WITNESS:  That's correct.

14  BY MR. DEFFET:

15     Q.   Okay.  And that --                             2:22:42

16          THE RECORDER:  Hold -- hold on.  I need both

17  of those objections restated.

18          MR. BLASER:  Tucker Blaser.  Relevance.

19          MR. HENDERSON:  I had the same.

20  BY MR. DEFFET:

21     Q.   And that the lessee would provide tractor

22  orientation for drivers.  Right?                       2:22:57

23          MR. BLASER:  Same objection.  And I -- Tim, I

24  -- can I have a running objection just to the -- all

25  questions involving this January 1, 2019, lease

Page 145

1    agreement?                                        2:23:07

2            MR. DEFFET:  Yes.  I would appreciate that.

3    I -- I acknowledge that objection for both agreements.

4    I know you're going to state it for the November 27,

5    '19, and the January 1, '19.  Correct?            2:23:17

6            MR. BLASER:  Correct.

7            MR. HENDERSON:  And can I --

8            MR. DEFFET:  Is that in agreement --

9            MR. HENDERSON:  -- have the same --

10           MR. DEFFET:  -- from the others?  Same

11   objections from other defendants, right?           2:23:28

12           MR. HENDERSON:  Thank you, Counsel.

13           MR. DEFFET:  Okay.  Okay.  All right.

14   BY MR. DEFFET:

15       Q.   So in this January 1, '19, agreement, and you

16   can see it on the screen, it says (as read):  The

17   lessee, Piramal, will provide training orientation for

18   drivers.

19           Right?                                     2:23:41

20       A.   Yes.

21       Q.   Okay.  And that they're not to subcontract

22   this tractor for purposes of providing service.  Right?

23       A.   Yes.                                      2:23:54

24       Q.   Okay.  That they will complete a mileage and

25   trip cost report while in operation.  Right?

Page 146

1       A.    Yes.

2       Q.    That Piramal will provide the motor carrier

3  insurance coverage.   Correct?                          2:24:06

4       A.    Yes.

5       Q.    And that Piramal will hold harmless any legal

6  liability with respect to bodily injury, death, and

7  property damage arising from the negligence of Piramal

8  during the use of the tractor.                           2:24:25

9       A.    Yes.

10      Q.    Now, I'm going to stop share for a second.

11 What is your understanding and what orientation

12 training did Piramal provide your drivers after this

13 agreement was entered into?                              2:24:44

14      A.    Not one of my drivers drove that truck.

15 That's their driver, sir.   We --

16      Q.    Okay.

17      A.    -- all we do is -- all we do is own the

18 truck.   We lease it to them.   They have their own

19 driver.                                                  2:24:57

20      Jamie Coleman was the only driver they had

21 that was driving that truck, period.   No Murray

22 Brothers drivers drove that truck.   Period.             2:25:05

23      Q.    Okay.   You drove -- your company drove for

24 Piramal prior to this January 1, '19, agreement, right?

25      A.    Sure.

Page 147

1      Q.    Okay.  And did you lease your tractors to

2   Piramal prior to this January 1, '19, agreement?        2:25:21

3      A.    We've never leased our tractors to Piramal.

4   No, sir.

5      Q.    Okay.  And is it true that your company had

6   other lease agreements besides this January 1, '19,

7   agreement?

8      A.    We -- now -- now, re-ask again, sir?          2:25:42

9      Q.    Yes.  You had other agreements with Piramal

10  besides the January 1, '19, agreement, right?

11     A.    We had one in November of '19, yes.

12     Q.    Okay.  You were doing business with Piramal

13  with Murray Brothers, LLC, company prior to January --

14  prior to January 2019, right?                           2:26:04

15     A.    Yes, sir.

16     Q.    Okay.  What type of business were you doing?

17     A.    Contract freight.

18     Q.    Contract --

19     A.    We was --

20     Q.    -- what?

21     A.    -- we was a -- we was a contract hauler for

22  hauling their freight.                                  2:26:16

23     Q.    Okay.  And what responsibilities does a

24  contract hauler have regarding paperwork if they're

25  driving over the road for a company like Piramal?       2:26:26

Page 148

1       A.    What kind of paperwork?

2       Q.    Yes.

3             THE WITNESS:  I don't understand what he's

4  wanting.

5  BY MR. DEFFET:

6       Q.    Under federal law, isn't Murray Brothers,

7  LLC, required to keep paperwork when they're driving

8  for a shipper on the road in 2018?                        2:26:50

9             MR. HENDERSON:  Objection.  Vague, calls for

10  a legal opinion.

11            THE WITNESS:  I don't understand what kind of

12  paperwork you're asking for, sir.  I don't -- I mean,

13  we got bills of lading.  We -- we back up --             2:27:03

14  BY MR. DEFFET:

15      Q.    There you go.

16      A.    -- there.

17      Q.    Yes.

18      A.    We back -- we back up there, pick up a load,

19  have a bill of lading, and deliver it to their

20  customer.                                                 2:27:10

21      Q.    Okay.

22      A.    That's -- that -- that was our job.  For

23  Piramal Glass.

24      Q.    Why suddenly in 2019 did Piramal start doing

25  agreements with you, lease agreements?                    2:27:20

Page 149

1        A.   I would --

2             MR. BLASER:  That --

3             THE WITNESS:  -- I would say --

4             MR. BLASER:  -- mischaracterizes --

5             THE RECORDER:  I'm sorry.  Could you repeat

6   that?

7             MR. BLASER:  Yeah.  Tucker Blaser.

8   Objection.  Mischaracterizes testimony, foundation.   2:27:32

9             MR. DEFFET:  I'll ask it again.  He's -- I'm

10  going to ask the same question.  I think the

11  objection's noted.  Just so we're clear.

12  BY MR. DEFFET:

13       Q.   Why did Piramal start doing lease agreements

14  with Murray Brothers, LLC, starting in 2019?          2:27:50

15            MR. BLASER:  Same objection.

16            THE WITNESS:  My guess would be after the

17  accident, sir.

18  BY MR. DEFFET:

19       Q.   Okay.  Your testimony is you never had any

20  sort of signed document besides a bill of lading with

21  Piramal Glass prior to 2019.                          2:28:06

22       A.   That would be correct, I believe, yes, sir.

23       Q.   Okay.  Is it true that you operated under the

24  same standards that were listed in these lease

25  agreements when you did prior work for Piramal Glass?  2:28:19

Page 150

1          MR. HENDERSON:  Objection.  Assumes facts --

2          MR. BLASER:  Objection.  Foundation.

3          MR. HENDERSON:  Calls for speculation.

4    BY MR. DEFFET:

5       Q.   You have to answer the question, Mr. Murray.    2:28:32

6       A.   Yes.

7       Q.   Okay.  So even though this was memorialized

8    in writing in 2019, you operated under the same

9    standards prior to 2019.  It was just put in writing in

10   2019.  Correct?                                         2:28:47

11      A.   This --

12          MR. HENDERSON:  Same objections.

13          MR. BLASER:  Same objections.

14          THE WITNESS:  This -- this is correct.

15   BY MR. DEFFET:

16      Q.   Okay.  So in your practice, nothing actually

17   changed; it was just put in writing, is that correct,

18   in 2019?                                                2:28:59

19          MR. HENDERSON:  Same objections.

20          THE WITNESS:  This -- this would be correct,

21   sir.

22   BY MR. DEFFET:

23      Q.   Okay.  So the terms listed in the January 1,

24   '19, agreement were the same terms in place in 2018.    2:29:11

25          MR. HENDERSON:  Same objections.

Page 151

1              MR. BLASER:  Yeah.  Objection.

2    Mischaracterizes, foundation.

3    BY MR. DEFFET:

4         Q.   Please answer the question.              2:29:21

5         A.   Yes.

6         Q.   The answer was "yes"?

7              MR. DRISCOLL:  Hey, Tim, let's take a

8    five-minute break.

9              MR. DEFFET:  Okay.  Okay.

10             MR. DRISCOLL:  Okay, and call me on my cell.   2:29:31

11             THE RECORDER:  Going off the record at 1:48

12   p.m.

13                  (Off the record.)

14             THE RECORDER:  We're back on the record at

15   1:51 p.m.

16             MR. DEFFET:  Okay.                       2:29:47

17   BY MR. DEFFET:

18        Q.   We were talking about the agreements you had

19   with Piramal.  You had an agreement also on February

20   2013, right, which I had not gotten to yet?          2:29:55

21        A.   With Piramal?

22        Q.   Yes.

23        A.   That was probably with the truck too?

24        Q.   I'm asking you.  You had an agreement in

25   February 2013, right?                              2:30:07

Page 152

1          MR. HENDERSON:  Do you have a document you

2     can show him?

3          THE WITNESS:  I have a doc- -- yeah.  The

4     document with the truck -- leasing a truck to them,

5     yes.

6     BY MR. DEFFET:

7          Q.   Okay.  And what do you recall about that

8     agreement?                                    2:30:17

9          A.   We just lease a truck and they put their

10    driver in it and just for their local haul, sir.

11         Q.   Okay.

12         A.   Murray --

13         Q.   And so --

14         A.   -- Brothers -- Murray Brothers do not drive

15    that truck.  They drive it.  It belongs to them.  They

16    -- all we do is own it and maintain it.  And --     2:30:36

17         Q.   And --

18         A.   -- they just absolute --

19         Q.   Sorry.  Go ahead.

20         A.   They -- they rent it from us.  Basically all

21    it is.  Rental agreement.                     2:30:44

22         Q.   And that's the same terms as these other

23    agreements, correct?

24         A.   Yes, sir.

25         Q.   Okay.  And that they would provide

Page 153

1  orientation for the drivers, right?                    2:30:57

2       A.   Well, I -- I take that back.  It's not the

3  same agreement.  It's a -- it's -- it's a lease

4  agreement for a truck.  It has nothing to do with the

5  freight that we're hauling.                            2:31:07

6            Has nothing to do -- has nothing to do with

7  us hauling -- Murray Brothers trucks hauling their

8  freight.  This lease agreement has -- it's a -- it's

9  leasing a truck to them, sir.                          2:31:17

10      Q.   And that --

11      A.   It's --

12      Q.   -- Piramal --

13      A.   -- all together --

14      Q.   -- would have to -- Piramal has to --

15      A.   It's --

16      Q.   -- provide a --

17      A.   -- all together --

18      Q.   You gotta -- you -- sorry, but you gotta ask

19 -- you gotta answer the question I'm asking, you

20 please, okay?                                          2:31:26

21           So please answer the question I'm asking.  I

22 asked you if that February 2013 agreement provided,

23 like the other agreements, that Piramal would provide

24 orientation for the drivers.  Correct?                 2:31:39

25      A.   Absolutely not.

Page 154

1        Q.    It did not?   Okay.   So why -- why was that

2    agreement different than the ones in 2019?

3        A.    You -- you're not -- the truck is a leased

4    truck, sir, and it has nothing to do with us hauling

5    the freight.                                         2:31:57

6             The truck is a truck.   Just one truck --

7        Q.    Did --

8        A.    -- that they use --

9        Q.    -- Piramal -- in February of 2013 in that

10   agreement, did Piramal ask that they pre-authorize the

11   drivers?                                             2:32:11

12       A.    They take care of their own driver, yes.

13   They have one driver that drives their truck, sir.

14       Q.    In that agreement, February of 2013, did

15   Piramal agree to hold harmless any legal liability

16   responsible to injury or death resulting from that

17   lease agreement?                                     2:32:33

18       A.    From the truck -- the leased truck, yes.

19       Q.    So am I correct that these are the only three

20   agreements that you have with Piramal?

21       A.    Yes.                                       2:32:48

22       Q.    Okay.   I'm not trying to --

23            THE RECORDER:   Mr. --

24   BY MR. DEFFET:

25       Q.    -- speak out of --

Page 155

1          THE RECORDER:  Hold -- one second, Mr.

2  Deffet.  Could you turn your camera back on first?          2:32:56

3          MR. DEFFET:  Oh, I'm sorry, I'm sorry.

4          THE RECORDER:  And then I just wanted to

5  reiterate for you guys to let each other finish before

6  you speak.

7          MR. DEFFET:  Okay.                               2:33:04

8  BY MR. DEFFET:

9     Q.   I had this document up, but I'd like to ask

10  you some questions about it.

11          MR. DEFFET:  Does anybody have it available?

12  I can't seem to locate it.  I don't want to pin you

13  down with terms that are not -- not correct.          2:33:14

14          Does anyone have the February 2013 agreement?

15          MR. BLASER:  The -- the lease agreement?

16          MR. DEFFET:  Yeah.

17          MR. BLASER:  Yeah.  I've got it.               2:33:26

18          MR. DEFFET:  All right.  Could you post it --

19  could you share it?  I'm sorry.  My computer's acting

20  up right now.

21          MR. BLASER:  I've got three screens.  I'm not

22  exactly sure if this will share or not, but we'll see.

23  Let's see.                                             2:33:51

24          MR. DEFFET:  Okay.  Can you just maximize it

25  a little bit, if you would?  Thank you.  I appreciate

Page 156

1    it.

2    BY MR. DEFFET:

3         Q.   Okay.  So are you able to see this agreement,

4    the February 1, 2013, agreement, Mr. Murray?          2:34:18

5         A.   Yes, I am.

6         Q.   Okay.

7              MR. BLASER:  And Tim, before you get going,

8    just as -- just to -- for the court reporter's benefit

9    and for the record benefit, I still have a continuing

10   objection to all of the questions pertaining to these

11   lease agreements as well.                             2:34:32

12             MR. DEFFET:  Got it.  Okay.  I think I might

13   be at 5 or 6 on this.  I'm going to mark this as an

14   exhibit, okay?  Whatever the --

15             THE RECORDER:  This --

16             MR. DEFFET:  -- next one is.                2:34:41

17             THE RECORDER:  This will be 6.

18        (Exhibit No. 6 marked for identification.)

19             MR. DEFFET:  Okay.  Thank you.  I'll provide

20   it after the deposition.  I don't think I provided it

21   in the materials.

22             Tucker, I'm sorry.  Could you just scroll

23   down a little bit to the "Lessee will" part?  Thank you

24   very much.                                            2:34:54

25   BY MR. DEFFET:

Page 157

1      Q.   Okay.  Now, can see me with the mouse, Mr.

2  Murray?  On the screen?

3      A.   Yes.  You want about it?  Yeah.  Which one?

4  Uh-huh.                                              2:35:05

5      Q.   Okay.  So you see 1.  This is the same as the

6  other agreement.  It says (as read):  Allow only those

7  drivers pre-authorized by lessee to drive the tractor.

8           Right?                                      2:35:13

9      A.   This is correct.

10      Q.   And No. 2 says (as read):  Provide tractor

11  orientation for drivers.  Right?

12      A.   This is correct.                            2:35:21

13      Q.   Okay.  And No. 6 says (as read):   Provide

14  carrier insurance coverage.  Correct?

15      A.   That's correct.

16      Q.   And No. 8 says (as read):  Notwithstanding

17  any other agreements, lessee will hold harmless, any

18  legal liability with respect to bodily injury, death,

19  and property damage arising from the negligence of the

20  lessee during the use of the tractor.

21           Right?                                      2:35:40

22      A.   This is true.

23      Q.   Okay.

24           MR. DEFFET:  All right, I'm -- I'm done,

25  Tucker.  Thank you very much.  I appreciate it.       2:35:47

Page 158

1  BY MR. DEFFET:

2      Q.    Okay.  So February of 2013 to 2019, did you

3  have any other written agreements in writing with

4  Piramal?                                              2:35:59

5      A.    No, sir.

6      Q.    Okay.  So you operated on that agreement from

7  February 2013.  Correct?

8            MR. HENDERSON:  Objection.  Misstates

9  testimony.                                            2:36:09

10           THE WITNESS:  The agreement to lease the

11  truck.  I'm just trying to tell you that has nothing to

12  do with us hauling freight for them.  It don't have --

13  it didn't have nothing to do with that accident.      2:36:18

14  BY MR. DEFFET:

15     Q.    Okay.  Did you ever terminate or cancel any

16  of these agreements in February 2013?

17     A.    No, sir, we did not.                          2:36:26

18     Q.    Okay.  All right.  Bear with me.  I don't

19  have too much longer.  I'm not sure who's going to go

20  up next I think.

21           What is your understanding regarding the

22  federal motor carrier regulations and keeping a driver

23  investigation history file?                           2:36:58

24     A.    You mean accident register thing?

25     Q.    I mean a driver investigation history file,

Page 159

1    as stated in the federal motor carrier regulations.

2            THE WITNESS:  Is he talking about the

3    accident register?  Or what's he talking about?      2:37:20

4            MR. HENDERSON:  You can ask him to rephrase

5    or repeat it.

6            THE WITNESS:  Could you rephrase it a

7    different way?  I don't understand what you're trying

8    to ask me.                                           2:37:28

9    BY MR. DEFFET:

10       Q.   I -- I can't.  I'm -- I'm ask -- I'm quoting

11   directly from a regulation.

12           What is your understanding required -- the

13   general requirements for a driver qualification --

14   sorry, strike that -- driver investigation history

15   files?                                               2:37:41

16       A.   What am I investigating, sir?

17       Q.   What is your understanding regarding the

18   federal motor carrier regulations and driver

19   investigation history files?

20           MR. HENDERSON:  Objection.  Vague.           2:38:00

21           THE WITNESS:  I --

22   BY MR. DEFFET:

23       Q.   It's fine if you don't know what it is.  If

24   you don't know, just say you don't know.

25       A.   I -- I don't know, sir.  I don't know.      2:38:13

Page 160

1      Q.   Okay.  Okay.  I'm not asking you to answer

2  anything you don't know the answer to.

3      A.   I -- I -- I really don't.

4      Q.   Okay.

5      A.   I --

6      Q.   Okay.  That's fine.  If you tell me that,

7  I'll just move on.  Okay?  All right.              2:38:23

8      A.   Okay.

9      Q.   What is your understanding regarding the

10  annual inquiry and review of a driver's record that

11  works for Murray Brothers, LLC?

12      A.   You mean to check their past history?  What

13  do I know about it?                                2:38:37

14      Q.   Yes.

15      A.   Yeah, just -- yeah, you check their -- yeah.

16  You mean to check their history?  Yeah.  We do that.

17  We have PJC Insurance to do that for us.           2:38:48

18      Q.   Okay.  They do it once every 12 months?

19      A.   They do, sir.  Every --

20      Q.   Okay.

21      A.   -- every February.

22      Q.   Okay.  How come there's only one or two of

23  those in Mr. Cox's file?                           2:39:00

24      A.   I don't know how come they're in there, but I

25  know PJC does it before we renew our insurance every

Page 161

1    year.

2         Q.    And where --

3         A.    Because we --

4         Q.    -- where are those records kept?          2:39:10

5         A.    They would be at -- probably be at PJC

6    Insurance.

7         Q.    But you're required to keep those records

8    under the law, so where do you keep them?

9         A.    They would be kept at PJC Insurance, sir.     2:39:23

10        Q.    But they're an insurance company.  You're a

11   motor carrier.  So where do you keep those files?

12             MR. HENDERSON:  Objection.  Asked and

13   answered.

14             MR. DEFFET:  He hasn't answered.  He's just

15   said PJC keeps it.                                   2:39:35

16             MR. HENDERSON:  That's an --

17             THE WITNESS:  Well, that's --

18             MR. HENDERSON:  -- answer.

19             THE WITNESS:  What -- what else you -- what

20   -- I can't make something happen.  I don't have

21   something I don't have.                              2:39:43

22   BY MR. DEFFET:

23        Q.    Okay.  So you don't have it and you did not

24   keep it.

25        A.    Right.

Page 162

1      Q.   You've never kept the 12-month annual checkup

2 on the drivers.                                        2:39:54

3      A.   If I need it, I can get it from PJC

4 Insurance.

5      Q.   You have to answer the question.  Did you

6 keep the 12-month review of your drivers?

7      A.   No.                                          2:40:06

8      Q.   Did not keep --

9      A.   No.

10      Q.   -- it for Jimmie Dale Cox.  Correct?

11      A.   Correct.

12      Q.   Who was the person that you communicated with

13 at Piramal Glass?                                      2:40:25

14      A.   Rebecca Montgomery.

15      Q.   Does your wife email with her?

16      A.   Does my wife email with her?

17      Q.   Does anyone -- doesn't -- doesn't one of your

18 wives work with the company?                          2:40:42

19      A.   Larry's wife.

20      Q.   I'm sorry.  Okay.  Does Larry's wife

21 communicate with anyone at Piramal?

22      A.   No, she does not.                           2:40:50

23      Q.   Okay.  How do you communicate with Rebecca?

24      A.   By telephone or email.

25      Q.   You email with her?

Page 163

1      A.    Every once in a great while.  Most -- 90 --

2   90 percent's by telephone.                              2:41:03

3      Q.    So when she tells you you need to do some

4   sort of load or something, she emails you, right?

5      A.    Calls me on the telephone.                      2:41:14

6      Q.    And then she follows up with an email, right?

7           MR. HENDERSON:  Objection.  Assumes facts.

8           THE WITNESS:  I said about 10 percent of the

9   time she'll email me.  Most of the time it's -- 90

10  percent is on phone, sir.  90 percent.  That's quite a

11  bit.                                                     2:41:28

12  BY MR. DEFFET:

13     Q.    And does -- do they fax anything to you?

14     A.    No, sir.  No.

15     Q.    Okay.  Well, how do you get a hold of the

16  paperwork for each load that you do?                     2:41:38

17     A.    My drive -- I myself or my driver goes up and

18  picks it up at the traffic window.  When the load is

19  loaded.

20     Q.    You don't have --

21     A.    If my driver's not going to be in in time, I

22  go up there and sign the paperwork and have it ready

23  for my driver.                                           2:41:54

24     Q.    Did Jimmie Dale Cox give you a written

25  statement after this incident?

Page 164

1        A.    Did Jimmie Dale Cox give me a written

2    statement.  No, sir.

3        Q.    He never gave you anything in writing

4    regarding this incident.                              2:42:11

5        A.    Jimmie Dale Cox.  No, sir.

6        Q.    What was your conversation with him about

7    what happened on April 29, '18, and why the accident

8    happened?

9        A.    Well, he just called me and said he had an

10   accident and he calls -- then he only talked to me for

11   a couple minutes, and I talked to him later on, and he

12   explained to me that the -- he explained to me a car

13   swerved over in front of him, is what he told me.       2:42:47

14         That little kid swerved over and hit -- was

15   in the left lane to avoid a tractor stopped in the road

16   on the left lane, swerved over to Jimmie.  And slowed

17   down.  And then Jimmie hit him.                         2:43:00

18         That was Jimmie's -- that's what Jimmie says.

19       Q.    Okay.  I don't have too much more to go.  But

20   I do have a question for Tucker briefly, okay?          2:43:11

21         MR. DEFFET:  The stuff that you emailed me

22   last night, those agreements -- who are you stating

23   those -- you're stating those agreements are with

24   Murray Brothers, correct?

25         MR. BLASER:  Yes.  What I emailed you last

Page 165

1    night is Piramal's internal investigation of bills of

2    ladings between Piramal and Murray Brothers from the

3    dates that are stated.                                    2:43:36

4              I think it's October or May of 2012 through

5    October of 2018 or vice-versa, October of 2012 through

6    May of 20- --

7              MR. DEFFET:  Okay.  Okay.  Thank you for

8    clarifying.  I'm just going to ask a few questions and

9    share that.                                               2:43:49

10   BY MR. DEFFET:

11       Q.   Mr. Murray, was this a document created by

12   Piramal?

13             MR. DEFFET:  Tucker?

14             MR. BLASER:  Yes.                               2:43:59

15             MR. DEFFET:  Okay.  Was this something that

16   was created just for litigation?

17             MR. BLASER:  Well, I believe this was -- this

18   is a search that was done -- compiled through their

19   internal record system.  So --                           2:44:14

20             MR. DEFFET:  Okay.

21             MR. BLASER:  -- it was -- not --

22             MR. DEFFET:  All right.

23             MR. BLASER:  -- necessarily a document

24   created by Piramal but a document that was produced

25   through searches on their internal docket document

Page 166

1    system.                                            2:44:26

2              MR. DEFFET:   Okay.   So this is for agreements

3    or bills of lading?

4              MR. BLASER:   Correct.

5              MR. DEFFET:   Okay.

6    BY MR. DEFFET:

7         Q.   Are you seeing this on the screen, Mr.

8    Murray?                                             2:44:35

9         A.   I am.

10        Q.   Okay.   It's -- it looks like the first date

11   listed here is October 18, '12.   And it says 2,600

12   here.   Is that -- what does that mean to you?       2:44:49

13        A.   It looks like we probably took a load from

14   Park Hills, Missouri to Williamstown, New Jersey, I

15   would be guessing.   That's what --

16        Q.   Okay.

17        A.   -- that looks like to me, a $2,600 load.   2:45:00

18        Q.   Okay.   Okay.   These BOL -- these bills of

19   lading -- are these documents that you keep?   They're

20   all numbered.

21        A.   Yeah, it would be -- yes, it -- yeah, we keep

22   them after we get bill -- yeah, we bill them and then

23   we put the check with the bill of lading number, yes.  2:45:18

24        Q.   Okay, okay.   Where do you keep the bills of

25   lading?

Page 167

1      A.    In our -- in the file cabinet at 3548 Rosener

2  Road, Farmington, Missouri.

3      Q.    Okay.  Is that where you keep the lease

4  agreements, in the same place?                              2:45:33

5      A.    Yes, sir, it is.

6      Q.    Okay.  So for a layperson, forgive me, but

7  when you get these bills of lading, at what point in

8  time do you actually get the bill of lading during the

9  trip?                                                       2:45:45

10      A.    Well, I mean, we -- we will take a trailer up

11  at the glass factory.  They will load it.  When it gets

12  done loaded, we go to the shipping office, sign the

13  bill of lading.                                            2:45:59

14          They keep one copy.  We take two copies.

15  Deliver the load.  They get the bill signed.  The

16  driver will keep one copy.  The shipper -- the receiver

17  will get one copy.                                         2:46:09

18          When the driver gets back that week, he hands

19  the paperwork in.  We take the bill of lading, make a

20  bill out of it, send it back to Piramal Glass and bill

21  them for that -- for that load.                            2:46:21

22      Q.    Okay.  So you're essentially saying most of

23  the time you'll get a phone call, you're told to bring

24  someone up to the -- to the factory to pick something

25  up, and then that's how the transaction happens.          2:46:32

Page 168

1         A.    Exactly.  That's exactly how it happens.

2         Q.    Okay.  How many accidents have your drivers

3    had in the three years prior to the April 29, '18,

4    accident?                                          2:46:46

5         A.    I think there was two, one by Dennis White

6    and that was over in Columbus, Ohio, in just rush hour

7    traffic.  Bumped a little car.                     2:47:04

8               And in the last three years, I guess Jimmie's

9    down there in Pocahontas, Arkansas.

10        Q.    Do any of your drivers get bonuses if they

11   arrive at a place on time or early?                2:47:21

12        A.    Do they get -- no, no, sir, they do not.

13              MR. DEFFET:  All right.  I don't have

14   anything further right now.

15              MR. HENDERSON:  All right --

16              MR. DRISCOLL:  I --

17              MR. HENDERSON:  -- can we take ten?

18              MR. DEFFET:  I'm not sure who we want to --  2:47:40

19              MR. DRISCOLL:  I can go --

20              MR. DEFFET:  -- do next.

21              MR. DRISCOLL:  I'm --

22              THE WITNESS:  I'm --

23              MR. DRISCOLL:  -- up next.  So --

24              MR. DEFFET:  Okay.                       2:47:44

25              MR. DRISCOLL:  -- I -- you want to take five

Page 169

1    minutes?

2            MR. HENDERSON:  He said he's okay to move

3    forward.

4            THE WITNESS:  I'm fine.

5            MR. DRISCOLL:  All right.  Let's rock and

6    roll then, okay?                                    2:47:51

7                    DIRECT EXAMINATION

8    BY MR. DRISCOLL:

9        Q.   Sir, my name is Sean Driscoll.  I'm one of

10   the attorneys representing the Swanson/Elmore family.   2:47:56

11           I -- I'm just going to ask you right away.

12   Don't you believe Mr. Jimmie Dale Cox was the cause of

13   the incident that occurred in April of 2018?          2:48:06

14           MR. HENDERSON:  Objection.  Calls for a legal

15   conclusion.

16           MR. DRISCOLL:  No, it doesn't.

17   BY MR. DRISCOLL:

18       Q.   You can answer, sir.

19       A.   Do I believe he was the reason for the

20   accident?                                             2:48:15

21       Q.   Yeah.

22       A.   Do I think he caused the accident?

23       Q.   Yeah.

24       A.   I really don't know.

25       Q.   Okay.  So you're never going to offer any

Page 170

1  opinions as relates to what the cause of the incident

2  was that brings us here for your deposition.  Is that

3  fair?                                                  2:48:29

4      A.   That's fair to say, because I wasn't there to

5  really give that kind of opinion, sir.  I mean, I don't

6  -- I don't think nobody knows that for sure.           2:48:37

7      Q.   Mr. Murray, I'm -- my questions are going to

8  be very simple and direct.  Okay?

9      A.   Okay.

10     Q.   Can we agree that you are never going to

11 testify as relates to the cause of this accident?  Yes

12 or no?                                                  2:48:49

13     A.   Yes.

14     Q.   Okay.

15     A.   Oh.  Was -- yeah.  Yes.

16     Q.   Okay.  And can we agree that you didn't

17 inspect this truck after the occurrence, correct?       2:49:02

18     A.   I have not inspected the truck after the

19 wreck.  No, I have not.

20     Q.   All right.  When was the last time prior to

21 the incident that -- did you inspect the truck?         2:49:12

22     A.   Probably about a week before, sir.

23     Q.   Okay.  So from a week --

24     A.   And that was just --

25     Q.   -- prior --

Page 171

1      A.   -- a little -- that -- just a little

2  walkaround.                                              2:49:20

3      Q.   All right.  I mean, here, I -- I'm not trying

4  to be difficult, sir.  The -- I'm trying to move this

5  as quickly and easy as possible, okay?                   2:49:27

6           My -- my questions are going to be really

7  simple and basic.  All right?

8           Is it your testimony here that a week prior

9  to the incident was the last time you did a walkaround

10 on the truck?  True?                                      2:49:40

11     A.   True.

12     Q.   All right.  So you never did a pre-trip

13 inspection of this truck.  True?

14     A.   True.                                            2:49:48

15     Q.   So you have no idea as -- no idea and you can

16 render no opinion as it relates to the condition of the

17 brakes for that truck prior to Jimmie Dale Dix [sic]

18 taking this load.  True?                                  2:49:58

19     A.   True.

20     Q.   All right.  Let's rock and roll on this.

21 Okay.  So we've -- there's been a little bit of a

22 conversation regarding this February 2013 lease

23 agreement.                                                2:50:20

24           Do you recall questions regarding that

25 agreement?

Page 172

1        A.    I do.

2        Q.    All right.  So what I'm going to do is --

3    hold on.  Hopefully we'll be able to share this sucker.

4    Let's see.  All right.                                2:50:55

5            Can you see my -- the screen, the lease

6    agreement, sir?

7        A.    I can, sir.

8        Q.    You can or cannot?

9        A.    I can.  Yes.                                2:51:04

10        Q.    You can --

11        A.    Yes.

12        Q.    -- okay, perfect.

13        A.    Yes.

14        Q.    This looks to be an agreement made on

15    February 1st, 2013.  Is that correct?                 2:51:13

16        A.    Yes, sir.

17        Q.    All right.  And then it indicates that

18    Piramal Glass USA, Inc., Flat River Plant, is herein --

19    hereinafter referred to as the lessee.  True?         2:51:26

20        A.    True.

21        Q.    All right.  And Murray Brothers, LLC -- that

22    is the lessor.  Correct?

23        A.    Correct.                                    2:51:33

24        Q.    All right.  Now, if you go all the way to the

25    last page, can you tell me if that is your signature?

Page 173

1        A.    It most certainly is.

2        Q.    Okay.  And you had authority to enter into

3   this agreement on behalf of Murray Brothers, LLC.

4   True?                                                2:51:47

5        A.    True.

6        Q.    Okay.  And it appears that you have entered

7   into subsequent agreements after this incident

8   substantially similar to this lease agreement.  Is that

9   fair?                                                2:51:58

10       A.    That's fair.

11       Q.    All right.  Now, is it fair to say that when

12   you entered into this agreement, you understood that

13   Piramal Glass USA, Inc., was a motor carrier, true?    2:52:13

14       A.    Was a motor carrier -- yes.

15       Q.    Okay.  Because Mr. Murray, can we agree

16   you're not giving a tractor or a trailer to an entity

17   that is not a federal -- that is not a motor carrier,

18   true?                                                2:52:27

19       A.    True.

20       Q.    Because you know that would be illegal.

21   True?

22       A.    True.

23       Q.    Okay.  So can we agree that as in early as

24   February of 2013, you understood that Piramal Glass USA

25   was a -- a motor carrier, correct?                    2:52:45

Page 174

1        A.    This is true.

2        Q.    And therefore, as a motor carrier, the

3   federal motor safety regulations apply to that entity.

4   True?

5        A.    True.                                        2:52:56

6        Q.    All right.  And specifically, it looks like,

7   at least as of April of 2018, you were hauling

8   interstate for Piramal Glass.  True?               2:53:12

9        A.    Correct.

10        Q.    Because you were traveling from Missouri to

11   Illinois to Wisconsin.  Correct?

12        A.    Correct.

13        Q.    And you were actually carrying materials for

14   furtherance of their business.  True?              2:53:26

15        A.    True.

16        Q.    Okay.  And you understand that an employer

17   means any person engaged in business affecting

18   interstate commerce who owns or leases a commercial

19   motor vehicle in connection with that business.

20   Correct?                                           2:53:46

21        A.    Correct.

22        Q.    So at this time, Piramal was acting as an

23   employer of both Jimmie Dix as well as Murray, LLC,

24   under the federal regulations.  Correct?           2:53:57

25            MR. BLASER:  Objection.

Page 175

1          THE WITNESS:  That was acting --

2          MR. BLASER:  Calls for --

3          THE WITNESS:  -- as a what, sir?

4          MR. BLASER:  -- a legal conclusion.

5   BY MR. DRISCOLL:

6      Q.   Well, they employed you.  Correct?          2:54:03

7          THE RECORDER:  Mr. Blaser --

8          THE WITNESS:  Yes.

9          THE RECORDER:  -- can you repeat what you

10  said?

11          MR. BLASER:  Yes.  I said objection, calls

12  for a legal conclusion.

13  BY MR. DRISCOLL:

14      Q.   Well, sir, you've represented in your

15  deposition here that you are knowledgeable as it

16  relates to the federal motor carrier regulations.

17  Correct?                                          2:54:17

18      A.   Correct.

19      Q.   And you're the person most knowledgeable as

20  it relates to that for Murray Brothers, LLC.  True?

21      A.   One of them.  Yes.                        2:54:27

22      Q.   Okay.  And so you knew and understood that

23  under the federal regulations, that Piramal Glass was a

24  person engaged in business affecting interstate

25  commerce who owns or leased your vehicle and was

Page 176

1  hauling and you were hauling material for the benefit

2  of their business.  True?                                    2:54:46

3       A.   This is true.

4       Q.   Okay.  And you understood that an employee as

5  defined under the federal motor carrier regulations

6  means any individual who is employed by an employer and

7  who in the course of his or her employment directly

8  affects commercial motor vehicle safety, and that would

9  include independent contractors while in the course of

10 operating a truck.  True?                                     2:55:20

11      MR. BLASER:  Objection.  Calls for a legal

12 conclusion.

13 BY MR. DRISCOLL:

14      Q.   My statement is true, isn't it, sir?

15      A.   True

16      Q.   You can answer.  I -- I didn't hear it.           2:55:31

17      A.   I said true.

18      Q.   Okay.

19      MR. DEFFET:  Can you do a stop share so we

20 can see?  If -- if you're not using the agreement

21 anymore?                                                      2:55:41

22      MR. DRISCOLL:  Yeah.

23      MR. DEFFET:  Thank you.

24 BY MR. DRISCOLL:

25      Q.   And you know that a motor carrier means a

Page 177

1    for-hire motor carrier or private motor carrier,

2    correct, sir?                                          2:55:53

3        A.    Correct.

4        Q.    And so then if a motor carrier is hiring

5    someone to drive, then -- then they're responsible for

6    making sure that the equipment being operated on their

7    behalf is in safe working order.  True?                2:56:07

8        A.    True.  Yes.

9            (Exhibit C marked for identification.)

10   BY MR. DRISCOLL:

11       Q.    Okay.  Now, what I'm going to show you and

12   share, I believe, is what I will mark as Plaintiff's

13   Exhibit No. C.  Okay?                                   2:56:32

14           And that's going to be Defendant Murray

15   Brothers, LLC's answers to Piramal's interrogatories.

16   Okay?

17       A.    Okay.                                         2:56:40

18       Q.    Let me just make sure I've got the right one

19   I want.  Yeah.  Perfect.  Okay.

20           Now, sir, do you recognize this document that

21   is Defendant Murray Brothers, LLC's answers to

22   Piramal's interrogatories?                              2:57:07

23       A.    Yes, sir.

24       Q.    All right.

25       A.    I've seen quite a few of them, but I

Page 178

1    recognize it, yeah.

2         Q.   You know what?  I -- I'm sure you have.  I've

3    seen too many of them as well.  Okay?                    2:57:17

4         A.   So have you.

5         Q.   So now this document looks like Murray

6    Brothers, by and through Matthew Heffelfinger, as well

7    as Devin --

8              MR. DRISCOLL:  Devin, how do you pronounce

9    your last name?                                          2:57:29

10             MR. TASEFF:  Taseff, Sean.  Thanks for

11   asking.

12             MR. DRISCOLL:  All right.

13   BY MR. DRISCOLL:

14        Q.   Taseff.  You answered certain

15   interrogatories.  And it identities you as

16   interrogatory No. 1, Lee Murray.  Correct?              2:57:43

17        A.   This is correct.

18        Q.   And so you answered these interrogatories to

19   the best of your knowledge and ability.  Correct?

20        A.   I believe I -- yes.                            2:57:51

21        Q.   All right.  Now, what I want to do is draw

22   your attention specifically to interrogatory which is

23   No. 6.  Okay.  It states (as read):  State whether

24   Murray Brothers or any of its agents, employees, or

25   representatives communicated in any manner with Piramal

Page 179

1   employee or representatives regarding the

2   transportation of load identified in Bill of Lading

3   263844 at any time prior to April 29, 2018.  If so, for

4   each communication, state the following.                2:58:28

5        And then it goes A through D.  Did I read

6   that roughly correctly, sir?

7        A.   Yes.

8        Q.   All right.  Now, is it your understanding

9   that the bill of lading for this particular load was

10  263844?                                                 2:58:44

11       A.   I'm sure it was if that's what you have here.

12  I can tell you real quick.

13       Q.   Yeah, why don't you check for me.

14       A.   That is correct.                              2:58:54

15       Q.   Okay.  It indicates that -- after this

16  objection, and that'll -- without waiving it (as read):

17  Lee Murray, owner of Murray Brothers, LLC, communicated

18  by telephone with Rebecca Montgomery of Defendant

19  Piramal Glass USA regarding said load on or about April

20  27, 2018.                                               2:59:17

21       Did I -- does that appear to be correct?

22       A.   That's correct.

23       Q.   Okay.  Who called who?

24       A.   She would call me.                            2:59:27

25       Q.   Okay.  And what number did she utilize or do

Page 180

1    you have her programmed in any phone that she would

2    utilize to call you?

3         A.   She usually calls my cell phone.            2:59:40

4         Q.   Okay.  Is there any way you can provide me

5    right now with that number that she utilizes when

6    calling you?  Do you have her --

7         A.   My --

8         Q.   -- saved in --

9         A.   -- my --                                     2:59:48

10        Q.   -- your phone?

11        A.   My cell phone number you mean or her -- or

12   her number?

13        Q.   I want her number.

14        A.   Her --

15        Q.   I've already --

16        A.   -- number --

17        Q.   -- got your number.  I want hers.            2:59:57

18        A.   She calls me from her cell phone, and I --

19   and just one second.  It's a 734 number.  7.  Her

20   number's --

21             THE RECORDER:  And while he's --

22             THE WITNESS:  -- 7 --                         3:00:12

23             THE RECORDER:  I was just going to -- while

24   he's looking for that, if you could make sure to get

25   this sent over.  Because I don't believe I have this.  3:00:19

Page 181

1           MR. DRISCOLL:  Yeah, I -- I was -- I was kind

2      of -- I will make sure all of the exhibits that I

3      tender here today during the deposition will be sent to

4      you, Madam Court Reporter.                          3:00:28

5           THE RECORDER:  All right.  Thank you.  I just

6      wanted to make sure that came across.

7           MR. DRISCOLL:  I appreciate it.

8           THE RECORDER:  Yeah.                           3:00:32

9           THE WITNESS:  She -- she calls me a lot on

10     her cell phone number, which is 732-427-5680.  But she

11     also calls me on another phone.

12     BY MR. DRISCOLL:

13        Q.   And what's that other phone?                3:00:47

14        A.   573-431-5743.

15        Q.   5743.

16        A.   That's the regular -- that's a company phone

17     there.

18        Q.   Okay.  All right.  Does Jimmie Dale Cox have

19     her cell phone number or her -- or Piramal's call-in

20     number?  If you know?                               3:01:16

21        A.   I would -- I would say he definitely does not

22     have Rebecca's number.  I don't know if he would have

23     the glass company's number or not.  I mean, he probably

24     -- he might have, he might not.                     3:01:30

25           He would never call -- I mean, he would never

Page 182

1    call them.

2         Q.   Now, when Rebecca called you, did she ask you

3    which truck would be coming to pick up the load?

4         A.   Oh, no, she -- no.  She just -- she just

5    calls me and has a load and then it's my job to put the

6    driver on there that I think's -- has --                3:01:52

7         Q.   Okay.

8         A.   -- the most hours or going that way.  No,

9    they --

10        Q.   All right.

11        A.   -- never -- they never ask who's driving.

12        Q.   So then the answer to my question would be

13   no.                                                     3:02:00

14        A.   No.

15        Q.   All righty then.  All right.  Did she ask you

16   for any inspection reports of the truck that would be

17   sent over?

18        A.   No, sir.                                      3:02:11

19        Q.   Okay.  Did she ask for any record of any out

20   of service findings for this truck?

21        A.   No, sir.

22        Q.   Did she ask for any certification of a

23   driving record for Jimmie Dale Cox?                     3:02:25

24        A.   No, sir.

25        Q.   Did she ask for any documentation to make

Page 183

1   sure that the truck that was being provided was in safe

2   operation and complied with the federal motor carrier

3   regulations?                                              3:02:36

4       A.   No, sir.

5       Q.   Okay.  Did she ask for any documentation as

6   it relates to Mr. Cox's driving record?

7       A.   No.                                              3:02:54

8       Q.   Okay.  Did she ask for a copy of a CDL

9   license?

10      A.   No.

11      Q.   All right.  Did you perform an annual inquiry

12  and review of Jimmie Dale Cox's driving record?          3:03:23

13      A.   Do I?

14      Q.   Yeah.

15      A.   Through PJC.

16      Q.   Okay.

17      A.   Insurance.

18      Q.   And is it your testimony here that you don't

19  get a copy of any driving abstract?                      3:03:38

20      A.   That's -- this is correct.

21      Q.   Okay.  Have you ever requested a copy of the

22  driving abstract -- abstract?

23      A.   I have a couple times for our records, and

24  they got -- and the driver's gotta go to the license

25  office and get it printed out for me.                     3:03:53

Page 184

1        Q.    Okay.  So you have in the past had an ability

2   to get copies of drivers' abstracts upon your request.

3   True?

4        A.    Upon my request.  Yes, sir.                    3:04:02

5        Q.    And those are documents that you keep in the

6   drivers' individual files.  Correct?

7        A.    Correct.

8        Q.    And so that is a -- a document that you

9   could've provided for Piramal prior to the load of

10  April 28, 2019.  Correct?                                 3:04:20

11       A.    Yes.

12             MR. DEFFET:  Hey, Sean, can you do a stop

13  share?

14             MR. DRISCOLL:  Yeah.

15             MR. DEFFET:  It won't videotape anybody if

16  that document's up.  FYI.  You won't see --              3:04:32

17             MR. DRISCOLL:  Okay.

18             MR. DEFFET:  -- anyone's face.

19  BY MR. DRISCOLL:

20       Q.    Sir.

21       A.    Yes.                                            3:04:37

22       Q.    Did Piramal ever request a driving abstract

23  of Jimmie Dale Cox?

24       A.    No, sir, they had never asked.

25       Q.    So despite being a federal motor carrier and

Page 185

1    operating trucks on their behalf interstate, it's your

2    testimony here that Piramal has never requested any

3    driver abstracts for any drivers employed by Murray

4    Brothers.   True?                                    3:05:06

5          A.    This is true.

6          Q.    Okay.   And is it your testimony here today,

7    despite being a federal motor carrier, that Piramal has

8    never requested any inspection reports or maintenance

9    records for any tractors or trailers being hauled or

10   hauling their materials, true?                       3:05:27

11         A.    This is true.

12         Q.    Okay.   Now, with the -- you've strenuously

13   pointed out that in the previous lease agreements, that

14   you were just providing tractors to Piramal.   Is that

15   correct?                                             3:05:41

16         A.    Just one tractor, sir, just one truck, which

17   is one day cab truck.   It --

18         Q.    I understand.

19         A.    -- does not run other folks.   Yeah.      3:05:47

20         Q.    Okay.   And you've done -- you've gone out of

21   your way to stress that it's simply for one tractor.

22   Correct?

23         A.    Just one tractor only.                    3:05:54

24         Q.    All right.

25         A.    Just local --

Page 186

1       Q.   Have you ever --

2       A.   -- the local --

3       Q.   -- tendered --

4       A.   -- people.

5       Q.   All right.  As part of those lease

6   agreements, have you ever tendered any maintenance

7   records for those tractors with the lease agreement to

8   Piramal?                                              3:06:05

9       A.   Have I ever given them any maintenance

10  records?

11      Q.   Yeah.

12      A.   No.  We -- we maintain the truck and keep the

13  records ourself.                                      3:06:16

14      Q.   Sir, that wasn't my question.  And I'm not

15  trying to be difficult.  It's really a simply question.

16  When they --                                          3:06:23

17      A.   Okay.

18      Q.   -- leased a tractor from you, did you provide

19  any maintenance logs or maintenance records with that

20  tractor?

21      A.   No, sir.

22      Q.   Okay.  Did you provide any inspection reports

23  with that --                                          3:06:36

24      A.   No, sir.

25      Q.   -- tractor?

                                                            Page 187

1          A.    To -- to Piramal?

2          Q.    Yes.

3          A.    No, sir.                              3:06:42

4          Q.    Is it Piramal or Piramal?

5          A.    I call them Piramal.  I -- I don't know.  I

6     can't --

7          Q.    All right.

8          A.    -- verify from those the difference.  I call

9     it Piramal.                                      3:07:01

10         Q.    All right.  I'm going to call them Piramal.

11    Can we just agree we're talking about the same entity

12    --

13         A.    I --

14         Q.    -- no matter --

15         A.    Yeah.

16         Q.    -- the pronunciation?                 3:07:05

17         A.    I -- I know who you're talking about.  If you

18    know who I'm talking about.

19         Q.    All right, good.  Do you know if Piramal's

20    ever inspected any tractor that you've either leased or

21    provided hauling for?                            3:07:28

22         A.    Have they -- I will say no.

23         Q.    Okay.  And you're aware that every federal

24    motor carrier must do systematically inspection and

25    repair and maintain of any equipment that's under their

Page 188

1    control.   Correct?                                        3:07:47

2         A.    Yes.   But that's -- Murray Brothers does that

3    for them.

4         Q.    Okay.   Well, does the federal motor carrier

5    allow you to contract that out to other federal motor

6    carriers?                                                  3:08:00

7         A.    Well, the tractor belongs to us, sir, and we

8    -- if you read that contract, we maintain it.

9         Q.    Okay.   But aren't they solely in possession

10   of it for a period of time?                                3:08:10

11              MR. BLASER:   Objection.   Mischaracterizes --

12              THE WITNESS:   Yes.

13              MR. BLASER:   -- testimony.

14   BY MR. DRISCOLL:

15        Q.    Yeah.   They're in sole control of that unit

16   for a period of time.   Correct?                           3:08:16

17              MR. BLASER:   Again, same --

18              THE WITNESS:   Yes.

19              MR. BLASER:   -- objection.

20   BY MR. DRISCOLL:

21        Q.    Okay.

22        A.    But Murray Brothers is supposed to keep it

23   up, sir.                                                   3:08:26

24        Q.    Well, that's not my question.   My question is

25   -- is are they in control of that unit?   Yes or no?

Page 189

1        A.    Yes, they --                                    3:08:34

2              MR. BLASER:  Objection --

3              THE WITNESS:  -- are.

4              MR. BLASER:  -- calls for a legal --

5    BY MR. DRISCOLL:

6        Q.    Okay.  In fact --

7              MR. BLASER:  -- conclusion.

8    BY MR. DRISCOLL:

9        Q.    -- they're in sole control of that unit for a

10   period of time.  True?                                    3:08:39

11             MR. BLASER:  Same objection.

12   BY MR. DRISCOLL:

13       Q.    Now, do you think that Murray Brothers can

14   choose and pick which federal motor carrier regulations

15   that they want to comply with?                            3:08:49

16       A.    Course not.

17       Q.    Okay.  So would you -- you agree with me that

18   Piramal can't choose and pick which federal motor

19   carrier regulations they choose to comply with?           3:08:57

20       A.    Course not.

21       Q.    Okay.  And since Piramal's a federal motor

22   carrier, they have to comply with the same regulations

23   that you do, don't they?                                  3:09:06

24       A.    Yes, sir.

25       Q.    When borrowing your equipment or leasing your

Page 190

1    equipment, did Piramal do any yearly safety audits of

2    Murray Brothers?

3         A.   Not to my knowledge.  No.                    3:09:30

4         Q.   Did they ever ask for any of your records?

5         A.   No, sir.

6         Q.   Okay.  How did they determine that Murray

7    Brothers was a competent independent contractor?   3:09:43

8         A.   Well, I mean, they had -- they have a copy of

9    our authority and our insurance and stuff like that.

10        Q.   Okay.  Well, did they ever --

11        A.   I mean --                                     3:09:55

12        Q.   -- request any record regarding Murray

13   Brothers having a out of service record?

14        A.   No, sir, not to -- not to my knowledge.

15        Q.   Did they ever request any documentation as it

16   relates to any of your drivers?                         3:10:07

17        A.   No, sir.

18        Q.   And did they ever request any maintenance or

19   inspection logs regarding your equipment?

20        A.   Not to my knowledge.                          3:10:16

21        Q.   So is it your testimony here that essentially

22   this company simply got a copy of your insurance

23   policy, the fact that you had a DOT number, and that

24   Becky could call you on -- on your cell and you would

25   respond?                                                3:10:30

Page 191

1          MR. BLASER:   Objection.   Vague.

2   BY MR. DRISCOLL:

3      Q.   Well, I mean, did you provide any other

4   information other than your cell phone contact, your

5   direct dial contact, your copy of your insurance

6   policy, or your DOT number to Piramal?              3:10:47

7      A.   That -- that's it, sir.

8      Q.   That's all of the information that you ever

9   provided to Piramal when you were hauling material for

10  them interstate.   Correct?                          3:11:09

11     A.   To the best of my knowledge, yes, sir.

12     Q.   And they never asked for anything else, did

13  they?

14     A.   Not that I know of, sir.

15     Q.   I -- I just want to be real clear and -- from

16  questions that counsel asked you.                    3:11:29

17          You have no knowledge as it relates to the

18  conditions of the tractor and trailer that Jimmie Dale

19  Cox was operating on the day of this occurrence.   You

20  have no independent knowledge as it relates to the

21  condition of those brakes.   True?                   3:11:41

22     A.   That would be true.

23     Q.   All right.   Let's talk about dispatch.   Is it

24  your testimony here that you only had one call with

25  Rebecca prior to the load being hauled?              3:12:04

Page 192

1        A.    Probably -- yeah, probably that load, yeah.

2   I mean, we talk -- we -- we was talking.  I mean, we

3   talk every day.  Yeah.  Just about every --                    3:12:13

4        Q.    You --

5        A.    -- day.

6        Q.    You talk every day with Rebecca?

7        A.    I talk to her quite a bit about loads, yes.

8        Q.    Okay.  On an annual basis, how many loads do

9   you haul for Piramal?                                          3:12:30

10       A.    On an annual basis?  I don't know, probably

11  -- let's see.  I don't know.  Three, 400 I'd say, every

12  bit.  Probably more.

13       Q.    Three to 400 loads?  Is that both intrastate

14  and interstate?                                                3:12:53

15       A.    Yeah.  Probably more than that.  Yeah.

16       Q.    Is Piramal your largest customer?

17       A.    Yes, they are.

18       Q.    So without Piramal, would Murray Brothers go

19  under?                                                         3:13:11

20       A.    Well, we're still surviving and we can't work

21  for them no more.

22       Q.    Really.  So --

23       A.    Really.                                             3:13:19

24       Q.    -- why did your employment with Piramal end

25  -- or strike that.

Page 193

1        Why did your federal motor carrier services

2   end with Piramal?                                      3:13:30

3        MR. HENDERSON:  Objection.  Speculation.

4   BY MR. DRISCOLL:

5        Q.   Well, Rebecca's not calling you anymore every

6   day, is she?

7        A.   No, sir, she's not.                          3:13:40

8        Q.   Okay.  Well, why isn't Rebecca calling you

9   every day anymore?

10        MR. HENDERSON:  Same objection.

11   BY MR. DRISCOLL:

12        Q.   You can answer, sir.                         3:13:50

13        A.   I would imagine it's over this accident.

14        Q.   Okay.  So on an annual basis, Murray Brothers

15   is hauling material both inter- and intrastate between

16   300 and 400 times for Piramal.  Correct?               3:14:11

17        A.   I would say every bit of that.

18        Q.   And so that means approximately three to 400

19   times a year, they have an opportunity to ask for a

20   driving abstract of one of your drivers.  Correct?     3:14:26

21        A.   Yes, sir.

22        Q.   They have 300 to 400 opportunities to ask for

23   any inspection or maintenance records of your

24   equipment.  True?

25        A.   Yes, sir.                                    3:14:40

Page 194

1      Q.    And they've never done that as a federal

2  motor carrier.  True?

3      A.    Not to my knowledge.

4      Q.    How far away is Murray Brothers from Piramal?    3:14:54

5      A.    Less than a mile.  Or right at a mile

6  probably.

7      Q.    Out of those three to 400 trips, how many of

8  those do you think Jimmie Dale Cox was hauling for?

9      A.    Oh.  I mean, that's -- say he'd probably haul

10 -- annually?                                               3:15:20

11     Q.    Annually.

12     A.    I'd say he'd probably haul at least one a

13 week.  I mean, probably at least 50 to 80 loads a year

14 for them.  If not more.                                    3:15:31

15     Q.    Fifty to 80 --

16     A.    That's --

17     Q.    -- loads a year.  So that means on -- on 50

18 to 80 times a year, Piramal had an opportunity to

19 request the driving abstract of Jimmie Dale Cox.  True?    3:15:42

20     A.    True.  I mean, I'm -- I'll say probably 50

21 times, yeah, 50 -- I'd say he probably averaged one a

22 week.

23     Q.    Well, there are 52 weeks in a year, right?      3:15:56

24     A.    Yeah, but we didn't work every -- you don't

25 work every week.

Page 195

1      Q.   Yeah.

2      A.   We do --

3      Q.   So --

4      A.   -- get days --

5      Q.   -- Jimmie --

6      A.   -- off.                                      3:16:00

7      Q.   -- probably gets a --

8      A.   We do get --

9      Q.   -- he probably takes --

10     A.   -- a couple --

11     Q.   -- a vacation --

12     A.   -- days off, yeah.

13     Q.   -- once a year?                              3:16:03

14          THE RECORDER:  Okay, just guys, just be

15   careful of speaking at the same time.

16   BY MR. DRISCOLL:

17     Q.   All right.  And then how often did Murray

18   Brothers, LLC, lease a -- a sole tractor to Piramal?

19   On an annual basis.                                 3:16:22

20     A.   One truck per year -- one -- just a -- well,

21   a truck -- just one truck.

22     Q.   Okay.  So for a whole year, you lease a truck

23   to Piramal.

24     A.   Yes.  I -- they lease it for a year at a

25   time, yes.                                          3:16:37

Page 196

1        Q.   Okay.  And then they provide their own

2   CDL-qualified driver to operate that tractor.

3        A.   That is correct.

4        Q.   Okay.  Do you know who that driver is?          3:16:55

5        A.   Jamie Coleman.  And Rick Hale.  Jamie Coleman

6   or Rick -- well, Jamie just -- they just laid Jamie off

7   on July 31st.  Now Rick Hale drives it.                  3:17:08

8        Q.   Okay.  Do you know why they lease that

9   tractor?

10       A.   Why they leased it for?

11       Q.   Yeah.

12       A.   Well, they have -- they have a lot of local

13   stuff they do.  I mean, they -- yes.                     3:17:21

14       Q.   Okay.  So for intrastate loads, they use your

15   tractor with their driver.  For interstate loads, they

16   hire Murray Brothers, to the best of your knowledge and

17   understanding?                                           3:17:35

18       A.   They hire a lot of trucking companies, sir.

19       Q.   Okay.  But -- but solely for your purpose, to

20   the best of your knowledge, for interstate, they hire

21   Murray Brothers to haul loads.  True?                    3:17:48

22            MR. BLASER:  Objection --

23            THE WITNESS:  They --

24            MR. BLASER:  -- mischaracterizes.

25   BY MR. DRISCOLL:

Page 197

1       Q.   Okay.  All right.  Hold on one second, my

2   man.                                                      3:18:05

3            Is there anything that would've prevented you

4   from tendering any inspection reports or maintenance

5   records for your particular tractor-trailers to Piramal

6   if they asked for it?                                     3:18:17

7       A.   No.

8       Q.   Okay.  Is there anything that would've

9   prevented you from providing driver abstracts or that

10  information to Piramal if they asked for it?              3:18:26

11      A.   No.  But we've never -- we've never, ever had

12  a customer ask for it.  I --

13      Q.   Well, is --

14      A.   -- don't know why --

15      Q.   -- every customer --

16      A.   -- they would.

17      Q.   -- that you -- sir, is every customer that

18  you work for a federal motor carrier?                     3:18:37

19      A.   Some of them are, yes.  Not every company,

20  no.  But we do -- we do haul for other motor carriers,

21  and they -- nobody's ever -- nobody's ever asked that,

22  sir.  Asked for --                                        3:18:50

23      Q.   What --

24      A.   -- anything from us.  So.

25      Q.   Do you agree that as a federal motor carrier,

Page 198

1  Piramal had to comply with the federal -- federal motor

2  carrier safety -- safety regulations?                    3:19:00

3       A.   Yes, they do.

4        (Exhibit D marked for identification.)

5  BY MR. DRISCOLL:

6       Q.   All right.  I'm going to show you what was

7  previously marked or what I'm going to mark as Exhibit

8  No. D to your deposition, and this is actually the bill

9  of lading, okay?                                          3:19:29

10       A.   Yes, sir.

11       Q.   All right.  So it looks like uniform straight

12  bill of lading short form.  You're familiar with this

13  document?

14       A.   I am, sir.                                      3:19:42

15       Q.   All right.  And then it indicates from Flat

16  River Factory, gives an address.  Correct?

17       A.   Correct.

18       Q.   And then it provides the phone number

19  573-431-5743.  That's the phone number you indicated

20  that on occasion you get from -- or you get a call from

21  Rebecca.  Correct?                                       3:20:01

22       A.   This is correct.

23       Q.   All right.  And then it provides the bill of

24  lading number, which we spoke about in your answers to

25  interrogatories.  Correct?

Page 199

1        A.    Correct.                                    3:20:10

2        Q.    All right.   And then it says Carrier's No.

3    11638.   Do you see that?

4        A.    I do.

5        Q.    And I'm -- it's been a long day, man, I

6    appreciate it.   What does --

7        A.    I --

8        Q.    -- that number mean?   If you know.          3:20:23

9        A.    It's probably our carrier number from Piramal

10   Glass, I would say.

11       Q.    Okay.   So is -- so that would be their

12   internal carrier number for Murray Brothers, LLC?    3:20:35

13       A.    I would -- yeah, I believe that's true.

14       Q.    Okay.   Fair enough.   Do you see that, where

15   it says deliver 4/29?   Up in the --

16       A.    Yes.

17       Q.    -- middle, the actual handwriting?          3:20:50

18       A.    Yeah.

19       Q.    So --

20       A.    So that --

21       Q.    -- those --

22       A.    -- should've been 4 -- that actually

23   should've been 4/30.

24       Q.    Okay.

25       A.    I believe.                                   3:20:56

Page 200

1      Q.   Do you know whose handwriting that is?

2      A.   I do not.  No, I -- I -- I wouldn't -- I

3  couldn't swear to whose that was, no.

4      Q.   Okay.  Do you know who wrote this down, the

5  corrected number?                                    3:21:10

6      A.   No, sir, I could not say that.

7      Q.   All right.  It's -- it's BM.  Would that be

8  Rebecca Montgomery you think?

9      A.   Becky Montgomery, yeah.  I would say yes.

10  She goes by Becky, yes.                               3:21:21

11      Q.   Okay.  Now, at the bottom, it looks like it's

12  your signature, 4/27/18.  Is that right?

13      A.   That is correct.

14      Q.   Okay.  And then it says Becky Montgomery in

15  the lower left-hand corner.  Is that correct?         3:21:40

16      A.   That's correct.

17      Q.   When did you sign -- I -- I should say where

18  did you sign this bill of lading?

19      A.   At Piramal Glass.                             3:21:52

20      Q.   Okay.  So --

21      A.   She would know but --

22      Q.   -- you actually went to the facility?

23      A.   Yes.  I go there quite often, yes.

24      Q.   Well, you used to go there quite often.

25  Right?                                                3:22:01

Page 201

1        A.    Yes.

2        Q.    All right.

3        A.    Very true.

4        Q.    So were you at -- at Piramal Glass on a daily

5   basis prior to this incident?                              3:22:10

6        A.    I wouldn't say a daily basis, but I would be

7   up there at least every week, yes.

8        Q.    Okay.  And is that when you would be signing

9   bill of ladings?                                           3:22:21

10        A.    Yes.  We would take trailers mostly on

11   Fridays if it's on a Friday.  We take trailers up

12   there, drop them in the door.  When they get the

13   trailer load, it would go there and I'd get the bills

14   and stuff because the drivers are -- I usually -- the

15   drivers usually don't mess with that.                     3:22:37

16        I usually take care of that all for them,

17   take it over -- take the trailer over to our yard.

18        Q.    Okay.  Well, do --

19        A.    Unless --

20        Q.    -- you know what day of the week this

21   incident happened on?                                     3:22:46

22        A.    Yes.  That was definitely on a Friday.  No --

23        Q.    Okay.

24        A.    -- doubt about it.

25        Q.    Okay.  So when would you have signed this

Page 202

1   bill of lading?  Before he left for his trip?  Or

2   after?                                                    3:23:01

3        A.   He didn't leave until the 29th, sir.

4        Q.   Okay.

5        A.   I picked the -- the trailer got loaded on a

6   Friday afternoon.  I picked it up, brought it over to

7   our yard, got the bills ready for my driver, put the

8   bills in my driver's truck like I always do, and --

9   either that or I put them in back of the trailer.         3:23:19

10            And that's how we -- that's how we operate.

11       Q.   Okay.  So actually, you go the day before to

12  load the trailer up for your driver, and you drive that

13  tractor back to your facility for your drivers.           3:23:37

14       A.   Probably less than a half a mile, yes, sir.

15       Q.   Okay.  And you didn't do a pre-trip

16  inspection for that vehicle.  True?

17       A.   True.  Well, I walked around the trailer and

18  stuff.  I was not a -- I would not have been in

19  Jimmie's truck.  I would've been in our day cab.          3:24:01

20            We have a little --

21       Q.   All right.  So --

22       A.   -- local tractor.

23       Q.   Well -- well, let's be -- let's be --

24       A.   Was not --

25       Q.   -- right here then.

Page 203

1      A.   I -- I was not in Jimmie Cox's truck all.

2  Period.                                              3:24:10

3      Q.   But what you're telling me is you're -- you

4  picked -- you got in your day cab, you went over to

5  Piramal, you -- but you must've picked up the trailer

6  from your own yard.  Correct?                        3:24:19

7      A.   Picked up the trailer from Piramal's yard and

8  brought it to our yard.  Which is just right -- like I

9  said, it's about three blocks down the street.       3:24:28

10      Q.   So the -- so the trailer was owned by who?

11      A.   Murray Brothers.

12      Q.   But the trailer was at Piramal's facility?

13      A.   It was at -- to get loaded, sir.            3:24:41

14      Q.   All right.  So how often -- how long did that

15  trailer stay at Piramal's facility for?

16      A.   Oh, it got loaded that day and I go up there.

17  They got -- they got like 18 doors.                  3:24:52

18           We dropped it in the door and they get it

19  loaded.  I go up there and pick it up sometimes.  Or

20  different people pick it up, me or my brother or --

21  well, if a driver comes in, he'll go pick it up.     3:25:02

22      Q.   Okay.

23      A.   And just --

24      Q.   So --

25      A.   -- bring it over to our yard.  Like on a

Page 204

1   weekend deal.

2       Q.    All right.  So to the best of your knowledge

3   and recollection, you had taken the day cab and dropped

4   off the trailer into one of Piramal's bays, sat it

5   there --                                              3:25:15

6       A.    Yeah.

7       Q.    -- they load --

8       A.    Yeah.

9       Q.    -- it, you come back, and they say, hey, it's

10  ready to rock and roll.  You get in your day cab.  You

11  picked it up and you pulled it back to your yard for

12  Jimmie to pick it up and haul --                      3:25:26

13      A.    Yeah.

14      Q.    -- it north.  Is that fair?

15      A.    So yeah, he would've -- he would've picked it

16  up Sunday -- he would've picked it up Sunday afternoon,

17  yes.  He was leaving Sunday -- Sunday lunchtime or so,

18  yes.                                                  3:25:35

19      Q.    Did you speak to Jimmie Dale Cox on Sunday

20  prior to him leaving the facility?

21      A.    I -- I did not speak to Jimmie that Sunday,

22  no, sir, not until after the accident.  I spoke to him

23  -- I spoke to him Saturday -- Friday and Saturday I

24  spoke to him.                                         3:25:54

25            I never spoke to him Sunday, no.  Which is

Page 205

1   very common.

2        Q.    All right.  And do you live at the yard?

3        A.    No, sir.

4        Q.    Oh, okay.

5        A.    Sometimes I feel like it.                    3:26:06

6        Q.    Fair enough.  Okay.  So who's -- and I'm

7   trying to make sure I've got your cell phone number

8   here correctly, but your cell phone number is

9   314-422-9644?                                           3:26:36

10       A.    That is correct.

11       Q.    Okay.  It indicates that this incident

12  happened at 5:34 in the evening.  Do you have any

13  reason to dispute that?                                 3:26:50

14       A.    Do I have any reason to dispute it?  I -- I

15  mean, I wasn't there, so I couldn't answer that.

16       Q.    Okay.  Do you know when was the last time you

17  spoke to Jimmie Dale Cox on the day of the occurrence?  3:27:17

18       A.    The only time I talked to Jimmie was the --

19  after the accident, sir.  That's the only time I talked

20  to him that Sunday.  I never talked to him that Sun- --

21  I never talked to him Sunday at all.                    3:27:32

22          The first time I talked to Jimmie, it was

23  after the accident.

24       Q.    Who handles dispatch for you?

25       A.    That would be myself.

Page 206

1      Q.    Okay.  And do you do --                          3:27:42

2      A.    The

3      Q.    -- dispatch --

4      A.    -- majority --

5      Q.    -- on a -- I'm sorry?

6      A.    The majority of the time, it's me.  We do --

7  me and Larry do swap around, but most of the time --

8  that day, I was in dispatch.                               3:27:52

9      Q.    Okay.  And do they call your cell phone or a

10 landline?

11     A.    They probably call my landline, which when

12 I'm gone, I have it to my cell phone.                      3:28:06

13     Q.    Okay.

14     A.    But they will call my landline phone usually.

15     Q.    All right.  Do you know how many times he

16 attempted to call you before you two actually spoke?       3:28:24

17     A.    Well, looking at the police report, it looks

18 like he called me -- he tried to get a hold of me two

19 different times right before -- right after the

20 accident.                                                  3:28:33

21     Q.    Okay.  Now, I've got two calls to you.  Well,

22 I've got -- the call lasted two minutes and 24 seconds.

23     A.    That would be the --

24     Q.    What'd you guys talk about?                      3:28:43

25     A.    That he was just in -- he was just involved

Page 207

1    in a -- a pretty serious accident.  He called me and

2    told me.

3         Q.   Okay.

4         A.   And I asked him if everything was okay and

5    make sure everybody was okay and be sure you get

6    checked out at the hospital and go take a drug test.      3:29:04

7         Q.   Okay.  So I've got the dispatch number as

8    573-431-0178.

9         A.   That is correct.

10        Q.   Okay.  And then I've got your cell that we've

11   already discussed.                                         3:29:18

12            Now, it looks like he attempted to call you

13   at around 2:14 on 4/29.  Do you recall that?

14        A.   I -- no, I don't recall talking to him that

15   day.                                                       3:29:36

16        Q.   Okay.  It looks like there was a -- about 39

17   seconds.

18        A.   He might've just called and told me he was

19   leaving, but I don't really recollect that too much,

20   no.  Well, he was -- if that was at 2:14 in the

21   afternoon, he would've been at Beasley Fuel Stop.          3:29:58

22        Q.   Okay.  And then at around 1:28, he called

23   Murray dispatch and spoke for about five minutes and 19

24   seconds.  Do you know what that was about?                 3:30:10

25        A.   No.  I do not.

Page 208

1    Q.   After the occurrence, did you speak to

2    Rebecca?

3    A.   I spoke to -- I talked to Becky the next

4    morning, Monday.  It would've been Monday morning.          3:30:30

5    Q.   April 30th.  Right?

6    A.   April 30th.  Yes, sir.

7    Q.   All right.  In fact, that's what you put in

8    your answers to interrogatories.                            3:30:41

9        Why'd you report the accident to Rebecca?

10    A.   Because I wanted her -- to let her know that

11    her customer was not going to receive the load.  It was

12    --

13    Q.   Okay.

14    A.   -- it was going --

15    Q.   And what --

16    A.   -- to RGL warehouse up there and I wanted her

17    to call them and tell them that their load wasn't going

18    to be there, it was in an accident.                         3:31:01

19    Q.   All right.  So tell me specifically what you

20    said to Rebecca and what Rebecca said to you.

21    A.   I just called her that morning, told her that

22    Jimmie had been involved in an accident, that load was

23    not going to be there Monday morning, would she please

24    call RGL warehouse and tell them that the -- what had

25    happened.                                                   3:31:19

In Demand Electronic Court Reporting, Inc.          www.InDemandReporting.com          (773) 239-6008

Page 209

1          So the load -- so the load -- load was not

2   going to be there.

3          Q.   Okay.  So what'd she say to you?

4          A.   She just wanted to make sure everybody was

5   okay, and that was really about it.                    3:31:30

6          Q.   And did you tell -- what'd you tell her about

7   everybody being okay?

8          A.   Told her it was a bad -- it was a pretty bad

9   accident and didn't really know -- at that time, I

10  really didn't know very much about everybody.          3:31:43

11          I didn't really know -- I didn't know how bad

12  anybody was seriously hurt at the time.

13          Q.   Did she ask you what the cause of the

14  accident was?

15          A.   I don't recollect that.  No.               3:31:56

16          Q.   Okay.  Did you --

17          A.   I probably --

18          Q.   -- have any conversations --

19          A.   -- just told her he was involved in an

20  accident.

21          Q.   Okay.  Was any discussion of insurance had?  3:32:06

22          A.   Was any discussion what, sir?

23          Q.   Of insurance.

24          A.   With Becky and myself?

25          Q.   Yeah.

Page 210

1      A.   No, sir.  No.                                    3:32:15

2      Q.   All right.

3      A.   She's just an employee at -- at Piramal

4  Glass.

5      Q.   No, I got it.  But she's your primary point

6  of contact it sounds like, right?                         3:32:31

7      A.   My point of contact, but she's not the owner

8  of the company or nothing.

9      Q.   Okay.  Well, who else do you have contact

10  with at Piramal?

11      A.   Well, we'll -- Billie Cagle used to work

12  here.  She don't work there no more.                     3:32:45

13           I've talked to Rick Hale every once in a

14  while.  Once in a great, great, great while, not very

15  often, Faron Henson sometimes.  But Rebecky -- Becky's

16  probably the 90 -- 95 percent person I talk to at

17  Piramal Glass.                                           3:32:59

18      Q.   Okay.  After April 30th, have you had any

19  other conversations with any other employees of

20  Piramal?

21      A.   Well, yeah.

22      Q.   Okay.                                           3:33:11

23      A.   You mean about the accident?

24      Q.   Yeah.

25      A.   I just talked -- probably talked to -- no,

Page 211

1    not -- I don't guess so, not really, not too much about

2    the accident, no.                                        3:33:25

3            Just told them everybody -- I just told

4    everybody up there we had an accident and stuff.

5        Q.   Okay.  Is this the first time Murray Brothers

6    has been -- well, strike this.                           3:33:35

7            Is this the first time that Murray has ever

8    hauled a load for Piramal where the vehicle's been

9    involved in an accident?

10       A.   Yes.  I believe so.  Yes, this is the very

11   first time we had an accident with a load of glass,

12   yes.                                                     3:33:48

13       Q.   Okay.  Do you know if Piramal filled out any

14   accident report?

15       A.   I would not know.  I would not have a clue

16   about that.

17       Q.   Okay.  Did you have to fill out any

18   documentation -- or strike that.                         3:34:02

19           Did Piramal require you to fill out any

20   documentation regarding the incident or the accident?

21       A.   Did they have me to fill anything out?  Not

22   that I recall, no, I didn't fill nothing out.  For --    3:34:13

23       Q.   Okay.

24       A.   -- Piramal.

25       Q.   How -- who informed you that Piramal would

Page 212

1   not -- no longer be using Murray Brothers' services?        3:34:24

2        A.    Rebecca did.   First of the year.

3        Q.    Okay.   And the first of 2019?

4        A.    '20.

5        Q.    Of --

6        A.    '20.

7        Q.    -- 2020.   Okay.   And what did you say to her

8   and what did she say to you?                                3:34:38

9        A.    She said she just hated to lose us but that

10  was -- it wasn't her call.   It was coming from New

11  Jersey, I guess.   From the main office.                    3:34:49

12       Q.    Okay.   And --

13       A.    Nothing was -- no -- nobody's ever really

14  said nothing or why or nothing.   They just said Murray

15  Brothers is not allowed to haul for Piramal no more,

16  period.                                                     3:34:59

17       Q.    Okay.   And were you calling to do a load, or

18  did she just call you and let you know that Piramal

19  would no longer be using the services of Murray

20  Brothers?                                                   3:35:12

21       A.    Basically she just called me and said that

22  she was -- they wasn't going to be using our services

23  no more, yes.

24       Q.    Okay.   Do you know if they did any audit or

25  review or pulled any of Mr. Cox's driving abstracts?        3:35:29

Page 213

1      A.    Not to my knowledge that I would know of.

2  No.

3      Q.    If I told you through discovery after this

4  incident Piramal pulled the driver's abstract of Jimmie

5  Dale Cox, would that surprise you?                          3:35:43

6      A.    Probably -- I mean, I -- not really.  I mean,

7  I don't guess.

8      Q.    Okay.  Now, do you know if Murray Brothers

9  ever got a copy of Jimmie Dale Cox's CDL license prior

10  to the incident?                                           3:36:00

11      A.    A copy of his license?  Yeah --

12      Q.    Yes.

13      A.    -- I got a copy of his license.

14      Q.    Okay.

15      A.    Yeah.

16      Q.    Did -- did Piramal ever have a copy of his

17  license?                                                   3:36:07

18      A.    Not to my knowledge.  I wouldn't -- I

19  wouldn't -- I wouldn't know how they would've.

20      Q.    Okay.  Well, has Piramal had any direct

21  interaction with Jimmie Dale Cox when he has picked up

22  a load or done any driving for them?                       3:36:21

23      A.    I mean, I'm sure he'd sit up there and talk

24  to them, but I mean, he -- he never -- he never had

25  nothing to do with the business part of it.  I mean,

Page  214

1  I'm sure he'd go up there and talk to the people and

2  stuff.                                                        3:36:33

3          But I mean, that would be about it.

4      Q.   Okay.  Hold on one second.  I'm almost done,

5  I promise, all right, Mr. Murray?  I know you've --           3:36:50

6      A.   I'm fine.

7      Q.   -- had a long day.  But you've enjoyed every

8  minute of it, haven't you?

9      A.   Oh, yeah.  No place I'd rather be.                   3:36:59

10      Q.   Okay.  All right.  Just bear with me one

11  second, sir.  I just want to see if we can figure out

12  and get some facts down, okay, so bear with me one

13  second.                                                      3:37:31

14          All right.  Can we agree that Piramal hired

15  Murray Brothers and Jimmie Dale Cox to transport their

16  load on or before April 29th, 2018?

17      A.   Yes, sir.                                           3:38:05

18      Q.   Okay.  And can we agree that Piramal, by and

19  through Murray Brothers and Jimmie Dale Cox, operated

20  the 2014 Peterbilt truck on April 29th, 2018?               3:38:19

21      A.   Yes, sir.

22      Q.   Can we agree that, to the best of your

23  knowledge and understanding, on October 21st, 2015,

24  Defendant Jimmie Dale Cox was convicted of improper

25  backing in Illinois?                                         3:38:35

Page 215

1        A.    Yes, sir.

2        Q.    Can we agree that on December 18, 2015,

3    Defendant Jimmie Dale Cox struck a diesel pump in

4    Batesville, Mississippi?

5        A.    Yes, sir.                                    3:38:45

6        Q.    Can we agree that on April 25th, 2016,

7    Defendant Jimmie Dale Cox was involved in an accident

8    in Pocahontas, Illinois?

9        A.    Arkansas.                                    3:38:55

10            (Interruption in the proceedings.)

11    BY MR. DRISCOLL:

12        Q.    Sorry about that.  How --

13        A.    What was the --

14        Q.    -- how do you --

15        A.    -- date?

16        Q.    -- pronounce it?  It was April 25th, 2016?   3:39:06

17            MR. DEFFET:  Arkansas.

18            THE WITNESS: Arkansas Yeah.

19            MR. DEFFET:  He corrected me.  FYI.

20            MR. DRISCOLL:  Okay.

21            THE WITNESS:  Pocahontas --

22    BY MR. DRISCOLL:

23        Q.    On July --

24        A.    -- it was --

25        Q.    -- 13th --

Page 216

1      A.   -- in Pocahontas, Arkansas.                    3:39:15

2           MR. DRISCOLL:  I'm sorry, Tim.  What'd you

3  say?

4           MR. DEFFET:  I'm just saying he corrected me

5  earlier.  It's Pocahontas, Arkansas, not Illinois.

6           MR. DRISCOLL:  I apologize.  Okay.            3:39:24

7  BY MR. DRISCOLL:

8      Q.   On July 13th, 2016, Defendant Jimmie Dale Cox

9  was convicted of speeding in excess of 10 miles per

10 hour in Wisconsin?

11     A.   Correct.                                       3:39:34

12     Q.   Okay.  On January 25th, 2018, Defendant

13 Jimmie Dale Cox was involved in an accident in Gren- --

14 is it Grenada --

15     A.   Yes.

16     Q.   -- Mississippi?                                3:39:43

17     A.   Grenada.

18     Q.   Grenada?  Now, in April of 2018, was he

19 involved in an incident in -- prior to this one in

20 Mississippi?  If you know?                              3:40:04

21     A.   Not that I recall.

22     Q.   Okay.  Do you know -- well, here.  On or

23 before April 29th, 2018, Murray Brothers had an out of

24 service violation -- order violation that exceeded the

25 national average.  Do you disagree with that or dispute

Page  217

1    that?                                                3:40:28

2        A.   No, I do not.

3        Q.   Okay.  So prior to April 29th, 2018, Murray

4    Brothers had an out of service order violation that

5    exceeded the national average.  Correct?              3:40:40

6        A.   This is probably correct.

7        Q.   Okay.  And are you aware that you can search

8    the Federal Motor Carrier Administration's website to

9    determine a company's out of service violations?       3:41:01

10       A.   Well, my -- my -- the CDL consultants keeps

11   me updated on that, yes.

12       Q.   Yeah, okay.  So federal motor carriers have

13   access to the Federal Motor Carrier Safety

14   Administration website that allows them to determine a

15   certain motor carrier's out of service record.  True?  3:41:19

16       A.   This is true.  Yes.

17       Q.   Would you agree with me that prior to April

18   29th, 2018, Piramal could've gotten access to Jimmie

19   Dale -- Jimmie Dale Cox's driver abstract?             3:41:41

20       A.   I'm sure they could've.

21       Q.   Okay.  And would you agree with me that prior

22   to April 29th, 2018, Piramal could have learned of what

23   your out of service record was?  True?                 3:41:57

24       A.   True.

25       Q.   And you would agree with me that if Piramal

Page 218

1    -- well, here, strike that.

2            Well, here.  You would agree with me that

3    since Piramal was Murray Brothers's largest customer,

4    that you did everything to make them happy.  Correct?    3:42:24

5        A.    Yes, sir.

6        Q.    Okay.  And you --

7        A.    We tried.

8        Q.    -- did your -- and if they made any requests

9    of you, you would've complied with that request because

10   of the business relationship that you had with Piramal.

11   True?                                                    3:42:35

12           MR. HENDERSON:  Objection.  Improper

13   hypothetical.  Calls for speculation.

14   BY MR. DRISCOLL:

15       Q.    All right, I'll rephrase.

16           Would you agree with me, as a principal of

17   Murray Brothers, LLC, that any reasonable request made

18   by Piramal, your customer, you would've complied with?   3:42:52

19       A.    We would've gave it a good effort, yes.

20       Q.    Is Joni Jimmie Dale Cox's wife?

21       A.    She is.

22       Q.    Do you know how -- who John Parras is?

23       A.    John who?                                      3:43:19

24       Q.    Parras?

25       A.    Don't believe -- don't believe.  Uh-uh.  No.

Page 219

1       Q.   Do -- do you require your drivers to have

2    Murray Brothers dispatch and your cell programmed into

3    their phone?                                             3:43:39

4       A.   Do I require them to?  No.

5       Q.   Okay.  Well, you're aware of the federal

6    regulation that allows for operation of a mobile device

7    but it must be a single touch to operate.  Correct?     3:43:51

8       A.   This is correct.

9       Q.   Okay.  What did Murray Brothers do prior to

10   April 29th, 2018, to make sure that the drivers were

11   compliant with the federal road -- motor carrier

12   regulation as it relates to use of mobile devices?       3:44:05

13      A.   Well, we'd give them a company policy.  Just

14   cell phone policy.

15      Q.   And that's it.

16      A.   And -- and that and they -- every -- and

17   every one of my drivers do have a headset.  Bluetooths

18   or whatever they call it.                                3:44:22

19      Q.   Do you -- who provides the headset?

20      A.   They do.  They buy --

21      Q.   So they can --

22      A.   -- their own --

23      Q.   -- buy it.

24      A.   -- headset.  Yes.                                3:44:31

25      Q.   Do you know what steps Piramal took to

Page  220

1    pre-authorize any of its drivers to operate your

2    equipment?

3         A.   Do you -- now, do what now?  About -- oh,

4    about the -- the -- like Jamie Coleman?                 3:45:04

5         Q.   Yeah, like -- here.  Do you know the

6    background check or what necessary steps Piramal took

7    to make sure the individual who was driving your

8    tractor was competent to do so?                         3:45:16

9         A.   Not really, no.

10        Q.   But as a federal -- federal motor carrier,

11   you would expect them to comply with the regulations

12   when they are putting a driver in your tractor.  True?  3:45:30

13        A.   True.

14        Q.   Now, when they operated your tractor, did

15   they operate it under their DOT number or your DOT

16   number, if you know?

17        A.   Oh, I know under theirs.                       3:45:41

18        Q.   Did they ever provide you a certificate of

19   insurance?

20        A.   I believe we do have a copy, yes.

21        Q.   Can you provide that --

22        A.   I think --

23        Q.   -- to your counsel?                            3:45:52

24        A.   I -- I think we do.  I ain't for sure, but I

25   think we -- that we -- might be one at the office

Page 221

1   there.

2       Q.    Okay.  So can you please provide any

3   certificate of insurance or policies that Piramal has

4   tendered to you in the past to your counsel and provide

5   it to us?                                          3:46:10

6       A.    Yeah, I will try to get that from --

7       Q.    Okay.  Have you ever inquired as it relates

8   to what type of insurance coverage Piramal has that

9   provides you coverage when you're hauling their loads?   3:46:22

10      A.    No, sir.

11      Q.    Are you aware of any other incidents

12  involving Jimmie Dale Cox that he was involved in an

13  automobile accident or property damage that we haven't

14  already discussed prior to April 29th, 2018?         3:46:58

15      A.    Nothing that we haven't discussed, sir.  I

16  think everything that I know of should be there.

17      Q.    Okay.  And as it relates to the out of

18  service, I know that you're above the national average.   3:47:20

19          Has anything changed dramatically in that

20  status from the day of the occurrence until let's say

21  January of 2020?

22      A.    Has it come down some?  I believe it has,

23  yes.                                                3:47:32

24      Q.    So actually, your out of service record has

25  gotten better and yet Piramal still chose not -- no

Page 222

1    longer to use your services?

2        A.   To -- to the best of my knowledge, yes,

3    that's it.                                          3:47:45

4        Q.   Interesting.  Did you ask them if your out of

5    service record had any impact on them discontinuing

6    your services?

7        A.   I did not ask them nothing, sir.  They

8    decided not to use us no more and we just let it go at

9    that.                                               3:48:01

10       Q.   Okay.  Are you hoping to get their business

11   back?

12       A.   I would like to.

13       Q.   Have you taken any steps or measures to get

14   their business back?                                3:48:11

15       A.   Not really.  No, sir.

16       Q.   Now, in preparation for your testimony here

17   today, you testified that you looked at certain -- a

18   lot of discovery documents.  Do you recall that?    3:48:23

19       A.   I looked at a lot of pieces of paper, yes,

20   sir.

21       Q.   So did you look at any of Piramal's answers

22   to interrogatories or any documents that they produced?

23       A.   I probably looked through them.  Don't really

24   remember much of them, no.                          3:48:43

25       Q.   Okay.  What email account do you utilize to

Page 223

1    communicate with Piramal?

2         A.   I do -- we do very little email.  We -- I

3    mean, like I said, most -- most everything we do's

4    telephone and --                                          3:48:59

5         Q.   I -- I --

6         A.   -- I will -- Becky -- I will email her every

7    once in a while or she'll email me but not very often.

8         Q.   Okay.  And what's the email address that --

9    that she has that you -- and the ones that you utilize?   3:49:11

10        A.   Her --

11        Q.   Is it --

12        A.   -- email address --

13        Q.   -- AOL?  Is it Gmail?  What is it?

14        A.   It's -- it's -- it's at Piramal Glass.  I'm

15   pretty sure it's Piramal Glass.  At Piramal Glass.        3:49:21

16        Q.   Okay.  And what's your email address that you

17   communicate with her at?

18        A.   Mine's lee.murray@att.net.

19        Q.   Okay.  And I'm sorry if that was asked

20   before.  I may have missed it.                            3:49:33

21        A.   Oh, that's --

22        Q.   Was it --

23        A.   -- fine.

24        Q.   -- asked before?

25        A.   I'm pretty sure --

In Demand Electronic Court Reporting, Inc.          www.InDemandReporting.com                    (773) 239-6008

Page  224

1          MR. HENDERSON:  No, it wasn't.

2          THE WITNESS:  -- I -- I think her -- her

3   email's Rebecca -- Rebecca Montgomery at Piramal Glass

4   dot com.                                          3:49:43

5   BY MR. DRISCOLL:

6      Q.   Okay.  And you -- you indicated that on

7   occasion your brother's wife would email with Piramal.

8   Is that correct?

9      A.   No.  I did not -- no, I did not say that.   3:49:54

10      Q.   Okay.

11      A.   I said she -- she doesn't -- she does not --

12   she does not have no contact with Piramal.

13      Q.   Okay.

14      A.   That -- that I know of.  To my knowledge.    3:50:03

15      Q.   All right.

16          MR. DEFFET:  Wait.  Your wife or your

17   brother's wife?  I'm sorry.

18          THE WITNESS:  My brother's wife, my

19   sister-in-law.                                    3:50:13

20          MR. DEFFET:  Okay.

21          THE WITNESS:  I mean my brother's wife.

22          MR. DRISCOLL:  All right.  You know what?  I

23   think I'm done right now.  I'm going to look through my

24   notes.  I think I'm done right now.  I'll look through

25   my notes.                                         3:50:59

In Demand Electronic Court Reporting, Inc          www.InDemandReporting.com          (773) 239-6008

Page  225

1          I may have some follow-up.  But Mr. Murray, I

2    appreciate your time, okay?

3          THE WITNESS:  Thank you, sir.

4          MR. DEFFET:  Now's a good time for a break.

5          MR. HENDERSON:  Yeah, let's take a break now.

6          MR. DRISCOLL:  All right.

7          THE RECORDER:  Going off the record at 3:12

8    p.m.

9          MR. HENDERSON:  Come back at 3:20?              3:51:14

10                    (Off the record.)

11          THE RECORDER:  We're back on the record at

12    3:23 p.m.

13          MR. HENDERSON:  Who's up next?

14          MR. DEFFET:  Yeah, who -- what are we doing

15    here?                                                 3:51:33

16          MR. BLASER:  I -- I've got some brief

17    questions.  Nathan, if you don't mind me going.

18          MR. HENDERSON:  Go ahead --

19          MR. BLASER:  Unless --

20          MR. HENDERSON:  -- Tucker.                      3:51:40

21          MR. BLASER:  Okay.  Allyson, we're -- we got

22    you?  You're on?

23          THE RECORDER:  Yep.  I'm here.

24          MR. BLASER:  Okay.

25          MR. DEFFET:  We're rolling?                     3:51:49

Page 226

1          THE RECORDER:  We are.

2          MR. BLASER:  We're -- we're -- we are back on

3    the record, Allyson?

4          THE RECORDER:  Yes.  Yup.

5          MR. BLASER:  All right.                    3:51:55

6                    CROSS-EXAMINATION

7    BY MR. BLASER:

8        Q.   Good morning, Mr. Murray.  My name's Tucker

9    Blaser.  I represent Piramal Glass in this lawsuit, and

10   I've just got a few questions for you today, okay?    3:52:04

11       A.   Okay.

12       Q.   I'll try to be as -- as quick as possible.

13   You -- you told Sean earlier that you were familiar

14   with the federal motor carrier regulations.  Is that

15   right?                                              3:52:15

16       A.   That's right.

17       Q.   Told him you understood the definition of a

18   motor carrier, right?

19       A.   Right.

20       Q.   Is it your understanding that Piramal was

21   acting under its authority as a motor carrier when

22   Murray Brothers hauled the load for Piramal on April

23   29th, 2018?                                          3:52:33

24       A.   Was that -- was Piramal acting as a motor

25   carrier?

Page  227

1        Q.    Right.

2        A.    I was -- I would say that it is more acting

3    as a company shipping freight.                          3:52:45

4        Q.    So would it be your understanding that Murray

5    Brothers was acting as a -- a motor carrier under the

6    definitions of the federal motor carrier regulations

7    when Murray Brothers was hauling the load for Piramal

8    on April 29th, 2018?                                    3:53:00

9             MR. DRISCOLL:  Objection.  Form, foundation.

10             THE WITNESS:  Yes.

11    BY MR. BLASER:

12        Q.    Okay.  Would you agree that when Pir- -- or

13    strike that.                                           3:53:14

14             Would you agree that Piramal would only be

15    required to abide by the federal motor carrier

16    regulations when it was acting under its authority as a

17    motor carrier?

18             MR. DRISCOLL:  Objection.  Form, foundation.   3:53:30

19             THE WITNESS:  I would -- I would think so.

20    BY MR. BLASER:

21        Q.    The bill of lading that's been produced in

22    this case with regard to the subject load -- it

23    identifies the carrier as Murray Brothers.  Is that

24    correct?                                               3:53:49

25        A.    That's correct.

                                                              Page 228

1       Q.   Okay.  Nowhere on that bill of lading does it

2   identify Piramal as the motor carrier.  Is that

3   correct?

4            MR. DEFFET:  Objection.  The --

5            THE WITNESS:  That is correct.

6            MR. DEFFET:  -- document speaks for itself.        3:54:01

7            MR. BLASER:  Okay.  I -- I didn't catch his

8   answer.

9            THE WITNESS:  That is correct.

10  BY MR. BLASER:

11      Q.   Okay.  I'm going to share this with you.

12  Okay, Mr. Murray.  Do you see on your screen a document

13  entitled "Lease Agreement" at the top?                      3:54:43

14      A.   I do.

15      Q.   Okay.  And I believe this is -- already been

16  marked in the exhibit as Exhibit 6.  I've got a few

17  questions about this lease agreement.                       3:54:55

18            First, on the -- the very first line, it says

19  (as read):  Agreement made 1st of February 2013 between

20  --

21            And then I'm -- I'm going to paraphrase.

22  Piramal as the lessee and Murray Brothers, LLC, as the

23  lessor.  Is that right?                                     3:55:11

24      A.   This is correct.

25      Q.   Is it your understanding that, you know,

Page  229

1   under this lease agreement, Piramal was leasing a

2   tractor from Murray Brothers for the purposes of

3   Piramal using it to haul local loads?                        3:55:26

4         A.    This is correct.

5         Q.    Okay.   The -- the tractor that's identified

6   in this lease agreement is not the tractor that was

7   involved in the April 29th, 2018, accident.   Is that

8   correct?                                                     3:55:41

9         A.    That is correct.

10        Q.    Okay.   The -- the lease, the terms of this

11  lease -- and if you need to look at it, I can pull it

12  all the way down and pull it all the way back up.            3:55:56

13           But the terms of this lease are not

14  applicable to the contract freight work that you --

15  that Murray Brothers performed for Piramal for roughly

16  the last 15 years.   Is that a fair statement?               3:56:11

17              MR. DEFFET:   Objection.

18              THE WITNESS:   That's a very --

19              MR. DEFFET:   Calls for a legal conclusion.

20              THE WITNESS:   That's a fair statement.

21  BY MR. BLASER:

22        Q.    Okay.   The terms in this lease agreement,

23  they would not be applicable to the load that Murray

24  Brothers was hauling for Piramal on April 29th, 2018.

25  Is that a fair statement?                                    3:56:33

Page 230

1        A.   Yes, it is.

2             MR. DEFFET:  Same objection.  I just wanted

3    to let him get his answer out.

4    BY MR. BLASER:

5        Q.   I'm going to -- similar lines of questioning

6    here, Mr. Murray.  I'm going to direct your attention

7    to the document on the screen.                          3:56:50

8             You see on your screen a document that says

9    "Lease Agreement," correct?

10       A.   Correct.

11       Q.   I believe this is -- been marked as Exhibit

12   No. 5 in this deposition.  But for purposes of the

13   record, it's Bates labeled Piramal PIRA 54 through 55.  3:57:12

14            Mr. Murray, the -- the first line identifies

15   that this is an agreement made on the 1st day of

16   January 2019, and I'll paraphrase the -- paraphrase,

17   but between Piramal Glass as lessee and Murray

18   Brothers, LLC, as lessor.  Is that correct?            3:57:31

19       A.   That's correct.

20       Q.   Again, the tractor identified in this lease

21   is a 2014 Peterbilt.  Is that right?

22       A.   Correct.                                       3:57:44

23       Q.   And it has a VIN number of 1NPXGGGG50D226154.

24   Is that right?

25       A.   Correct.

Page 231

1        Q.    Is it -- am I correct that this is -- the

2    tractor that is subject to this lease is not the

3    tractor that was involved in the accident on April

4    29th, 2018?                                           3:58:07

5        A.    That is correct.  This is not the truck.

6    This is not the tractor that was involved.

7        Q.    Okay.  And similarly, none of the terms of

8    this lease would be applicable to the load that Murray

9    Brothers was hauling for Piramal on April 29th, 2018.  3:58:26

10            MR. DEFFET:  Objection.  Calls for a legal

11   conclusion.

12            THE WITNESS:  That is correct.

13   BY MR. BLASER:

14       Q.    Would it be a fair statement to say that

15   these two lease -- leases have nothing to do with the

16   contract freight hauling business that you performed --

17   that Murray Brothers performed for Piramal?            3:58:50

18            MR. DRISCOLL:  Objection --

19            THE WITNESS:  That's --

20            MR. DRISCOLL:  -- to form.

21            THE WITNESS:  -- correct.  That is correct.

22   It has nothing to do with the haul -- the loads we

23   haul.                                                  3:59:01

24   BY MR. BLASER:

25       Q.    And just to confirm, but under the -- either

Page 232

1   one of these lease agreements, no Murray Brothers

2   driver ever drove under one of these leases for

3   Piramal.  Is that fair?                                    3:59:19

4       A.   That is very fair.

5       Q.   Okay.  All right.  And then I'm going to

6   share another document with you here.  At least I think

7   I'm going to.                                              3:59:45

8            I'm -- Mr. Murray, did I do this correctly?

9   Do you see a document on your screen with the title

10  page called "Piramal Glass"?                               4:00:32

11      A.   Yeah, I see a document here, yeah.

12           MR. DEFFET:  Tucker --

13  BY MR. BLASER:

14      Q.   Okay.

15           MR. DEFFET:  -- I think you might be showing

16  some of your own notes.  And it looks like a Word

17  document.                                                  4:00:40

18           THE WITNESS:  Yeah.

19           MR. BLASER:  Well --

20           MR. DEFFET:  Which document are you trying to

21  pull up?

22           MR. BLASER:  Piramal Glass Transport Service

23  Agreement November 2019.                                   4:00:49

24           MR. DEFFET:  Hold on.  I'll pull it up.  You

25  have to stop sharing, yes, for me to do it.

Page 233

1            MR. BLASER:  How do I stop sharing?

2            MR. DEFFET:  You just --                    4:00:57

3            MR. DRISCOLL:  I don't know --

4            MR. DEFFET:  -- click in --

5            MR. DRISCOLL:  -- but your --

6            MR. DEFFET:  -- a certain area --

7            MR. DRISCOLL:  -- notes are impeccable --

8            MR. DEFFET:  -- up at the top --

9            MR. DRISCOLL:  -- Tucker.              4:01:01

10           MR. DEFFET:  You click up at the top.

11           MR. BLASER:  Yeah.

12           MR. DEFFET:  There should be a red button to

13     press stop share.

14           THE WITNESS:  I write everything down.      4:01:11

15           MR. DEFFET:  Okay.  Hold on one sec.  I think

16     I got it.

17           MR. BLASER:  So you just saw all the notes?

18     That's awesome.

19           MR. DEFFET:  Only for a --

20           MR. DRISCOLL:  Yeah.

21           MR. DEFFET:  -- second.                4:01:21

22           MR. DRISCOLL:  It's okay.  I -- they looked

23     amazing.

24           MR. BLASER:  They're -- I mean, they're

25     pretty solid.

Page 234

1            MR. DRISCOLL:  I --

2            MR. DEFFET:  I saw pay it -- pay them.  Pay

3    them quickly at the bottom?                          4:01:29

4            THE WITNESS:  Gavin --

5            MR. DEFFET:  Okay, give me a second --

6            MR. DRISCOLL:  But I don't understand --

7            MR. DEFFET:  -- I think I got it.

8            MR. DRISCOLL:  -- why you had to say that I

9    was a jerk.  You didn't need to put that in your

10   attorney product.                                    4:01:37

11           MR. DEFFET:  Okay.  Is this what you're

12   looking for?

13           MR. BLASER:  It is.

14           MR. DEFFET:  Okay.  Just tell me how you want

15   me to scroll it.  I'll do it.                         4:01:46

16           MR. BLASER:  Just on the very first page.

17   BY MR. BLASER:

18       Q.   Mr. Murray, this document is a transport

19   service agreement, and -- and do you see November 2019

20   on the front page?  Is that correct?                 4:02:00

21       A.   I do, sir.

22       Q.   Okay.  It -- would it be fair to say that

23   this agreement governs the contract freight business

24   between Murray Brothers and Piramal from November 2019

25   forward?                                              4:02:14

Page 235

1        A.    Yes.

2        Q.    Okay.

3              MR. BLASER:  And then, Tim, if you can scroll

4    to the effective date.  I think it's --

5              MR. DEFFET:  Sure.  You want me to go -- oh,

6    here we -- well, it's got this date and then the last

7    page has a different date.  You want me to go to the

8    last page?                                        4:02:26

9              MR. BLASER:  Yeah.  Let me take a look at it.

10   I -- I thought this was the only date.  So.

11             MR. DEFFET:  The signing --

12             THE WITNESS:  I --

13             MR. DEFFET:  -- date.

14             MR. BLASER:  Oh, the signing date.  Yeah, and

15   go back to the effective date.                     4:02:36

16             MR. DEFFET:  Right there?

17   BY MR. BLASER:

18        Q.    Mr. Murray, do you see here on the screen it

19   says this agreement was made and entered into November

20   27th, 2019, between Piramal Glass, identified as

21   shipper, and Murray Brothers, LLC, identified as

22   carrier?                                           4:02:54

23        A.    Yes, sir.

24        Q.    My question is, none of the specific

25   provisions in this agreement were in effect prior to

Page 236

1   this date of November 27th, 2019.  Is that correct?          4:03:09

2          MR. DEFFET:  Objection.  Mischaracterization

3   of prior testimony.

4          THE WITNESS:  That's correct.

5   BY MR. BLASER:

6      Q.   Okay.  Is it fair to say that there was no

7   written agreement that governed the contract for any

8   business between Murray Brothers and Piramal prior to

9   this November 27th, 2019, date?          4:03:29

10     A.   None that I can recall.

11     Q.   So the agreement was an agreement of -- of

12  understanding but it wasn't actually written down

13  anywhere.

14     A.   This is correct.          4:03:42

15     Q.   Okay.

16         MR. DRISCOLL:  Hey, Tim, stop sharing, will

17  you, if we don't need it.

18         MR. DEFFET:  Oh, sorry, sorry.

19         Just let me know if you want to go back,

20  Tucker.          4:03:50

21         MR. BLASER:  No.

22  BY MR. BLASER:

23     Q.   And then your understanding of the

24  relationship between Murray Brothers and Piramal prior

25  to this agreement was one where Murray Brothers worked

Page  237

1    as an independent contract hauler for Piramal.  Is that

2    right?                                              4:04:01

3         A.   That's correct.

4         Q.   Okay.  Is it fair -- strike that.

5              Has Murray Brothers been hauling loads for

6    Piramal for about 15 years?                         4:04:15

7         A.   I'd say somewhere in there, yes, sir.

8         Q.   Okay.  Would you be able to tell me how many

9    loads Murray Brothers hauled for Piramal over the

10   course of 15 years?                                 4:04:25

11        A.   Probably not.  No --

12        Q.   Okay.

13        A.   -- sir.

14        Q.   Would it be a fair estimate to say that it's

15   thousands of loads that Murray Brothers has hauled for

16   Piramal over this 15-year history?                  4:04:37

17        A.   I would say that very easily, yes.

18        Q.   Okay.  The accident that occurred on April

19   29th, 2018, with Jimmie Dale Cox is the only time a

20   Murray Brothers driver has ever been involved in an

21   accident during the 15 years Murray Brothers has hauled

22   loads for Piramal.  Is that correct?                4:04:57

23        A.   That is correct.

24        Q.   The load that Jimmie Dale Cox was hauling for

25   Piramal on April 29th, 2018, was going from Piramal's

Page 238

1   facility in Park Hills, Missouri to Neenah, Wisconsin?

2   Is that your understanding?                            4:05:20

3        A.   Yes.  RGL warehouse in Neenah, Wisconsin,

4   yes.

5        Q.   You indicated that you've hauled loads for

6   Piramal -- Piramal on this route.  Is that fair?

7        A.   Yes.                                          4:05:35

8        Q.   How many times do you -- you -- would you say

9   in your career you've hauled this load for Piramal?

10       A.   Oh, just this one here?

11       Q.   Sure.                                         4:05:45

12       A.   Oh, I probably -- I probably only run two to

13   three times.

14       Q.   Okay.  Do you know -- has Jimmie Dale Cox

15   ever run this particular load prior to the -- the April

16   29th, 2018, accident?                                  4:06:01

17       A.   Yes, sir, quite a few times.

18       Q.   Okay.  So he had experience with the exact

19   load that he was hauling on April 29th, 2018, prior to

20   then.

21       A.   Yes, sir.                                     4:06:14

22       Q.   Is there any way to estimate how many times

23   he would have -- have hauled this specific load for

24   Murray Brothers, you know, going to the Piramal

25   facility in Wisconsin?                                 4:06:32

Page 239

1    A.   I'd say he's -- he probably hauled it 30, 40

2    times he's probably been up there.  Yeah, we went up

3    there quite often for them.  Through the years.          4:06:42

4    Q.   Fair to say Murray Brothers believed Jimmie

5    Dale Cox -- Jimmie Dale Cox was competent to haul the

6    load he was hauling on the April 29th, 2018, date?

7    A.   Yes, sir.                                           4:06:56

8    Q.   Okay.  At the time of the accident, is it

9    correct that Murray Brothers had a satisfactory safety

10   rating by the Federal Motor Carrier Safety Association?

11   A.   They did.                                           4:07:09

12   Q.   Okay.  If Piramal had requested then Murray

13   Brothers' safety rating under the Federal Motor Carrier

14   Safety Association as of April 27th, 2018, it would've

15   shown that Murray Brothers had a competent rating or a

16   -- a satisfactory rating.  Is that correct?             4:07:37

17   A.   Satisfactory rating, yes, sir, we did.

18   Q.   And if Murray Brothers had requested that you

19   provide Jimmie Dale Cox's driving record on April 27th,

20   2018, that driving record would've shown no prior

21   accidents involving injury to another person.  Is that

22   correct?                                                 4:07:59

23   A.   That would be correct.

24   MR. DEFFET:  Objection.  Mischaracterization

25   of prior testimony.

Page  240

1    BY MR. BLASER:

2        Q.   Murray Brothers owned the Peterbilt and

3    utility trailer that were involved in the accident on

4    April 29th, 2018, correct?                              4:08:14

5        A.   This is correct.

6        Q.   Murray Brothers was responsible for the

7    maintenance of the Peterbilt and utility trailer

8    involved in the accident?

9            MR. DRISCOLL:  Objection.  Form --

10           THE WITNESS:  Yes.

11           MR. DRISCOLL:  -- foundation.              4:08:24

12   BY MR. BLASER:

13       Q.   I'm sorry.  I didn't get your answer.

14       A.   Yes.

15       Q.   And Piramal was in no way responsible for

16   maintaining the Peterbilt or utility trailer involved

17   in the accident on April 29th, 2018.  Correct?         4:08:37

18           MR. DEFFET:  Objection.  Calls --

19           MR. DRISCOLL:  Objection.

20           MR. DEFFET:  -- for a legal conclusion.

21           MR. DRISCOLL:  Misstates previous testimony.

22           THE WITNESS:  No.                          4:08:45

23   BY MR. BLASER:

24       Q.   Jimmie Dale Cox was an employee of Murray

25   Brothers at the time of the accident?

Page 241

1       A.   Yes.                                            4:08:55

2       Q.   Jimmie Dale Cox received his paycheck from

3  Murray Brothers at the time of the accident?

4       A.   Yes.

5       Q.   For the load in question, Jimmie Dale Cox

6  received his instructions from Murray Brothers.          4:09:07

7            THE WITNESS:  This is --

8            MR. DRISCOLL:  Objection.

9            THE WITNESS:  -- correct.

10            MR. DRISCOLL:  Form, foundation.

11  BY MR. BLASER:

12       Q.   For the load in question, Jimmie Dale Cox

13  determined the route he chose to take to haul the load.

14  Is that correct?                                         4:09:17

15       A.   Correct.

16       Q.   For the load in question, Piramal did not

17  have any -- strike that.

18            For the load in question, Piramal did not

19  select Jimmie Dale Cox as the driver for Murray

20  Brothers who would haul this load.                       4:09:37

21            MR. DRISCOLL:  Objection.  Form --

22            THE WITNESS:  That's --

23            MR. DRISCOLL:  -- foundation, misstates the

24  prior testimony.

25            THE WITNESS:  That is correct.                 4:09:43

Page  242

1  BY MR. BLASER:

2      Q.    You mentioned earlier that you haul for other

3  motor carriers aside from Piramal.  Is that -- I keep

4  saying you.  Strike that.                          4:10:06

5          You -- you testified earlier that Murray

6  Brothers hauls for other motor carriers aside from

7  Piramal.  Is that correct?

8      A.    That's correct.

9      Q.    Are these companies acting under their

10  authority as a motor carrier when Murray Brothers hauls

11  loads for them?                                    4:10:26

12          MR. DRISCOLL:  Objection.  Form, foundation.

13          THE WITNESS:  Like rephrase -- what are you

14  -- what are you trying to -- what -- what are we

15  asking?                                            4:10:38

16  BY MR. BLASER:

17      Q.    Well, I guess my question is that you

18  testified earlier that Murray Brothers hauls loads for

19  other companies that have motor carrier authority,

20  correct?                                           4:10:51

21      A.    This is correct.

22      Q.    And my question is during these occasions, is

23  that company acting under their motor carrier

24  authority, or is the motor carrier under those

25  occasions Murray Brothers?                         4:11:09

Page 243

1            MR. DRISCOLL:  Objection.

2            THE WITNESS:  Murray --

3            MR. DRISCOLL:  Form, foundation.

4            THE WITNESS:  Murray Brothers is acting under

5    their motor carrier.

6    BY MR. BLASER:

7        Q.    Okay.  And just to confirm, on -- on these

8    occasions where you're hauling for companies that have

9    motor carrier authority, these companies never asked

10   Murray Brothers to provide an accident history, an out

11   of service average, drivers' histories or a driver's

12   motor vehicle history report, or any safety policies

13   and procedures of Murray Brothers.                    4:11:43

14       A.    Never.

15       Q.    At the time of this accident, April 29th,

16   2018, how many trucks did Murray Brothers own?

17       A.    How many trucks did we have at the time?     4:12:00

18       Q.    Yeah.

19       A.    Eight.

20       Q.    Okay.  How many drivers?  At the time.

21       A.    We had eight drivers at the time.            4:12:10

22       Q.    There was some talk earlier about out of

23   service averages, the -- the rating under the Federal

24   Motor Carrier Safety Act.  Do you know how they compile

25   those -- those out of service averages?                4:12:23

In Demand Electronic Court Reporting, Inc.          www.InDemandReporting.com                    (773) 239-6008

Page 244

1       A.   Well, I believe it's how many times you get

2   pulled over, how many violations you have, and then

3   they divide it by how many trucks that you have.

4       Q.   Okay.                                    4:12:33

5       A.   Trucks and drivers.  Yeah.

6       Q.   So if you had --

7       A.   So on a small -- on a small scale, you know,

8   if you -- if -- a small fleet.  If they get pulled over

9   a couple times, it looks worse than a company that has

10  1500 trucks and they get pulled over, you know, a

11  hundred times.                                    4:12:50

12       It's going to look worse for a guy that gets

13  eight trucks and gets pulled over two times.  It's

14  going to look worse.  It's -- it goes on a percentage

15  of how many trucks you have.  And how many times you

16  get pulled over.  With violations.                4:13:05

17       Q.   That's exactly what I was -- what I was

18  getting at, officially clarify.  At this time, those

19  are all the questions that I have for you.  So thank

20  you very much for your time and sticking it out for us.  4:13:16

21       A.   Thank you.

22       MR. HENDERSON:  Does anyone else have

23  anything?

24       MR. DEFFET:  I have some follow-up, but I

25  don't know if defense wants to do some questions first.  4:13:27

In Demand Electronic Court Reporting, Inc          www.InDemandReporting.com                    (773) 239-6008

Page 245

1              MR. WILKE:  I -- I -- this --

2              MR. HENDERSON:  Are you --

3              MR. WILKE:  -- is James Wilke.  I don't have

4    any questions.  Thank you very much, Lee.          4:13:32

5              MR. DEFFET:  Okay.

6              THE WITNESS:  Thank you.

7              MR. HENDERSON:  I can just do mine at the end

8    when you guys are done with yours.

9              MR. DEFFET:  Who was that?  Sorry.  I can't

10   see everybody.                                    4:13:39

11             MR. HENDERSON:  Nathan --

12             MR. DRISCOLL:  That was --

13             MR. HENDERSON:  -- Henderson.

14             MR. DRISCOLL:  -- Nathan.

15             MR. DEFFET:  Okay, okay.  So I can go ahead

16   for a few more?                                   4:13:45

17             MR. HENDERSON:  Yeah, that's fine.  Go ahead.

18             MR. DEFFET:  Okay, okay.

19                  REDIRECT EXAMINATION

20   BY MR. DEFFET:

21      Q.   Mr. Murray, in regard to filling out any

22   forms after the accident, you were asked a little bit

23   about Piramal, but I don't think you were directly

24   asked about anything you submitted to your insurance

25   company.                                          4:14:02

Page 246

1        Did you submit anything in writing to your

2   insurance company regarding the incident?

3        A.   A police report, sir.  The traffic --

4        Q.   You submitted --

5        A.   -- police --

6        Q.   Okay.

7        A.   -- report.  Traffic --                    4:14:13

8        Q.   What about --

9        A.   -- crash.

10       Q.   -- your statement about what happened and

11   your discussion with Jimmie Dale Cox?

12       A.   Did I discuss with my insurance company?  No,

13   I did not.                                          4:14:23

14       Q.   You didn't -- you didn't write anything down

15   for your insurance company regarding your conversations

16   with Jimmie Dale Cox?

17       A.   I -- everything I had I sent to them from the

18   traffic accident, sir.                              4:14:35

19       Q.   But what did you send them?

20       A.   The -- like the ticket and stuff that he got.

21   I sent that to them.  And the traffic -- and the

22   traffic report.  The highway patrol report.         4:14:48

23       Q.   Did Jimmie Dale Cox give you anything in

24   writing or email or text?

25       A.   No, sir.

Page 247

1    Q.   You did not record anything in writing and

2   give it to your insurance company?                    4:14:59

3    A.   No, sir.

4    Q.   How did you make a claim?

5    A.   I just called it in, sir.

6    Q.   And did you get a document back to fill out

7   once you made the claim?                               4:15:12

8    A.   I do not recall, no, I don't believe I did.

9    Q.   Did anyone for your company or anyone working

10   with your company get a document to fill out that you

11   helped them fill out?                                 4:15:23

12    A.   Not that I would know of.

13    Q.   What does that mean, not that you know of?

14    A.   That I mean I don't -- I don't know.  Maybe

15   they did it but I didn't know nothing about it.       4:15:33

16    Q.   Okay.  Well, as we said earlier, you are the

17   corporate representative for your company today, and

18   you're supposed to review documents in advance.       4:15:41

19        So you have to give me --

20    A.   Well, I didn't see -- I did not see them,

21   sir.

22    Q.   Did you talk to somebody who filled something

23   out that was submitted to your insurance company?     4:15:50

24    A.   I did not.

25    Q.   Jimmie Dale Cox did not fill out anything in

Page 248

1   writing that was given to you, other employees,

2   Piramal, or your insurance company.                    4:16:00

3            MR. HENDERSON:  Objection --

4            THE WITNESS:  No.

5            MR. HENDERSON:  -- asked and answered.

6            THE WITNESS:  No --

7   BY MR. DEFFET:

8        Q.   What was --

9        A.   -- sir.

10       Q.   -- the answer?                                4:16:04

11       A.   No, sir.

12       Q.   Did Jimmie Dale Cox file a workers'

13   compensation claim on this case?

14       A.   Yeah, I think he went to the -- he went to

15   the hospital, and I think workmen's comp paid his

16   hospital bills.  Yes.                                  4:16:20

17       Q.   Does he have an active workers' compensation

18   case against you?

19       A.   No, sir, he does not.

20       Q.   Did you settle a comp -- a workers' comp case

21   with him on this?                                      4:16:31

22       A.   I think they just paid his hospital bills,

23   sir.

24       Q.   He had a broken foot, right?

25       A.   In this wreck?  No --

Page 249

1      Q.   Yes.

2      A.   -- sir.

3      Q.   No?  Okay.                                        4:16:42

4      A.   He had a -- he had a broken foot but it was

5  from years ago, I think.  It -- it was nothing to do --

6  no, he did not get a broken foot out of this wreck.

7  No, sir.                                                  4:16:50

8      Q.   Okay.  So you're not sure whether he has an

9  open work comp claim or not?

10         MR. HENDERSON:  Objection.  Mischaracterizes

11  --

12         THE WITNESS:  I --

13         MR. HENDERSON:  -- testimony.

14         THE WITNESS:  He does not have a workmen's

15  comp claim open, no, he does not.                        4:17:00

16  BY MR. DEFFET:

17     Q.   Okay.  Did he file an occupational accident

18  claim?

19     A.   That's -- yes.  For his hospital bills.  Yes.

20     Q.   Okay.  And who has that policy?                   4:17:11

21     A.   It'll be Missouri -- the Missouri -- it's

22  MEM.  Missouri Mutual.

23     Q.   It's a different --

24     A.   It's Missouri --

25     Q.   -- insurance company than involved here so

Page 250

1    far?                                              4:17:24

2         A.   Yeah.   MEM.   Missouri Employment Mutual.

3         Q.   And do you know what the claim number is?

4         A.   I do not, not unless it's in here.  I don't

5    know.  I don't know what the claim number is.  No.   4:17:39

6         Q.   Okay.  You can get that --

7         A.   I do not.

8         Q.   -- to your attorneys?

9         A.   I could probably get that to my attorneys,

10   yeah.

11        Q.   Okay.

12             MR. HENDERSON:  We'll get that --          4:17:45

13   BY MR. DEFFET:

14        Q.   So right now --

15             MR. DEFFET:  What -- what was that?

16             MR. HENDERSON:   I said we'll get that and

17   pass it on to you.

18             MR. DEFFET:  Thank you.  Okay.             4:17:51

19   BY MR. DEFFET:

20        Q.   So right now there's no filed Department of

21   Labor claim at Missouri for Jimmie Dale Cox?

22        A.   No, sir.                                   4:18:00

23        Q.   Have you made an offer to resolve his claim

24   for injuries?

25        A.   Ask that again, sir?

Page 251

1      Q.   Have you made an offer to resolve his claim

2   for injuries?

3           MR. HENDERSON:  Objection.  Asked and

4   answered.                                          4:18:14

5           THE WITNESS:  Well, I don't believe there was

6   no injury.  He just went to the hospital to get stuff

7   checked out and stuff, and then they paid his hospital

8   bills far as I know.                               4:18:22

9   BY MR. DEFFET:

10      Q.   Have you made an offer to resolve his claim?

11      A.   No, sir.

12      Q.   Has he given a statement to --

13      A.   There was --

14      Q.   -- MEM?

15      A.   There was no claim to resolve is what I'm

16   saying, sir.                                       4:18:34

17      Q.   Has he given a statement to MEM?

18      A.   I -- yes, I guess he did.

19      Q.   Okay.  When did he do that?

20      A.   Probably would've been about in May of 2018.   4:18:46

21      Q.   And do you have that in your records?

22      A.   I do not.

23      Q.   Why not?

24      A.   I just don't have it.                      4:18:56

25      Q.   It hasn't been shared with you?

Page 252

1          MR. HENDERSON:  Objection.  Argumentative,

2   calls for speculation, lacks foundation.

3          THE WITNESS:  No.

4   BY MR. DEFFET:

5      Q.   How do you know it existed then?          4:19:05

6      A.   Just going off -- I guess it was existed.

7   Jimmie went -- Jimmie got his hospital bill -- bills

8   paid, he told me, so I just figured it was all settled

9   done.                                               4:19:15

10      Q.   When's the last time you spoke to him about

11   it?

12      A.   Probably in May of 2018.

13      Q.   Did you submit any claim forms after he made

14   the claim for -- for that injury?                   4:19:30

15      A.   No, sir.

16      Q.   Is this a policy that you require your

17   drivers to -- to purchase themselves?

18      A.   No.  It's through Murray Brothers.  It's work

19   -- it's regular Missouri workmen's comp insurance, sir.  4:19:44

20      Q.   Okay.  I know some -- some trucking companies

21   try to make everybody an independent contractor, so I'm

22   trying to make sure I understand this.  So --         4:19:52

23      A.   No.  He --

24      Q.   -- did you --

25      A.   He's an employee.  He's not an employ -- he's

Page 253

1    not -- he's not a lease driver.

2         Q.   Okay.  So you're not denying he's employed,

3    and it was under your --                            4:20:01

4         A.   Oh.

5         Q.   -- policy, your MEM policy, that he made a

6    claim.

7         A.   Yes.

8         Q.   Did you ever submit anything to the federal

9    motor carrier safety -- safety agency regarding this

10   accident?                                           4:20:24

11        A.   I don't believe so, no.

12        Q.   Are you required to report an accident with

13   this many injuries and property damage?

14            MR. HENDERSON:  Objection.  Calls for a legal

15   conclusion.                                          4:20:37

16            THE WITNESS:  I would imagine it was already

17   reported by the State of Illinois.

18   BY MR. DEFFET:

19        Q.   And aren't you required to respond and give

20   information to them?                                4:20:48

21            MR. HENDERSON:  Same --

22            THE WITNESS:  I --

23            MR. HENDERSON:  -- objections.  Calls for

24   speculation, lacks foundation.

25            THE WITNESS:  I would've given information

Page  254

1   anybody would've called.                              4:20:56

2   BY MR. DEFFET:

3        Q.   Don't you feel like you had a duty to report

4   it under the law?

5             MR. HENDERSON:  Same objections.  Calls for a

6   legal conclusion.  Argumentative.  Asked and answered.   4:21:07

7             MR. DEFFET:  He did not answer that question.

8   BY MR. DEFFET:

9        Q.   Do you feel you had a duty to report it under

10  the law to the Federal Motor Carrier Safety

11  Administration?

12            MR. HENDERSON:  Same objections.             4:21:17

13            THE WITNESS:  It was reported, sir.  By the

14  State of Illinois.  To --

15  BY MR. DEFFET:

16       Q.   Do you --

17       A.   -- the federal government.

18       Q.   -- feel you, for Murray Brothers, LLC, had a

19  duty to report to this to the Federal Motor Carrier

20  Administration?                                        4:21:31

21            MR. HENDERSON:  Same objections.

22            THE WITNESS:  No.

23  BY MR. DEFFET:

24       Q.   So it wasn't that important to you that all

25  these people got injured.  You didn't think it needed

Page 255

1    investigating.                                          4:21:42

2         MR. HENDERSON:  Objection.  It's

3    argumentative, misstates his testimony.

4         THE WITNESS:  I told you once before I

5    thought it was very important.  My prayers, my heart,

6    and everything goes out to everybody that got hurt.    4:21:51

7         I'm very sorry for that.  I don't know what

8    you want me to do.

9    BY MR. DEFFET:

10       Q.   Well, when you hire a trucker with this

11   record and then you don't do any remedial training with

12   him, it doesn't really show that you're sorry about

13   what happened.                                          4:22:03

14        MR. HENDERSON:  Same objection.  Come on,

15   Counselor, move on.

16        THE WITNESS:  Gentlemen -- sir, he's been

17   driving for 35 years.  He's got a pretty good -- he's

18   got -- for as many miles as he's logged, he's got a

19   pretty good record.  Far as I'm concerned.             4:22:16

20   BY MR. DEFFET:

21       Q.   Do you feel pressure to testify in favor of

22   Piramal Glass because you want their business back?

23       A.   No --

24        MR. HENDERSON:  Objection.

25        THE WITNESS:  -- sir.                              4:22:25

Page 256

1           MR. HENDERSON:  Counselor --

2           MR. Blazer:  Objection.  Speculation,

3      foundation.

4      BY MR. DEFFET:

5         Q.   Okay.  You do -- you do want to do more work

6      for Piramal Glass, right?                          4:22:33

7         A.   I would.

8         Q.   Okay.  And in fact, wasn't Piramal Glass your

9      main source of income for Murray Brothers, LLC,

10     company?

11          MR. HENDERSON:  This has all been covered,

12     Counselor.                                          4:22:44

13          THE WITNESS:  Yes.

14     BY MR. DEFFET:

15        Q.   Okay.  And what percentage of business did

16     Piramal Glass give you before they terminated the

17     relationship with you after the incident?           4:22:54

18          MR. HENDERSON:  Objection.  Vague.

19          THE WITNESS:  I'd say probably 60 percent.

20     BY MR. DEFFET:

21        Q.   You were running three or 400 loads a year

22     and it was only 60 percent of your business?        4:23:06

23        A.   Probably about 60 to -- yeah, 60, 65 percent,

24     yeah.

25        Q.   Okay.  Who were the other carriers that you

Page 257

1    were running for?

2              MR. HENDERSON:  Objection.  Relevance.          4:23:15

3              THE WITNESS:  We run for Trailboard.  We --

4    we broker loads -- we -- them's just loads going out.

5    We gotta come back -- we gotta come back every time.     4:23:23

6    BY MR. DEFFET:

7         Q.   You -- I'm sorry.  I didn't --

8         A.   We gotta --

9         Q.   -- catch the name.  Running for who?

10        A.   I said we -- we broke our loads coming back

11   to Missouri.  We go out for Piramal Glass and we gotta

12   get loads coming back.  So that --                        4:23:35

13        Q.   Who are you get -- who are you getting the

14   loads from?

15        A.   Oh, probably about a hundred different

16   companies.

17        Q.   Can you name --

18        A.   Because we broke --

19        Q.   -- some of the carriers?                         4:23:43

20        A.   Landstar, Schneider, J.B. Hunt, Nolan

21   Transportation, Dino Transportation.  I don't know.  I

22   could -- BNSF Logistics.  Rangeline.  It's -- there's

23   quite a few of them out there.                            4:24:06

24        Q.   Okay.  Bear with me.  I maybe got one or two

25   more questions.  Then you're done.

Page 258

1       In your answers to Plaintiff Martinez's

2  supplemental discovery issued to me on August 27th,

3  '20, on page 4, in request No. 5 -- here, I'll pull --

4  I'll pull it up.                                        4:24:34

5       Can you see that on the screen?

6       A.   I do now.

7       Q.   Okay.  Give me a second here.  In No. 5, it

8  asks about contacting other people here.                4:25:01

9       And it says -- do you see where I'm waving?

10  I says April 30, 2000 -- April 30th, 3019?

11       A.   Yes.

12       Q.   Okay.  That was a misprint, right?  It -- it

13  was April 30th, 2018?                                   4:25:14

14       A.   Exactly.  Yes.

15       Q.   Okay, okay.  Earlier you were -- you were

16  discussing the bill of lading.  Isn't it true that

17  Piramal Glass's carrier number is listed on the bill of

18  lading?                                                 4:25:44

19       A.   Yeah.

20       Q.   Okay.  If they weren't acting as a carrier in

21  that transaction when -- then why would they list their

22  carrier number?                                         4:25:55

23       MR. HENDERSON:  Objection.  Speculation.

24       THE WITNESS:  I don't understand what --

25  rephrase?  What -- what are you asking about the

Page 259

1    carrier number?

2    BY MR. DEFFET:

3        Q.   Sure.   In the bill of lading, when you were

4    discussing that earlier, Piramal Glass had their

5    carrier number listed on the bill of lading for April

6    29, '18, right?                                         4:26:12

7            MR. BLASER:  Objection.  Foundation.

8    Mischaracterizes.

9            MR. DEFFET:  Can someone pull that --

10           THE WITNESS:  The --

11           MR. DEFFET:  -- up?

12           THE WITNESS:  -- carrier --

13           MR. DEFFET:  I don't have that --

14           THE WITNESS:  The carrier -- I think the

15   carrier number is Murray Brothers.  That's our number

16   in their system, I believe.                             4:26:28

17   BY MR. DEFFET:

18       Q.   There's two carrier numbers listed, I think,

19   on the bill of lading.  One is yours and one is Piramal

20   Glass, isn't it?

21           MR. BLASER:  Objection.  Mischaracterizes,

22   argumentative.                                          4:26:38

23           MR. DEFFET:  Well --

24           MR. BLASER:  Foundation.

25           MR. DEFFET:  -- can someone pull it up for

Page  260

1   me, please?  I'm sorry.  I can't locate it.

2            THE WITNESS:  We got it right here.        4:26:43

3            MR. DRISCOLL:  I'll do it.

4            MR. DEFFET:  Thanks.  I appreciate it.

5            THE WITNESS:  I only see one carrier number

6   on here, sir.

7   BY MR. DEFFET:

8       Q.   One second.  I don't want to misstate

9   something.  I might be wrong.  Okay?  Just hang with me

10   for a second.                                          4:26:55

11       A.   All right.  There's only carrier number I

12   see.

13            MR. DEFFET:  Oh, I'm sorry, Sean.  Can you

14   scroll down a little bit?

15   BY MR. DEFFET:

16       Q.   Okay.  So the 11638.  Whose carrier number is

17   that?                                                  4:27:07

18       A.   I would say that's probably Murray Brothers.

19   I'm sure that's our number in their system.

20       Q.   Okay, okay.

21            MR. DEFFET:  Can you --

22            THE WITNESS:  We're --

23            MR. DEFFET:  -- scroll down a little bit?

24   Okay.  You can stop share.  I'm sorry.  Okay.          4:27:25

25   BY MR. DEFFET:

Page 261

1    Q.   Piramal Glass gave me some answers yesterday.

2  Bear with me, because I really haven't had a chance to

3  look at it real close.                              4:27:52

4       I can't find it.  Anyway.  Do you -- do you

5  recall what the agreements are with the containers with

6  Piramal Glass?  Is that only Larry Murray Trucking or

7  do you also do that?                                4:28:31

8    A.   That -- that's Larry Murray Trucking only.

9  Murray Brothers has nothing to do with the containers.

10   Q.   Okay.  You and Larry Murray Trucking both

11 have the same phone number for your business, don't

12 you?                                                4:28:42

13   A.   Yes, sir.

14   Q.   Okay.  And whose number is that?

15   A.   That's actually Larry's home number.

16   Q.   Okay.  And that goes to Murray Brothers, LLC,

17 and Larry Murray Trucking, Inc., right?             4:28:56

18   A.   Yes, it does.

19   Q.   Okay.  If you're two completely separate

20 entities, why do you have the same phone number?

21   A.   Larry -- Larry just rents trailers and that's

22 it.  Murray Brothers does the trucking.            4:29:13

23   Q.   Okay.  Where -- where are all the documents

24 kept for -- for Larry Murray Trucking's corporate

25 documents?

Page 262

1              MR. HENDERSON:  Objection.  Beyond the scope

2     of the notice of this deposition, calls for

3     speculation, lacks foundation.                        4:29:25

4              MR. DEFFET:  He's noticed up --

5              THE WITNESS:  We would --

6              MR. DEFFET:  -- as a fact and a 30(b)(6)

7     witness, so he can testify.

8              THE WITNESS:  You could --                   4:29:30

9              MR. HENDERSON:  For Larry Murray Trucking.

10             THE WITNESS:  You can ask -- you have to ask

11    Larry Murray Truck -- Larry Murray about Larry Murray

12    Trucking.

13    BY MR. DEFFET:

14        Q.   I did ask --                                 4:29:36

15        A.   I don't --

16        Q.   -- Larry Murray.  Now I'm asking you to

17    confirm what the story is so we can see if they jive.

18    So where --

19             MR. HENDERSON:  Same objections.             4:29:42

20    BY MR. DEFFET:

21        Q.   -- are Larry Murray Trucking, Inc.'s

22    documents kept?

23             MR. HENDERSON:  Same objections.  He's not

24    here as a witness for Larry Murray Trucking.          4:29:49

25             THE WITNESS:  How would I know where he keeps

Page  263

1    his records?  I mean, that's for Larry Murray Trucking.

2    I --

3    BY MR. DEFFET:

4        Q.   Both --                                    4:29:54

5        A.   -- don't have nothing -- I have nothing to do

6    with Larry Murray --

7        Q.   Let me ask --

8        A.   -- Trucking.

9        Q.   -- the question, please.  Murray --

10       A.   Okay.

11       Q.   -- Brothers, LLC, and Larry Murray Trucking

12   keep their documents in the same basement, don't they?   4:30:04

13       A.   Murray Brothers' documents are in the

14   basement, yes.

15       Q.   And Larry Murray Trucking is either in the

16   garage in the same location or a basement in the same

17   location.  Right?                                    4:30:16

18           MR. HENDERSON:  Same objections.

19   Argumentative.

20           THE WITNESS:  I'd say that's the very good --

21   very good possibility, yes, I'd say, but I wouldn't say

22   -- I wouldn't -- I couldn't tell you for sure.        4:30:25

23   BY MR. DEFFET:

24       Q.   Okay.  Why can't you tell me for sure?

25       A.   Because I don't work --

Page 264

1          MR. HENDERSON:  Objection --

2          THE WITNESS:  -- for Larry Murray Trucking.

3   BY MR. DEFFET:

4      Q.   But it's your brother and you share the same

5   location, the same phone address, correct?          4:30:37

6      A.   This is true.

7      Q.   Okay.

8      A.   Yes.

9      Q.   All right.  And doesn't -- I'm sorry if I'm

10  speaking to the wrong person, but isn't -- is it

11  Larry's wife works both for your company and for Larry

12  Murray Trucking, Inc.?                              4:30:52

13     A.   Yeah.  She does both, yes.

14     Q.   Okay.  And she keeps the records for both

15  companies, right?

16     A.   That's -- she probably does some of that,

17  yes.                                               4:31:04

18     Q.   I mean, she does, right?

19     A.   She does some of that, I'm sure.

20     Q.   Well, what -- what are you not sure about?

21     A.   I'm not sure what Larry Murray Trucking does. 4:31:15

22     Q.   You don't -- okay.  So what work does Larry

23  Murray -- Murray's wife do for Murray Brothers, LLC?

24     A.   She does the billing and stuff for us.  She

25  bills -- she does all the billing for us.          4:31:29

In Demand Electronic Court Reporting, Inc.          www.InDemandReporting.com          (773) 239-6008

```
                                                          Page 265
 1        Q.   Okay.  Where does she do the billing?

 2        A.   In -- in their basement in the office.

 3        Q.   And what's the location?

 4        A.   3548 Rosener Road, Farmington, Missouri.        4:31:43

 5        Q.   And that's the location on the Secretary of

 6   State documents for Murray Brothers, LLC, right?

 7        A.   Yes, sir, it is.

 8        Q.   Okay.  So your documents are kept at that

 9   location, right?                                           4:31:53

10        A.   Yes, sir.

11             MR. HENDERSON:  Asked and answered.

12   BY MR. DEFFET:

13        Q.   That's also the corporate location for Larry

14   Murray Trucking, Inc., correct?                            4:32:00

15        A.   Yes, sir.

16        Q.   Okay.  And is it true there's only one

17   computer that both companies use to do the billing?

18             MR. HENDERSON:  Objection.  Mischaracterizes

19   prior testimony.                                           4:32:10

20             THE WITNESS:  True.

21   BY MR. DEFFET:

22        Q.   And that's Larry Murray's wife.  Correct?

23        A.   Yes.                                             4:32:20

24        Q.   And what is her full name?  I'm sorry.

25        A.   Karen Mur- -- Karen Faye Murray.
```

In Demand Electronic Court Reporting, Inc          www.InDemandReporting.com          (773) 239-6008

Page 266

1      Q.    Okay.  And who pays Karen Murray?

2      A.    I ain't for sure she gets a check.          4:32:33

3      Q.    Does she have ownership of any of the

4   corporations?  For the LLCs?

5          MR. HENDERSON:  I'm going to object as calls

6   for speculation to the extent you're asking about Larry

7   Murray Trucking.  And to the extent you're asking about

8   Murray Bros. Trucking, that question's been asked and

9   answered.                                            4:32:49

10          THE WITNESS:  She has nothing to do with --

11   she -- she has nothing to do with Murray Brothers, LLC.

12   BY MR. DEFFET:

13      Q.    But she -- she --

14      A.    On --

15      Q.    -- does the billing for Murray Brothers, LLC,

16   but you're saying she does not have an official

17   corporate title?                                     4:33:03

18      A.    No.  I mean, she does the billing just to

19   help out.  I mean, I don't know if she draws the check

20   or not.  I don't really know if she does -- I really

21   don't know if she does or not.                       4:33:13

22      Q.    And is that the same computer that the J.J.

23   Keller logs were performed on?

24      A.    Yes, sir.

25      Q.    Okay.  So all this went on on one computer

Page  267

1   for both corporations and the LLC -- all the billing,

2   all the logging, all that stuff was done by one person

3   working for both companies, right?                    4:33:33

4         MR. HENDERSON:  I'm going to object to the

5   extent that he can't answer for what she did for Larry

6   Murray Trucking.

7         THE WITNESS:  I --

8   BY MR. DEFFET:

9         Q.   Go ahead --

10        A.   -- really can't --

11        Q.   -- and answer, please.                      4:33:40

12        A.   I -- I really can't answer for what -- I

13   don't know what she does for Larry.  I'm sure she does

14   a lot for him, but I mean, I can't sit here under oath

15   and say what she does and not really being -- I don't

16   really know.                                          4:33:52

17        Q.   So when you were talking --

18        A.   I know --

19        Q.   -- about the ELD earlier, that was on her

20   computer that you would do the ELD stuff.  Right?     4:34:00

21        A.   Hers or mine.  Yeah, I have one at my house

22   too.

23        Q.   Okay.  Is she the one that actually did the

24   ELD training?

25        A.   No, she is not.                             4:34:12

Page 268

1        Q.   Okay.  How did you train your drivers on

2   those computers?  Which computer were -- were they

3   trained on?

4        A.   Well, we didn't really use a computer, sir.

5   We just used the ELD.  What -- we went through J.J.

6   Keller and had them to walk us through on their --

7   well, they gave you a little tablet.                    4:34:32

8             It's like a little tablet you hook to the

9   device on the truck.

10       Q.   Okay.  So there was a -- there was a tablet

11   that J.J. Keller came to work with you to train you on

12   it?                                                     4:34:43

13       A.   Well, we had to buy it, yes.  Uh-huh.  And

14   each --

15       Q.   Okay.

16       A.   -- truck had one.

17       Q.   Okay.  Who bought those?                       4:34:50

18       A.   Murray Brothers.

19       Q.   Does Larry Murray Trucking and Murray

20   Brothers, LLC, use the same bank accounts at all?

21       A.   No, sir.                                       4:35:01

22       Q.   And what company issues the checks to your

23   workers?

24       A.   Murray Brothers, LLC.

25       Q.   Okay.  What -- what payroll company does

Page 269

1    that?

2         A.    Janice Neubrand does the checks.            4:35:17

3         Q.    She does that for Larry Murray Trucking and

4    Murray Brothers, LLC, right?

5         A.    I don't know if she -- I don't know if she

6    does it for Larry Murray.  He don't have no employees.  4:35:26

7         Q.    Well, he's a -- he -- he's the owner of the

8    company, right?

9         A.    Yeah, but he -- she wouldn't be coming in and

10   doing a payroll check for nobody --

11        Q.    Okay.

12        A.    -- to no one, I mean.                        4:35:37

13        Q.    That's fair.  But she does the -- the tax

14   records and things like that for Larry Murray Trucking

15   and Murray Brothers, LLC, right?

16        A.    That's --

17              MR. HENDERSON:  Objection.

18              THE WITNESS:  -- correct.                    4:35:45

19              MR. HENDERSON:  Calls for speculation.

20   Counselor, is there an end to this?  You -- you went

21   for over three hours earlier.  You said you had a few

22   questions to follow up.                                4:35:52

23              I don't hear any follow-up.  I just hear you

24   reasking your -- reasking questions that you've covered

25   or irrelevant questions that you've left out of your

Page 270

1    first three hours.  So I'd like it if you'd wrap this

2    up at some point.                                        4:36:03

3            MR. DEFFET:  Actually, under the Federal

4    Rules, I can go at least eight hours, so if you'll

5    kindly give me some patience here.  I was given an

6    avalanche of documents this week that were about three

7    weeks late with hundreds of pages of documents.         4:36:18

8            I'm a solo practitioner.  So he can sit and

9    wait while I ask the questions.  If you wanted me to --

10            MR. HENDERSON:  Well --

11            MR. DEFFET:  -- go through this in a timely

12   fashion, maybe you should've served me the discovery in

13   a timely fashion and not give me hundreds of pages of

14   documents at 4 p.m. the night before a federal

15   deposition.  How about that?                            4:36:36

16            MR. HENDERSON:  Counselor, I promise you I

17   didn't give you any documents the night before a

18   deposition.  So I --

19            MR. DEFFET:  Well, maybe --

20            MR. HENDERSON:  -- don't know what --

21            MR. DEFFET:  -- you should learn what's been

22   going on in this case.  Let me finish my questions.  I

23   don't have that much longer to go.                      4:36:47

24            MR. HENDERSON:  That would be great.  You

25   said a half hour ago you had one or two.  Let's go.

Page 271

1          MR. DEFFET:  The relevancy is that both these

2     companies are acting as the same company, and therefore

3     they are both responsible for this accident.          4:36:59

4          That's the relevancy for the record.

5          MR. WILKE:  This is James Wilke.  Move to

6     strike counsel's comments.  It -- it --

7          MR. BLASER:  Join.

8          MR. WILKE:  -- irrelevant.

9          THE RECORDER:  And who joined in that?          4:37:16

10         MR. DEFFET:  Go -- go ahead.  I'm done.

11         MR. WILKE:  James Wilke joined in that.

12         MR. BLASER:  And --

13         THE RECORDER:  Okay.  Thanks.

14         MR. BLASER:  -- Tucker Blaser as well.          4:37:21

15         MR. HENDERSON:  Nathan Henderson did not

16    join.  I want those comments on the record for me.

17         MR. DEFFET:  That's great.  I responded to

18    the objection.  So please go ahead.  I'm done.          4:37:32

19         MR. DRISCOLL:  You're done?

20         MR. HENDERSON:  Oh, you're done?

21         MR. DEFFET:  Yeah.

22         MR. DRISCOLL:  Nathan, I'm going to have

23    hopefully less than five questions.  And I -- and it's

24    for follow-up with Mr. Blaser.          4:37:42

25         MR. HENDERSON:  I --

Page  272

1                     REDIRECT EXAMINATION

2    BY MR. DRISCOLL:

3        Q.   Sir --

4             MR. HENDERSON:   -- appreciate that.

5             MR. DRISCOLL:  No, not a problem.            4:37:46

6    BY MR. DRISCOLL:

7        Q.   Sir, counsel asked you questions as relates

8    to operating authority and whether or not Piramal was

9    acting under their operating authority.  Do you recall

10   that questioning?                                     4:37:57

11       A.   Yes.

12       Q.   Okay.  I just want to clear something up real

13   quick.  It's your understanding that an employee means

14   an individual other than an employer who's employed by

15   an employer and who is in the course of his or her

16   employment directly affects commercial motor vehicle

17   safety.                                               4:38:20

18             Such term includes a driver of a commercial

19   motor vehicle including an independent contractor while

20   in the course of operating a commercial motor vehicle,

21   a mechanic, and a freight handler.                    4:38:32

22             Do you dispute that deposition -- or that --

23   strike that.

24             Do you dispute that description of what an

25   employee is pursuant to the federal motor carrier

Page  273

1    regulations?

2              MR. BLASER:  Objection.

3              THE WITNESS:  No.

4              MR. BLASER:  Vague --

5    BY MR. DRISCOLL:

6         Q.   Okay.                                    4:38:44

7              MR. BLASER:  -- compound.  States a legal --

8    BY MR. DRISCOLL:

9         Q.   So --

10             MR. BLASER:  -- conclusion.

11   BY MR. DRISCOLL:

12        Q.   -- can we agree, sir, that a federal motor

13   carrier who employs independent contractors cannot

14   obviate their responsibility or compliance with those

15   regulations?  True?                                4:39:02

16             MR. BLASER:  Objection.  Calls for a legal

17   conclusion, vague.

18   BY MR. DRISCOLL:

19        Q.   My statement is true, isn't it?

20             MR. BLASER:  Same objection.

21   BY MR. DRISCOLL:

22        Q.   Sir?                                     4:39:11

23        A.   True.

24        Q.   Okay.  And you -- you're not the one that

25   decides whether or not Piramal is operating under their

Page 274

1    designated authority.  True?                              4:39:23

2         A.    True.

3         Q.    All right.  I think it was four questions.

4    Mr. Murray, I appreciate your time.  Thanks a lot.        4:39:31

5         A.    Thank you.

6              MR. HENDERSON:  Sean, I appreciate your

7    efficiency.

8              MR. DRISCOLL:  Yeah.

9              MR. HENDERSON:  We're going to take five

10   minutes, have me look at my notes, see if I have

11   anything.  If I do, we'll be outta here by 4:30, I

12   think, so --                                              4:39:45

13             THE RECORDER:  Going off the --

14             MR. HENDERSON:  -- give me --

15             THE RECORDER:  -- record --

16             MR. HENDERSON:  -- a few to look --

17             THE RECORDER:  -- at 4:11 p.m.

18                  (Off the record)

19             THE RECORDER:  We are back on the record at

20   4:24 p.m.                                                 4:39:52

21             THE WITNESS:  Can you keep this?

22             MR. HENDERSON:  This is Nathan Henderson on

23   behalf of defendants.  We do not have any questions at

24   this time and we will reserve signature.                  4:40:01

25             THE RECORDER:  All right.  Going --

Page  275

1          MR. DEFFET:  James --

2          THE RECORDER:  -- off record --

3          MR. DEFFET:  James doesn't have any

4  questions, right?  We're good?                    4:40:06

5          MR. WILKE:  I have no questions.  No.

6          MR. DEFFET:  Okay, okay.

7          THE RECORDER:  All right.  Going off the

8  record at 4:24 p.m.

9                   (Off the record.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 276

1                    CERTIFICATION

2         I Allyson Pritchard do hereby certify that

3    the foregoing transcript of said deposition is a true,

4    complete and correct report of the entire testimony so

5    given by said witness, together with such other matters

6    and things as counsel for the parties present at the

7    taking of said deposition desire to have appear of

8    record.

9         I further certify that I am not counsel for,

10   nor attorney for any of the parties to the aforesaid

11   cause, nor am I related to any of the parties to the

12   aforesaid cause, nor am I interested in any manner in

13   the said cause or in its outcome.

14

15

16                    Allyson Pritchard

17                    October 30, 2020

18